**Kimberlee C. Morrow**, OSB No. 830280
kcm@hartwagner.com
HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

Of Attorneys for Defendants
City of Eugene, Jairo Solario,
Andrew Roberts, Jacob Thomas,
and Robert Griesel

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ANZHELIKA PAYNE, Personal Representative of the Estate of Landon Jay Payne,<br><br>Plaintiff,<br><br>v.<br><br>JAIRO SOLORIO, et al.,<br><br>Defendants. | 6:22-cv-00471-MC<br><br>DEFENDANT CITY OF EUGENE, JAIRO SOLORIO, ANDREW ROBERTS, JACOB THOMAS, AND ROBERT GRIESEL'S MOTION FOR SUMMARY JUDGMENT<br><br>*Oral Argument Requested* |

**LR 7-1 CERTIFICATION**

The undersigned represents that counsel for defendants City of Eugene, Jairo Solorio, Andrew Roberts, Jacob Thomas, and Robert Griesel has conferred with plaintiff's counsel in a good faith effort to resolve the subject of this motion but was unable to do so. The Court's ruling on this motion is necessary.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

MOTION ..... 1

OVERVIEW ..... 1

SUMMARY JUDGMENT STANDARDS ..... 1

BACKGROUND ..... 2

I. Payne's Arrest ..... 2

II. Policies and Training ..... 9

ARGUMENT AND AUTHORITY ..... 11

I. Section 1983 Claims: Merits ..... 11

A. Fourth Amendment, Excessive Force ..... 11

B. Fourteenth Amendment, Due Process ..... 14

II. Section 1983 Claims: Entity Liability ..... 18

A. Custom or Practice ..... 19

B. Failure to Train as Policy ..... 20

C. Final Policymaker ..... 22

III. Section 1983 Claims: Individual Liability ..... 23

A. Qualified Immunity ..... 23

1. Excessive Force ..... 24

2. Due Process ..... 25

B. Personal Participation; "Supervisory Liability" ..... 26

IV. Tort Claims ..... 27

A. Battery ..... 27

B. IIED ..... 28



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF CONTENTS (*continued*)


C. Negligence .......... 28

D. OTCA Requirements .......... 29

1. Notice of Claim .......... 30

2. Individual Defendants .......... 33

V. Punitive Damages .......... 34

CONCLUSION .......... 34




**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

# TABLE OF AUTHORITIES

## CASES

*Albright v. Oliver*,
510 U.S. 266 (1994) ........................................ 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................ 2

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........................................ 23, 24

*Ballard v. City of Albany*,
191 P.3d 679 (Or. App. 2008) ........................................ 28

*Boedigheimer v. Opel*,
2015 WL 3821041 (D. Or. June 17, 2015) ........................................ 15

*Bower v. Count of Inyo*,
489 U.S. 593 (1989) ........................................ 12

*Boyd v. Benton County*,
374 F.3d 773 (9th Cir. 2004) ........................................ 24

*Bracken v. Douglas County*,
2023 WL 4886971 (D. Or. Aug. 1, 2023) ........................................ 28

*Brungardt v. Barton*,
685 P.2d 1021 (Or. App. 1984) ........................................ 30

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2010) ........................................ 12

*C.O. v. Portland Public Schools*,
406 F. Supp. 2d 1157 (D. Or. 2005) ........................................ 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................ 1

*Chew v. Gates*,
27 F.3d 1432 (9th Cir. 1994) ........................................ 12

*Child v. City of Portland*,
547 F. Supp. 2d 1161 (D. Or. 2008) ........................................ 34



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)

*Christie v. Iopa*,
176 F.3d 1231 (9th Cir. 1999) ... 22

*City of Newport v. Fact Concerts, Inc.*,
453 U.S. 247 (1981) ... 34

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992) ... 15

*Collins v. City of San Diego*,
841 F.2d 337 (9th Cir. 1988) ... 22

*Commissioners of Bryan County, Oklahoma v. Brown*,
520 U.S. 397 (1997) ... 21

*Connick v. Thompson*,
563 U.S. 51 (2011) ... 20, 21

*Coppedge v. City of Hillsboro*,
2022 WL 21828133 (D. Or. Mar. 31, 2022) ... 29

*County of Los Angeles v. Mendez*,
815 F.3d 1178 (9th Cir. 2016) ... 24

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) ... 15

*Cruz-Manjarrez v. City of Portland*,
2007 WL 2607464 (D. Or. Sept. 4, 2007) ... 28

*Davidson v. City of Statesville*,
2012 WL 1441406 (W.D.N.C. Apr. 26, 2012) ... 25

*Deorle v. Rutherford*,
272 F.3d 1272 (9th Cir. 2001) ... 13

*Dunn v. City of Milwaukie*,
348 P.3d 301 (Or. App. 2015) ... 31

*Duyck v. Tualatin Valley Irrigation District*,
742 P.2d 1176 (Or. 1987) ... 31

*Elifritz v. Fender*,
460 F. Supp. 3d 1088 (D. Or. 2020) ... 3, 20



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)

*Estate of Duncan v. Wallowa County Sheriff's Department*,
2020 WL 13749990 (D. Or. Oct. 27, 2020) .......... 31

*Fazzolari v. Portland School District No. 1J*,
734 P.2d 1326 (1987) .......... 29

*Gaston v. Parsons*,
864 P.2d 1319 (Or. 1994) .......... 31

*Gillette v. Delmore*,
979 F.2d 1342 (9th Cir. 1992) .......... 19, 22

*Gordon v. County of Orange*,
888 F.3d 1118 (9th Cir. 2018) .......... 15

*Graham v. Barnette*,
5 F.4th 872 (8th Cir. 2021) .......... 4

*Graham v. Connor*,
490 U.S. 386 (1989) .......... 12

*Griffin v. TriMet*,
870 P.2d 808 (Or. 1994) .......... 29

*Hernandez v. City of Los Angeles*,
96 F.4th 1209 (9th Cir. 2024) .......... 12

*Hicks v. City of Portland*,
2006 WL 3311552 (D. Or. Nov. 8, 2006) .......... 28

*House v. Hicks*,
179 P.3d 730 (Or. App. 2008) .......... 28

*Jett v. Dallas Independent School District*,
481 U.S. 701 (1989) .......... 19

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) .......... 13

*Law v. City of Post Falls*,
772 F. Supp. 2d 1283 (D. Idaho 2011) .......... 13

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) .......... 14



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)


*Lindsay v. Kiernan*,
378 Fed. Appx. 606 (9th Cir. 2010) ........ 13

*Lunneen v. Village of Berrien Springs*,
2022 WL 16569574 (W.D. Mich. Nov. 1, 2022) ........ 25

*Mann v. Department of Transportation*,
836 P.2d 1353 (Or. App. 1992) ........ 32, 33

*Mann v. Taser International, Inc.*,
588 F.3d 1291 (11th Cir. 2009) ........ 15, 16, 17

*Marquez v. City of Phoenix*,
693 F.3d 1167 (9th Cir. 2012) ........ 7, 14

*Martineau v. McKenzie-Willamette Medical Center*,
533 P.3d 1 (Or. 2023) ........ 31

*Mattos v. Agarano*,
661 F.3d 433 (9th Cir. 2011) ........ 24

*Monell v. New York City Department of Social Services*,
436 U.S. 658 (1978) ........ 18, 19

*Moran v. Washington*,
147 F.3d 839 (9th Cir. 1998) ........ 23

*Nattell v. Curry County*,
2013 WL 5372539 (D. Or. Sept. 23, 2013) ........ 29

*Nelson v. Pima Community College*,
83 F.3d 1075 (9th Cir. 1996) ........ 2

*Oklahoma City v. Tuttle*,
471 U.S. 808 (1985) ........ 20

*Ortez v. Washington County*,
88 F.3d 804 (9th Cir. 1996) ........ 26

*Oviatt v. Pearce*,
954 F.2d 1470 (9th Cir. 1992) ........ 21

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ........ 20




**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)

*Phillips v. Hust*,
477 F.3d 1070 (9th Cir. 2007) ........ 23

*Price v. City of Sutherlin*,
945 F. Supp. 2d 1147 (D. Or. 2013) ........ 28

*Rice v. Morehouse*,
989 F.3d 1112 (9th Cir. 2021) ........ 13

*Rodriguez-Bonilla v. Ivey*,
2023 WL 2375217 (M.D. Fla. Mar. 6, 2023) ........ 25

*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022) ........ 15

*Saberi v. City of Portland*,
2006 WL 2707995 (D. Or. Sept. 18, 2006) ........ 27

*Saucier v. Katz*,
533 U.S. 194 (2001) ........ 23, 24

*Sharp v County of Orange*,
871 F.3d 901 (9th Cir. 2017) ........ 24

*Shilo v. City of Portland*,
2005 WL 3157563 (D. Or. Nov. 22, 2005) ........ 27

*Smalls v. Binner*,
2016 WL 1305201 (W.D. Va. Apr. 1, 2016) ........ 25

*Taylor v. List*,
880 F.2d 1040 (9th Cir. 1989) ........ 26

*Thomas v. Deschutes County*,
2022 WL 2704176 (D. Or. July 12, 2022) ........ 29

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996) ........ 20

*U.S. v. Leon*,
468 U.S. 897 (1984) ........ 12

*Uruo v. Clackamas County*,
997 P.2d 269 (Or. App. 2000) ........ 31



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)

*Walden v. Dawson*,
2014 WL 5810824 (D. Or. Nov. 7, 2014) .......... 29

*Walthers v. Gossett*,
941 P.2d 575 (1997) .......... 27

*West v. Atkins*,
487 U.S. 42 (1988) .......... 11

*West v. DeKalb County Georgia*,
2024 WL 1010672 (N.D. Ga. Feb. 2, 2024) .......... 25

*Whitfield v. TriMet*,
2009 WL 839484 (D. Or. Mar. 30, 2009) .......... 27

*Wimett v. Sothern*,
2013 WL 3973866 (D. Or. July 31, 2013) .......... 22, 34

*Woods v. Gutierrez*,
2012 WL 6203170 (D. Or. Dec. 12, 2012) .......... 27

*Woodward v. City of Gallatin, Tennessee*,
2013 WL 6092224 (M.D. Tenn. Nov. 19, 2013) .......... 25

*Yela Fiduciary Services, LLC v. Benton County*,
2023 WL 5018218 (D. Or. Apr. 12, 2023) .......... 15

STATUTES

42 U.S.C. § 1983 .......... 18

ORS 161.233 .......... 28

ORS 30.020 .......... 31

ORS 30.269 .......... 34

ORS 30.272 .......... 34

ORS 30.275 .......... 30

ORS 426.228 .......... 4



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

TABLE OF AUTHORITIES (*continued*)

RULES

FRCP 56 .......... 1

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV .......... 12

U.S. Const. amend. VIII .......... 14

U.S. Const. amend. XIV .......... 15



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

## MOTION

The defendants City of Eugene, Jairo Solorio, Andrew Roberts, Jacob Thomas, and Robert Griesel move for summary judgment under Rule 56 against each of Plaintiff's claims. This motion is supported by the legal argument below; the accompanying declarations of Kimberlee Morrow, Jennifer Reynolds, Clifford Sites, Chris Skinner, Jairo Solorio, Andrew Roberts, Jacob Thomas, and Robert Griesel, with attached exhibits; and the pleadings and record on file.

## OVERVIEW

High on methamphetamines, Landon Payne resisted his arrest by city police officers on an arrest warrant. The officers handcuffed Payne following a brief struggle. Because they had used a taser to help subdue him, the officers called medics to evaluate whether it was safe to transport Payne to the county jail. The medics concluded that it was. Almost an hour after his arrest, Payne suffered a cardiac arrest at the jail, and died two days later. A medical examiner could not determine what had caused the cardiac arrest but listed methamphetamines, "excited delirium," and chronic heart problems as likely contributing factors.

The complaint bases its many claims on two allegations. One, that the officers used excessive force. And two, that they should have transported Payne to a hospital rather than jail. The defendants are entitled to summary judgment. The minimal force the officers used to arrest the resisting Payne was clearly reasonable. Meanwhile, the officers could not have known that Payne would suffer a cardiac arrest. They called medics, who evaluated Payne and determined that it was safe to transport him to jail.

## SUMMARY JUDGMENT STANDARDS

A court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The mere existence of a factual dispute between the parties is insufficient to defeat a motion for summary judgment. "Likewise, mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima*



HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

*Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). Instead, to defeat a motion for summary judgment, the non-moving party must show that there is a genuine issue of fact, which means that the disputed evidence would be sufficient to support a reasonable jury verdict. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 245–52 (1986). As described below, there are no genuine issues of material fact which would allow Plaintiff to proceed to trial, and Defendants are entitled to summary judgment as a matter of law on Plaintiff's claims.

## BACKGROUND

### I. Payne's Arrest

Landon Payne lived in northeast Eugene with his wife, Anzhelika, or Angie, her two parents, and her two children by a prior marriage. Beginning at 9:28 on the evening of March 27, 2020, three of their neighbors began making emergency 9-1-1 calls. They variously reported how a man was screaming "help me, someone's trying to murder me!" somewhere near the Payne household. (Reynolds Declaration Exhibits 1–4.) Angie placed a 9-1-1 call of her own at 9:29, saying that she had an "emergency." Namely, that Payne was "acting crazy," and screaming that his family was "going to kill him!" She also reported that he was probably high on methamphetamines. (Reynolds Decl. Ex. 5.) Dispatchers immediately began to route Eugene police officers to the scene. (Solorio Decl. ¶ 4; Thomas Decl. ¶ 4; Roberts Decl. ¶ 4.)

Angie had asked the dispatcher to send "CAHOOTS," or Crisis Assistance Helping Out On The Streets. (Reynolds Decl. Ex. 5.) CAHOOTS is a mobile crisis and medic response unit funded by the police department, but staffed by personnel from the White Bird Clinic, a community health provider. It provides mobile social services, crisis counseling, and non-emergency medical transport to the intoxicated or mentally ill, thereby relieving police officers from tasks better suited to those with more relevant training. Each mobile CAHOOTS "team" includes a social worker and a medic. (Solorio Decl. ¶ 5.)

The dispatcher told Angie that she would put in a request for a CAHOOTS team, but that police officers would likely be the first to arrive. Angie stayed inside on the line with the dis-



HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

patcher as she waited. During this time, Angie told Payne that she had called CAHOOTS and that the "police were coming." Payne could be heard to say that he "didn't want to go." The call ended at about 9:43. (Reynolds Decl. Ex. 5.)

City of Eugene police officers Jairo Solorio, Jacob Thomas, and Andrew Roberts began arriving at 9:44.[1] (Solorio Decl. ¶ 6; Thomas Decl. ¶ 5; Roberts Decl. ¶ 5.) Solorio approached Payne and Angie, who were standing outside the home on the porch. He began talking to Payne, who said that his "household was threatening to have him killed." Though obviously delusional, paranoid and agitated, Payne was no longer screaming. Solario asked how he could help. Payne continued to say that if he stayed at the house he would be "killed." (Solorio Bodycam 9:46–48.) Meanwhile, Angie had left the porch and was talking to Roberts nearby. She said that her husband was acting "crazy," and that he was not "sober." She reported, however, that she did not feel threatened by Payne, and that he had not been acting aggressively towards her or anybody else in the home. (Roberts Bodycam 9:46–48.)

Thomas joined Solorio as he continued talking to Payne on the porch. (Thomas Bodycam 9:47.) At about 9:48, Solorio asked again how they could help. Payne responded by asking if he could go inside and gather his belongings so that he could go to the White Bird Clinic while its personnel arranged "housing" for him. Solorio informed Payne that the clinic was closed for the evening. And as he would later repeat to Angie, he said that he did not think that either White Bird or any other social services facility were currently operating due to the Covid-19 pandemic, only then weeks old. (Solorio, Thomas Bodycam 9:48–50.) Knowing that White Bird was closed, Angie told Roberts that she was unsure how they could help, and asked what could be done. Roberts acknowledged that it would be best if Payne could be removed from the home and given some medical treatment. (Roberts Bodycam 9:46–56.)

---

1 Various body-worn and other cameras captured most of the events described below. The resulting videos have been submitted to the court along with this motion. These videos are imprinted with a running timestamp which aids in locating the relevant portions. On summary judgment, when video has captured the facts, courts should view those facts "in the light depicted in the video." *Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1106 n. 9 (D. Or. 2020).



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

By statute, a police officer can only arrest a person and take him to a medical facility for a mental health evaluation or treatment if he has "probable cause to believe that the person is dangerous to self or others." ORS 426.228(2)(a). This officer–hold statute is designed to comply with the dictates of the Fourth Amendment. *See, e.g.*, *Graham v. Barnette*, 5 F.4th 872, 886 (8th Cir. 2021) (surveying cases providing that officer–hold arrests are lawful only if there is probable cause to believe that the arrestee is a "danger to himself or others"). To assess whether they could arrest Payne and take him for treatment under the officer–hold statute, Roberts asked Angie whether she thought Payne was a "danger to himself or anybody else." Angie said that he was not. (Roberts Bodycam 9:48, 9:51.)

Roberts responded by explaining that since Payne had not committed any crime they would be unable to "take him into custody and force him to go" anywhere for evaluation or treatment. They could, however, take Payne to be evaluated or treated if he consented. To that end, Roberts told Angie that a CAHOOTS team might have better luck at convincing Payne since he was likely to be "more cooperative" with them. (Roberts Bodycam 9:51–52.)

While Roberts talked to Angie, Solorio continued to ask Payne how they could help considering that White Bird or any similar facility was likely closed. He asked whether he would be willing to talk with a CAHOOTS team. Payne was willing. But he also kept repeating how he wanted to gather his belongings so that he could go to White Bird. Solorio kept telling him that that it was closed. (Solorio Bodycam 9:50–56.) At 9:56—after talking with Payne for more than 10 minutes—Solorio left him on the porch and walked over to Roberts and Angie. (Solorio Bodycam 9:56.) Thomas stayed on the porch and tried to talk to Payne, but he was reluctant to engage. Payne sat down at 9:57. (Thomas Bodycam 9:56–10:01.)

Angie repeated to Solorio some of what she had told Roberts, including how Payne had not made any threats, and how in her view Payne did not pose any threat to himself or others. Together with Angie, the officers continued to weigh their options considering that they could not take Payne into custody under the officer–hold statute, and that there was seemingly no clinics open. Solorio again mentioned CAHOOTS. (Solorio, Roberts Bodycam 9:56–10:01.)



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

Overhearing Solorio's remark about CAHOOTS, Payne said that he was unaware of the service. Angie told him that they were affiliated with White Bird, and that they could help. Thomas, still standing on the porch by Payne, gave him a lengthy explanation of what CAHOOTS was and the services it offered. (Thomas Bodycam 9:59–10:02.) Meanwhile, at 9:59, one of the officers put in a call to ensure that a CAHOOTS team was coming. (Solorio Decl. ¶ 8.) After they talked some more, Solorio and Angie approached Payne on the porch and told him that a CAHOOTS team was on its way. They reiterated that White Bird—which Payne was still insisting on—and any other similar facility was closed either because of the time of day or the pandemic. (Solorio, Thomas Bodycam 10:01–07.)

The three officers and Angie continued talking to Payne on the porch until 10:07, when Angie went inside the house. The officers stood by and observed Payne on the porch until the CAHOOTS team arrived at about 10:09. (Solorio, Thomas, Roberts Bodycam 10:07–09.) When the team arrived, Roberts informed Thomas on the side that it appeared Payne was subject to an arrest warrant. (Roberts, Thomas Bodycam 10:09; Solorio Decl. ¶ 9; Thomas Decl. ¶ 7; Roberts Decl. ¶ 6.)

Thomas greeted the CAHOOTS team, comprising Tatanka Maker, the social worker, and Henry Cakebread, the medic. (Cakebread Deposition 21:11–15.) Thomas told them that Payne had a history of drug use, seemed to be under the influence, and that though he had been screaming he was now calmer even if he was anxious, paranoid, and delusional. Thomas also told them that Payne wanted to go to White Bird. Maker confirmed that it was closed due to the pandemic, along with every other similar facility, and that the hospital would be the only option. (Thomas Bodycam 10:09–12.) While Thomas talked to the CAHOOTS team, Solario, Roberts, and Angie—by now outside again—continued talking to Payne, trying to convince him to accept whatever help the team might be able to offer. (Solario, Roberts Bodycam 10:09–12.)

The CAHOOTS team began talking to Payne and Angie at 10:12. Payne started by saying he was looking for "temporary housing" because he had been "attacked" and was being "evicted." Observing now for herself that Payne was likely high on methamphetamines, Maker



HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

asked how he would "feel about seeing a doctor," and explained that they could transport him to a hospital. Payne said that he "did not need to do that." He again mentioned White Bird, and was again told that it was closed, which was why, Maker said, she had suggested a hospital. Angie continually explained to her husband that all the other options he kept mentioning besides a hospital were either not practical or not possible. Ultimately, Payne refused to be transported to a hospital. (Solorio, Thomas, Roberts Bodycam 10:12–16; Solorio Decl. ¶ 10; Thomas Decl. ¶ 6; Roberts Decl. ¶ 7; Cakebread Depo. 35:5–11, 35:18–36:4; Maker Depo. 46:6–14, 47:23–48:1, 49:3–8, 50:2–12, 50:14–51:10, 79:22–80:7.) At about 10:16, the CAHOOTS team began talking to Angie alone, on the far side of the CAHOOTS van.

While the CAHOOTS team talked with Payne and Angie, the officers talked amongst themselves about the warrant. (Solorio, Thomas, Roberts Bodycam 10:12–16.) Solorio had confirmed with dispatch that there was indeed a warrant commanding Payne's arrest. (Solorio Decl. ¶ 9; Thomas Decl. ¶ 7; Roberts Decl. ¶ 6.) As the CAHOOTS team continued talking to Angie, the officers talked with Payne. He repeated that he did not want them to transport him to a hospital, and that he preferred to go inside—even though there were children in the house—so that he could grab his belongings and leave. (Solorio, Thomas, Roberts Bodycam 10:16–18.)

Under department policy, officers must arrest someone subject to an arrest warrant. They do not have any discretion to cite in lieu of an arrest. (Morrow Decl. Ex. 10.) So beginning at 10:18:09, the three officers attempted to arrest Payne on his warrant. (Solorio, Thomas, Roberts Bodycam 10:18; Solorio Decl. ¶ 11; Thomas Decl. ¶ 8; Roberts Decl. ¶ 8.) As they reached for his arms, Payne pulled them up, and moved away. Solario and Roberts, grabbing for Payne's arms, instructed him to put them down. Thomas, meanwhile, had drawn his taser, and told Payne to get on the ground or he would be tased. He did not. Solorio and Roberts wrestled him to the ground where Payne—a large man—continued to struggle, now kicking, thrashing, and trying to stand up. After several warnings, Thomas fired his taser into Payne's lower back. (Solorio, Thomas, Roberts Bodycam 10:18–21; Thomas Decl. ¶¶ 9–11; Cakebread Depo. 38:24–39:6, 39:13–18, 79:6–20; Maker Depo. 55:19–56:18.)



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

A taser works in one of two ways. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012) (explaining how a taser works). First, it can fire a pair of dart-like electrodes, or probes. If they attach to a person and are spaced far enough apart, they disrupt the target's ability to voluntarily control his muscles, thereby rendering him incapacitated. However, owing to the short distance between Payne and Thomas when the latter fired his taser, the probes attached too close together, and were therefore ineffective. (Thomas Decl. ¶ 11.) Because a taser can fire its probes only once before being reloaded, Thomas resorted to using the taser in the other way it works, so-called "drive-stun" mode. (Thomas Decl. ¶ 12.)

In that mode, the taser is held against a person and discharged. Unlike probes, a drive-stun has no ability to incapacitate. Rather, a drive-stun is a pain-compliance technique. After the probes failed to incapacitate Payne, Thomas discharged his taser in drive-stun mode three times against Payne's thigh and lower back, for a total of between 15 and 17 seconds.[2] (Thomas Decl. ¶¶ 12–14.) Meanwhile, Solorio and Roberts kept instructing Payne to "stop resisting arrest," and to "stop fighting," as they continued trying to gain control. (Solorio, Thomas, Roberts Bodycam 10:18–21.)

The officers successfully placed handcuffs on Landon by 10:20:33, about two and a half minutes after they first began the arrest. On placing the handcuffs, they rolled Payne over from his stomach onto his side. (Solorio, Thomas, Roberts Bodycam 10:20–22.) Solorio then retrieved his patrol car, and drove up to where Payne lay. At the same time, the officers notified dispatch that they had used a taser, and would therefore need a supervisor to begin evaluating that use of force, and a medic to ensure that it was safe to transport Payne to jail. (Solorio Bodycam 10:22–23; Solorio Decl. ¶ 12.)

At 10:23:48, the officers sat Payne up on the grass, and 30 seconds later they stood him up and walked him over to Solorio's patrol car. They placed Payne in the car at 10:26:12.

---

2 The taser log shows four drive-stun discharges. (Griesel Depo. 75:21–76:4, 78:9–13 & Depo. Ex. 271; Thomas Decl. ¶¶ 9–10.) However, at least one of those discharges did not make contact. (Thomas Decl. ¶¶ 13–14.)



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

(Solorio, Thomas, Roberts Bodycam 10:23–26; Solorio Car 10:26; Solorio Decl. ¶ 7.) He was still breathing heavily and agitated, so Solorio and Thomas tried to calm him down. (Solorio, Thomas Bodycam 10:23–28.) At 10:28, Thomas brought Payne a bottle of water and kept offering it, but he refused. (Thomas Bodycam, Solorio Car 10:28.)

Sergeant Robert Griesel arrived at about 10:31 in response to Solorio's request for a supervisor. (Griesel Bodycam 10:31; Griesel Decl. ¶¶ 4–5; Solorio Decl. ¶ 13.) The CAHOOTS team left at 10:33. (Solorio Bodycam 10:33.) In the car, Payne became increasingly agitated, and began to alternate between screaming and sobbing by about 10:34. (Solorio Car 10:28–34.) Medics along with an ambulance arrived by 10:40 to assess whether it was safe to transport Payne to jail. They began that assessment one minute later. (Solorio, Thomas, Roberts, Griesel Bodycam 10:40–41; Solorio Decl. ¶ 13; Thomas Decl. ¶ 16; Roberts Decl. ¶ 7; Griesel Decl. ¶ 6.)

The medics attached a cuff around Payne's upper arm to gather his blood pressure and other metrics, but Payne was "moving around too much" in the car to get a reading. After observing him until 10:45, the medics told officers that Payne was "healthy enough to transport" to jail. (Thomas, Roberts, Griesel Bodycam, Solorio Car 10:41–45; Solorio Decl. ¶ 13; Thomas Decl. ¶ 17; Roberts Decl. ¶¶ 9–10; Griesel Decl. ¶¶ 6–7.) Solorio, Thomas, and Griesel then conferred with Angie. Solorio explained that they had called medics not necessarily because they believed Payne needed medical treatment, but to ensure that it was safe to transport him to jail. They also told her that the jail had a medical staff, and that they would be able to evaluate Payne more completely in a controlled environment. If they determined that Payne needed medical treatment which they were unequipped to provide, Griesel explained, then Payne could be transported from the jail to a hospital. (Solorio, Thomas, Griesel Bodycam 10:43–46; Solorio Decl. ¶ 15; Thomas Decl. ¶ 18; Roberts Decl. ¶ 11; Griesel Decl. ¶ 8.)

Solario left with Payne for the jail at 10:47. (Solorio Car 10:47; Solorio Decl. ¶ 16; Thomas Decl. ¶ 19; Roberts Decl. ¶ 11; Griesel Decl. ¶ 9.) During the 13-minute ride, Payne continued to scream and sob. They arrived at the Lane County Jail in downtown Eugene just after 11:00. (Solorio Car 10:47–11:00.) At 11:07, a county deputy entered the front passenger seat



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

of Solorio's car and tried talking to Payne, but he continued to just scream. At 11:10, while Solorio stood off to the side at a distance, deputies removed the still-screaming Payne from the car. (Solario Car 11:07–11:10.)

As alleged in the complaint, Payne suffered a cardiac arrest a few minutes later while county deputies restrained him. He died two days later. (Amended Complaint ¶¶ 104–120). Following an autopsy and an investigation, the medical examiner was unable to determine the cause of Payne's cardiac arrest. However, a toxicology screening revealed significant levels of methamphetamines in Payne's system. Though he could not determine a cause, the examiner listed methamphetamines, "excited delirium," an enlarged heart, and a diseased heart valve as likely factors contributing to the cardiac arrest. (Sites Decl. Ex. 2.)

A detective called Angie on April 5 as part of the investigation into Payne's death. She told the detective, as she had told the officers, that Payne "was not a danger to us…[or] to himself." She also recounted how Payne started screaming after being tased, and that when the officers put him in Solorio's car, "it looked like he was about to have a heart attack." She was upset that the officers took Payne to jail because "more could be done for him if they took him right away to the hospital." (Sites Decl. Ex. 1.) Putatively acting in her capacity as the personal representative of Payne's estate, Angie filed the original complaint on March 27, 2022. She filed the operative amended complaint on January 8, 2024.

## II. Policies and Training

The Eugene Police Department has adopted many policies which govern police officer conduct. The department educates its officers on all its policies and on any updates to those policies, and it has in place various mechanisms to ensure that officers abide by these policies. (Solorio Decl. ¶¶ 17–20; Thomas Decl. ¶¶ 20–21; Roberts Decl. ¶¶ 13–14; Skinner Decl. ¶¶ 5–7.) Of relevance, the department has adopted policies on the use of force, and the use of tasers. The use of force policy authorizes officers to use force to effect an arrest, if necessary, but only an amount of force that complies with the law, department policy, and training. The policy



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

describes how force complies with the law when it is reasonable, considering the circumstances. The policy also has a section on "medical attention" which describes how medical personnel should examine any arrestee exhibiting symptoms of "excited delirium" prior to transport in a patrol car. The use of force policy anticipates that the force used might include a taser, covered under a separate policy. (Morrow Decl. Ex. 11.)

The policy on taser use specifies that only officers who have been trained on tasers may carry them, and that officers must be recertified in taser use annually. The policy authorizes taser use in accordance with the use of force policy. In particular, the policy authorizes taser use when an officer determines based on the circumstances that a taser is a reasonable means to subdue an arrestee. It prohibits the use of a taser on those who are known to be or who are obviously medically fragile, unless they pose a danger or cannot be safely controlled with other available force options. The policy also prohibits the use of a taser against a person who is "only in passive or static resistance to arrest." When a taser has been used, the policy requires officers to call medics to evaluate arrestees. (Morrow Decl. Ex. 12.)

Prior to Payne's arrest, each of the defendant officers received extensive training as cadets at the respective police academies they attended, as probationary officers newly hired by the department, and continuing later, after becoming police officers. Each officer has supplied a declaration which details the training they have received.

But in short, the training includes use of force training, and training on taser use. The use of force training is designed to instruct officers to only use an amount of force reasonably necessary to gain control. The taser training involves in-class training and practical exercises, and instruction on the proper use and function of a taser, the circumstances in which a taser may be deployed, reporting requirements for taser use, and how medics must be summoned following any taser use. In addition to this training, officers receive training on de-escalation techniques, mental health crises response and crisis intervention, basic first aid, and how to recognize behaviors that in totality are commonly referred to as "excited delirium." The crisis response and intervention training instructs officers on how to recognize mental health issues, identify a mental



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

health crisis, and on how to communicate, interact, or otherwise deal with people in an elevated mental state, such as those who are mentally ill or intoxicated. (Solorio ¶¶ 17–28; Thomas Decl. ¶¶ 20–31; Roberts Decl. ¶¶ 13–23; Griesel Decl. ¶ 10; Skinner Decl. ¶¶ 3–7.)

## ARGUMENT AND AUTHORITY

The complaint asserts claims against the defendants City of Eugene and officers Solorio, Roberts, Thomas, and Griesel. The complaint also asserts claims against Lane County and thirteen deputies. Two of these claims are brought under 42 U.S.C. section 1983: one is for an alleged deprivation of Payne's Fourth Amendment rights, while the other is for an alleged deprivation of his "8th and/or 14th Amendments" rights. The remaining claims are tort claims for battery, the intentional infliction of emotional distress, and negligence.

The claims against the city and its officers are based on two general allegations. One, that the officers used excessive force in arresting Payne. And two, that the officers did not provide him adequate medical treatment. The claims against the county and its deputies are similarly based on allegations that they used excessive force in restraining Payne on his arrival at the county jail, and that they failed to provide him with adequate medical treatment.

### I. Section 1983 Claims: Merits

A Section 1983 claim must be based on the alleged deprivation of a federal right. A Section 1983 claim necessarily fails if the plaintiff fails to establish that he was deprived of the alleged federal right on which the claim is based. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *West v. Atkins*, 487 U.S. 42, 48 (1988). The Section 1983 claims here must be dismissed because Plaintiff failed to establish that defendants deprived Payne of any rights secured by either the Fourth, Eighth, or Fourteenth Amendments.

#### A. Fourth Amendment, Excessive Force

Plaintiff asserts claims under the Fourth Amendment based on allegations that the defendant police officers employed "excessive force" in arresting Payne. (*See, e.g.*, Amended



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

Complaint ¶¶ 138, 141.) The complaint does not specifically allege why the force was excessive. But presumably the claim is based on the use of a taser to subdue Payne.

The Fourth Amendment protects against "unreasonable…seizures." U.S. Const. amend. IV. The basic elements of a Fourth Amendment claim include, accordingly, that the plaintiff was seized, and that the seizure was unreasonable. *Bower v. Count of Inyo*, 489 U.S. 593, 596 (1989). Having been arrested, Payne was unquestionably seized. In contrast to a warrantless arrest, an arrest conducted pursuant to a warrant is presumptively lawful. *U.S. v. Leon*, 468 U.S. 897, 922 (1984). An otherwise lawful seizure can nonetheless be unreasonable if officers used excessive force. To determine whether the force used was excessive, a court balances the arrestee's interests to be free from that force against the "countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

This balancing of interests must be undertaken with two principles in mind. First, that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1216 (9th Cir. 2024). Second and relatedly, "the calculus of reasonableness must [allow] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

In balancing the arrestee's and the government's respective interests, a court first evaluates the type and amount of force the government used. *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). "Deadly" force occupies the furthest end of the force continuum. By comparison, a taser deployed in probe mode is an "intermediate or medium"—but still "significant"—level of force considering its ability to incapacitate an arrestee by overcoming his nervous system, causing involuntary muscle contractions. *Bryan v. MacPherson*, 630 F.3d 805, 825–26 (9th Cir. 2010).

Thomas attempted to use his taser in probe mode, but the darts were spaced too close together to have the intended incapacitating effect. Thomas then used his taser in drive-stun mode



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

three times, discharging it in total for between 15 and 17 seconds. Because drive-stun mode is effectively a pain-compliance technique it constitutes a lesser, but still non-trivial, level of force compared to probe mode. *Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1294 (D. Idaho 2011) (commenting on this distinction between taser modes made by the Ninth Circuit).

The government's interest in the use of force is based on the totality of the circumstances. But a non-exhaustive list of factors to consider include: the need for the force; the extent of the plaintiff's injury, if any; efforts to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; whether the plaintiff was actively resisting; and whether a warning was given beforehand. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Rice v. Morehouse*, 989 F.3d 1112, 1121–22 (9th Cir. 2021).

The government's interest here in using a taser in drive-stun includes, most prominently, that Payne was a large man known to be high on methamphetamines who actively resisted and struggled against his arrest for more than two minutes even though he was warned repeatedly to stop resisting or he would be tased. When an officer has warned the arrestee that he would employ force if he does not stop resisting, but the arrestee refuses to comply, the government has an increased interest in the use of force, partly because of the safety risk to both officers and the arrestee. *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

Cases involving scenarios like those here have found that the use of a taser was reasonable. Even when the crimes involved are relatively minor, the salient fact rendering the use of a taser in either probe or drive-stun mode reasonable is the arrestee's continued obstinance. For example, in *Lindsay v. Kiernan*, 378 Fed. Appx. 606 (9th Cir. 2010), officers responded to a gas station clerk's complaint about a belligerent, intoxicated man on the premises. When the officers attempted to restrain the man, he "barreled through" them. After issuing a warning, an officer deployed taser probes. Though the probes caused the man to fall to the ground, he refused commands to offer his hands for cuffing. The officer then cycled current through the probes a second time. The court held that the man's belligerence and his repeated refusal to comply justified the taser use.



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

And in *Marquez*, officers used a taser in probe mode on a deranged man who refused to comply with their orders to release his grandchild. Because the probes were spaced too close together, they did not have the intended incapacitating effect. Over the next three minutes, as they attempted to gain control of the struggling man, officers used the taser in drive-stun mode, making contact a minimum of seven times. The officers ceased tasing the man after successfully placing handcuffs on him. Shortly after, the man went into cardiac arrest and died from what the medical examiner determined to be "excited delirium" and underlying heart disease. The court held that the taser use was reasonable, in part, because the officers had warned the man that he would be tased if he did not comply, but then he continued to actively resist arrest. *Marquez*, 693 F.3d at 1171–72, 1174–76 & n. 7.

Like the arrestees in *Lindsay* and *Marquez*, Payne actively resisted his arrest, struggled with officers as they attempted to arrest him, and refused orders to stop resisting. Given the circumstances, officer Thomas' use of a taser in drive-stun mode three times to help subdue Payne until he was successfully handcuffed was—as the courts in *Lindsay* and *Marquez* held—therefore reasonable. Because the force the officers used to arrest Payne was reasonable, he was not deprived of his Fourth Amendments rights.

**B. Fourteenth Amendment, Due Process**

The first, third, and eleventh claims are for deprivations of Payne's "8th and/or 14th Amendments" rights. These claims are generally based on allegations that the city and its officers deprived Payne of these rights by transporting him to the county jail rather than to a hospital. (*See*, *e.g.*, Amended Complaint ¶ 126.)

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. However, this only applies to prisoners who have been convicted and sentenced. A pre-conviction detainee like Payne has no rights under the Eighth Amendment. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Any Section 1983 claim asserted under the Eighth Amendment must therefore be dismissed. *Boedigheimer v. Opel*, 2015 WL 3821041 at *1 (D.



HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

Or. June 17, 2015) (dismissing a Section 1983 claim for an alleged deprivation of Eight Amendment rights asserted by a pre-conviction detainee). Section 1983 claims by pre-conviction detainees based on allegations of constitutionally inadequate medical care are assessed under the Due Process Clause of the Fourteenth Amendment. *See, e.g., Yela Fiduciary Services, LLC v. Benton County*, 2023 WL 5018218 at *7 (D. Or. Apr. 12, 2023).

The Due Process Clause prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In addition to guaranteeing procedural due process, this also creates a right to so-called substantive due process. A substantive due process claim can challenge an official's misconduct. If a recognized "fundamental right" is at stake, an official will have denied the plaintiff due process if his misconduct was sufficiently egregious. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). To be sufficiently egregious, the conduct must be "so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 847 n. 8. This standard ensures that the Due Process Clause does not become "a font of tort law," *id*. at 848, or "a guarantee against incorrect or ill-advised" decisions, *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).

Accordingly, a pre-conviction detainee asserting a claim for inadequate medical care under the Due Process Clause must show 1) that he faced "a substantial risk of suffering serious harm," 2) that the defendant "did not take reasonable available measure to abate that risk, even though…the consequences [were] obvious," and 3) a causal link between the plaintiff's injury and the official's deliberate indifference. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). The second element is an objective standard, measured by whether "a reasonable official in the circumstances" would have known that the consequences were obvious. *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022). In short, this standard requires a plaintiff to prove "something akin to reckless disregard." *Gordon*, 888 F.3d at 1125.

A remarkably similar claim to the one asserted here illustrates why the defendants did not deprive Payne of his due process rights. In *Mann v. Taser International, Inc.*, 588 F.3d 1291 (11th Cir. 2009), a woman named Fairbanks was high on methamphetamines. She became



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

"agitated and delusional," entered a neighbor's home, called 9-1-1, and claimed that the neighbors were in *her* house. Fairbanks then began ransacking and damaging the home. Police officers responded to the call and found Fairbanks outside, screaming, in a state of "excited delirium." The officers knew her to be a user of methamphetamines. *Id*. at 1298–99. Fairbanks' mother and sister, both present at the scene, told the officers that she "had mental problems," "needed help," that she was "sick," and that she "needed to go to the hospital instead of jail." *Id*. at 1299–1300.

At first Fairbanks was cooperative with the officers. And she initially complied with their attempt to arrest her. But when the officers placed handcuffs on her Fairbanks became combative. During the ensuing struggle, officers tased Fairbanks three times, and eventually gained control. They called medics as a precautionary measure. On arriving, the medics were unable to examine Fairbanks "because of her combative nature." *Id*. at 1300. They nonetheless concluded that "she was not in any immediate medical distress since she was talking, breathing, and responding." The officers believed that the medics approved her transport to jail. *Id*.[3]

Fairbanks continued "screaming" during the 10-minute ride to jail, except the last few seconds, when she stopped. On removing Fairbanks from the patrol car, the officer found her "unresponsive with labored breathing." The jailers called medics, who transported her to a hospital. Shortly after arriving she suffered a cardiac arrest and died. The medical examiner determined that her cardiac arrest was caused by hyperthermia, that is, excessive body heat. The mother asserted a Section 1983 due process claim based on allegations that the officers should have transported Fairbanks to a hospital rather than a jail. *Id*. at 1300–01.

The court assumed there was a question about whether Fairbank's methamphetamine use coupled with her "excited delirium" meant that she faced a substantial risk of suffering serious harm. *Id*. at 1306–07. It then considered whether the officers were deliberately indifferent to that risk, found that they were not, and dismissed the claim on summary judgment. The court used two broad observations in concluding that the officers were not deliberately indifferent.

---

3 There was some dispute about whether the medics had, in fact, approved her transport to jail. But there was no dispute about whether the officers at least believed they did.



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

First, they did not and could not have known that Fairbanks was at risk of imminent death, or that her behavior was indicative of anything other than typical methamphetamine use. Second, the officers could not possibly have been deliberately indifferent to whether Fairbanks needed medical attention considering that they had called *medics*, and when those medics determined that Fairbanks was not in medical distress, let alone at risk of death from hyperthermia. *Id*. at 1308.

The officers here were not deliberately indifferent for the same reasons as in *Mann*. They could not have known that Payne would suffer a cardiac arrest shortly after his arrival at the jail. They knew Payne was likely high on methamphetamines. And after his arrest, they knew that he screamed and sobbed uncontrollably. But agitated methamphetamine users do not need to be—and in fact they are not—transported to hospitals as a matter of course. To the contrary, they are regularly arrested and transported to jail where they do not suffer cardiac arrests.

Moreover, even after an autopsy, the medical examiner could not determine the precise cause of Payne's cardiac arrest. But he listed Payne's underlying, chronic heart conditions as a contributing cause. There is no evidence the officers were aware of these heart conditions. There is no evidence that *Payne* was aware of his underlying heart conditions. The officers did not violate Payne's due process rights unless it was *obvious* to them that he would suffer a cardiac arrest if not provided with medical treatment. There is nothing to suggest that it was or should have been obvious to the officers that Payne would suffer a cardiac arrest, especially when not even an autopsy revealed a conclusive cause.

And of course, the officers called trained medics to evaluate Payne. It is indisputable that the medics would have begun providing Payne with medical treatment if they determined he was at risk of a cardiac arrest, and that they would have transported him to the hospital in the ambulance they brought with them. But the medics assessed Payne and concluded that it was safe to transport him to jail where, importantly, medical personnel were available to conduct a more comprehensive assessment than the medics were able to conduct on scene with a combative, uncontrollable Payne handcuffed in a police car. No case has ever found a police officer delib-



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

erately indifferent to whether an arrestee should have been transported to a hospital when he 1) called trained, medical personnel to evaluate the arrestee, when 2) those medics cleared him for transport to jail where 3) a more comprehensive medical assessment could be performed, and from where 4) the arrestee could be transported to a hospital if needed.

The primary allegations supporting Plaintiff's due process claim seem to center on the medics' inability to take measurements of Payne's vital signs due to his combative state. (Amended Complaint ¶¶ 1, 87–88, 126.) There is no evidence to suggest that a measurement of Payne's vital signs would have revealed that a cardiac arrest was imminent. But regardless, these allegations simply do not suffice to state a due process claim for deliberate indifference against the medics, much less against the officers who relied on their expertise.

For the reasons given above, Payne was not deprived either his Fourth or Fourteenth Amendments rights. Because Payne was not deprived of any federal right, his Section 1983 claims necessarily fail, and must be dismissed. If, however, Payne were deprived of his rights under the Fourth or Fourteenth Amendments, then the question becomes whether the defendant city or the defendant officers could be liable for the deprivation under Section 1983.

## II. Section 1983 Claims: Entity Liability

The City of Eugene is a defendant to the Section 1983 claims. That statute states that "every person who" deprives someone of a right "secured by the Constitution and laws…shall be liable to the party injured." The word "person" encompasses municipal entities, which means that they can be liable for depriving someone of a constitutional or other federal right. But because Section 1983 does not provide for vicarious liability, an entity cannot be liable simply because it employed a person who deprived someone of a federal right. Instead, an entity can only be liable for its "own" deprivations. *See generally Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

Because a municipal entity can only be liable for its "own" deprivations of a federal right, a plaintiff suing an entity under Section 1983 must identify some way the entity itself caused the



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

alleged deprivation, besides the mere fact that it employed the alleged wrongdoer. There are generally two ways that a plaintiff making a Section 1983 claim can establish that the entity itself caused the alleged deprivation of a federal right.

One, a plaintiff can prove that the employee who allegedly deprived him of a federal right did so because he was acting pursuant to a formal municipal policy, or a custom or practice of the municipal entity so widespread and entrenched that it amounted to an informal policy carrying the force of law. *Monell*, 436 U.S. at 690–95. Or two, the plaintiff can prove that the act which allegedly deprived him of a federal right was done or was "ratified" by an official with "final policymaking authority" such that those acts become the municipality's acts. *See Jett v. Dallas Independent School District*, 481 U.S. 701, 737 (1989); *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

The complaint makes conclusory allegations to establish the city's liability under Section 1983. (*See*, *e.g.*, Amended Complaint ¶¶ 136–41.) These allegations, such as they are, come in three categories. The first is based on allegations that the city had some "policy, custom, or practice" which caused Payne's claimed constitutional deprivations. The second is based on allegations that the city had a "policy and/or custom…to inadequately…train its officers." (*Id*. at ¶ 137.) The third is based on allegations that defendant officers' unconstitutional acts were "ratified" by a final policymaker. (*Id*. at ¶ 185.)

**A. Custom or Practice**

The complaint makes many "policy, custom, or practice" allegations, all conclusory. Just to list one example, the complaint alleges that the city had a "policy, custom, or practice of denying people in medical and mental health crisis medically necessary transfers to hospitals." (Amended Complaint ¶ 139(b).)

A *formal* policy is "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483



HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499 | fax (503) 222-2301

(1986). Under this definition, a formal policy generally means an official, written policy adopted by a final policymaker for the entity. Certainly, Plaintiff has no evidence that the city has adopted a formal policy which mandates, for example, that police officers deny arrestees needed medical treatment.

An *informal* policy sufficient to establish entity liability on a Section 1983 claim is proved by showing that the entity had a longstanding custom or practice. *See Castro v. County of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015). Such liability "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Plaintiff has no evidence to establish any of the customs or practices alleged in the complaint to establish the city's liability under Section 1983. For example, Plaintiff has no evidence that the city's police officers have routinely denied needed medical treatment to arrestees. Because Plaintiff has no such evidence, the city cannot be liable under Section 1983 based on allegations that defendant officers were acting according to some longstanding city custom or practice when they allegedly deprived Payne his constitutional rights. *See, e.g.*, *Elifritz*, 460 F. at 1118 (finding no longstanding custom or practice sufficient to support a city's liability on a claim that officers used excessive force against a decedent experiencing a mental health crisis).

**B. Failure to Train as Policy**

"In limited circumstances, a local government's decision not to train [] employees about their legal duty to avoid violating citizens' rights may rise to the level" of a *policy* for purposes of Section 1983. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985). Before a municipality's alleged failure to train employees can subject it to liability under Section 1983, that failure to train must amount to "deliberate indifference" to the constitutional rights of others. *Connick*, 563 U.S. at 61.



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). To amount to "deliberate indifference" under a failure-to-train theory, "policymakers must [have] actual or constructive notice that a particular omission in their training program cause[d] [its] employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61. Accordingly, a plaintiff alleging Section 1983 liability under a failure-to-train theory must "ordinarily" produce evidence showing that the entity did not alter or improv its training in the face of a "pattern of similar constitutional violations" by untrained employees. *Id*. at 62.

The complaint only alleges that the city "inadequately…train[ed] its officers." (Amended Complaint ¶ 137.) It includes literally no other allegations about what training might be inadequate, how it was inadequate, or how any inadequacy amounted to deliberate indifference to the constitutional rights of others. The relevant training the officers received is described above. Plaintiff has no evidence that this training was inadequate, much less that any inadequacy has resulted in a "pattern of similar constitutional violations" as those which Plaintiff claims. For this reason alone, Plaintiff has failed to establish any basis for the city's liability on her Section 1983 claims under any failure-to-train theory.

Before a municipality can be liable under a failure-to-train theory, a plaintiff must also establish that the failure to train was "the moving force behind the constitutional violation." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). The officers talked to Payne for almost 35 minutes before his arrest. During that whole time, they succeeded in keeping Payne calm. They would have had him taken to a clinic like White Bird, but none were open. They would have had him taken to a hospital, but he refused. Payne became uncontrollably agitated only *after* he resisted the arrest for his warrant. The officers then called medics to assess whether it was safe to transport Payne to the county jail, and they determined that it was.

The arrest undoubtedly increased Payne's agitation. Thus Plaintiff's primary grievance can fairly be characterized to be that the defendant officers should not have arrested Payne,



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

despite the warrant mandating his arrest, since it was the arrest which made Payne so agitated. (Amended Complaint ¶¶ 1, 55, 59, 61.) There is no possible claim that could ever be successfully asserted against police officers for merely arresting someone pursuant to a valid arrest warrant.

### C. Final Policymaker

The complaint alleges that Griesel "ratified" the "policies" which caused Payne's constitutional injuries. (Amended Complaint ¶ 185.) These allegations are redundant since a municipal policy would already establish its liability in a Section 1983 claim. Nonetheless, the word *ratified* is the hallmark of an attempt to establish entity liability through allegations that an official with final policymaking authority approved of the act which deprived the plaintiff of a federal right.

There is a distinction between a municipal employee having decision-making or supervisory authority, and policymaking authority. Only an act done by someone with the latter can be imputed to the municipality itself. *See, e.g*, *Gillette*, 979 F.2d at 1350 (holding that a fire chief with the mere authority to hire and fire employees did not have policymaking authority). Whether a person is a final policymaker is a legal question for a court to decide based on state law. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

Under Oregon law, a city's police chief is the final policymaker as to the rules governing police officer conduct. *See Wimett v. Sothern*, 2014 WL 4059768, at *16 (D. Or. Aug. 14, 2014). As a sergeant, Griesel was merely the supervising officer who arrived on scene following Payne's arrest. By law, he had no final policymaking authority related to any acts he took, or any acts the other defendant officers took either before or after he arrived on scene. *Cf. Collins v. City of San Diego*, 841 F.2d 337, 341–42 (9th Cir. 1988) (holding that a police sergeant with supervisory authority was nonetheless not a policymaker for purposes of Section 1983 since under California law policymaking authority resided with the police chief). Meanwhile, Plaintiff has no evidence to show that any policymaking authority in the area at issue had been delegated to Griesel. Therefore, Griesel cannot have "ratified" either his own or the other officer's acts such



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

that they would become synonymous with the acts of the defendant city for the purposes of Section 1983.

For the reasons given above, Plaintiff has failed to establish that the defendant city could be liable under Section 1983 for the constitutional deprivations she claimed. Even if Payne were deprived of rights under the Fourth or Fourteenth Amendments, the city must be dismissed from the Section 1983 claims.

## III. Section 1983 Claims: Individual Liability

The complaint asserts both the Fourth and Fourteenth Amendment claims against all the individual defendants. The complaint also asserts these claims against Griesel in his purported capacity as a supervisor.

### A. Qualified Immunity

Individual defendants enjoy qualified immunity from liability on Section 1983 claims. *Flores v. Morgan Hill Unified School District*, 324 F.3d 1130, 1134 (9th Cir. 2003). Whether an individual defendant lost that qualified immunity is a pure question of law, *see Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007), which it is a plaintiff's burden to prove, *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

Qualified immunity is designed to ensure that government officials "are on notice their conduct is unlawful" before they can be subject to civil suit. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Accordingly, government officials cannot be liable under Section 1983 "insofar as their conduct does not violate clearly established…rights of which a reasonable person would have known." *Id*. Under this standard, the question is whether "every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Typically, whether an official would have known that his conduct deprived the plaintiff of a right is decided by reference to existing case law.

While courts "do not require a case directly on point," the precedent "must have placed



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

the…question beyond debate" as applied to the *specific* conduct at issue. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011). For example, a case which stands for "the general proposition…that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. Instead, the case must make it clear to an official "that his conduct was unlawful in the situation" at issue. *Saucier*, 533 U.S. at 202. This usually means that officials retain qualified immunity unless there is precedent that "*squarely* governs the case at hand," declaring conduct unlawful in the given situation. *County of Los Angeles v. Mendez*, 815 F.3d 1178, 1187 (9th Cir. 2016) (emphasis in original).

In determining whether there is such a case, a court begins "by looking to binding precedent." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). If there is none, a court can "look to whatever decisional law is available…including decisions of state courts, other circuits, and district courts." *Id*. However, nonprecedential decisions must generally form a "consensus" on the issue before they can be said to provide an official with notice that his conduct is unlawful. *Sharp v County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).

**1. *Excessive Force***

Payne resisted arrest. It took the defendant officers more than two minutes of struggle to place handcuffs on him. During this struggle and following warnings, Thomas used his taser in probe mode but—because the darts were spaced too closely together—it was ineffective at incapacitating Payne. He then discharged his taser in drive-stun mode three times against Payne's thigh and lower back in total for between 15 and 17 seconds. Thomas did not discharge his taser after the officers had Payne under control, in handcuffs.

The only Ninth Circuit cases which found taser-use to be unreasonable are those where an arrestee who was not actively resisting, *Marquez*, 693 F.3d at 1175 (commenting on another Ninth Circuit case), or where multiple officers continuously tased an arrestee for one and a half minutes straight, even after he had been placed in handcuffs, *Jones v. Las Vegas Metropolitan*



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

*Police Department*, 873 F.3d 1123, 1130–31 (9th Cir. 2017). No Ninth Circuit case involving facts remotely similar to those here have found excessive force. To the contrary, in cases like *Marquez* and *Lindsay* the Ninth Circuit has consistently found that officers used reasonable force in tasing resisting arrestees. Because no Ninth Circuit case involving facts similar to those here has found that officers used excessive force, the defendant officers here retained their qualified immunity, and should therefore be dismissed from the excessive force claim.

**2. *Due Process***

The due process claim is based on allegations that the defendant officers should have transported Payne to a hospital. There do not seem to be any Ninth Circuit cases involving a similar scenario to that here. The closest analogue among the other Courts of Appeal is *Mann*, described above. As described, the court in that case concluded that officers did not violate an arrestee's due process rights by transporting her to jail.

District court cases from other jurisdictions involving similar scenarios have all come to the same conclusion. Each one of the cases cited after this sentence involved some combination of drug use, an arrest or restraint, taser deployment, "excited delirium," transport to jail, followed by a sudden, unexpected death, typically from cardiac arrest. *See, e.g.*, *West v. DeKalb County Georgia*, 2024 WL 1010672 (N.D. Ga. Feb. 2, 2024); *Rodriguez-Bonilla v. Ivey*, 2023 WL 2375217 (M.D. Fla. Mar. 6, 2023); *Lunneen v. Village of Berrien Springs*, 2022 WL 16569574 (W.D. Mich. Nov. 1, 2022); *Smalls v. Binner*, 2016 WL 1305201 (W.D. Va. Apr. 1, 2016); *Woodward v. City of Gallatin, Tennessee*, 2013 WL 6092224 (M.D. Tenn. Nov. 19, 2013); *Davidson v. City of Statesville*, 2012 WL 1441406 (W.D.N.C. Apr. 26, 2012). None of these cases found a due process violation. As one court commented, it refused to "deem as a violation of constitutional rights a law enforcement officer's act of transporting to a detention center's adequate medical facilities, with the possibility of further transporting to a private hospital if necessary, an arrestee apparently exhibiting only 'extreme agitation,' 'bizarre behavior,'…or 'screaming.'" *Davidson*, 2012 WL 1441406 at *6 n. 9.



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

The critical facts here include among others that Payne did not start to scream and sob until after his arrest. The defendant officers then called medics who assessed that it was safe to transport Payne to jail. Obviously, if the medics and come to a different conclusion then they would have transported Payne to a hospital in their ambulance. The officers could not have known that Payne would suffer a cardiac arrest before medical personnel at the jail were able to perform a more comprehensive assessment. No case involving remotely similar facts has ever found that officers deprived an arrestee of his due process right by virtue of having been deliberately indifferent to whether he needed medical treatment. The defendant officers here therefore retained their qualified immunity, and should be dismissed from the due process claim.

**B. Personal Participation; "Supervisory Liability"**

Plaintiff asserts the Fourth Amendment claim for excessive force, and a claim for "supervisory liability" on both the Fourth and Fourteenth Amendment claims, against Griesel. (Amended Complaint ¶¶ 184–88.) Griesel arrived on scene after Payne's arrest.

Because Section 1983 does not provide for vicarious liability, an individual's liability under Section 1983—just like an entity's liability—arises only if the individual himself caused the constitutional deprivation. *Iqbal*, 556 U.S. at 677 (noting that an official can only be liable under Section 1983 "for his or her own misconduct"). An official, including a supervisor, can be liable under Section 1983 for the acts of others in one of two ways.

First, under a failure-to-train theory. The standards for supervisory liability under a failure-to-train theory are the same as those for entity liability as described above. *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158–59 (9th Cir. 2014). In sum, they require a supervisor to be deliberately indifferent to whether his failure to train a subordinate would lead that subordinate to violate someone's constitutional rights. Or second, if the official "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see Ortez v. Washington County*, 88 F.3d 804, 809 (9th Cir. 1996).



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

Griesel cannot be liable under a failure-to-train theory. The complaint makes no allegations, and Plaintiff has no evidence, that Griesel had any responsibility for training Solorio, Thomas, or Roberts in the use of force, or on when arrestees should be transported to a hospital. Regardless, Griesel cannot be liable under a failure-to-train theory for the same reasons the city cannot be liable. Namely, Plaintiff has no evidence that would establish whether any training or lack of training has routinely led to constitutional violations of the kind Plaintiff claims.

Griesel was not present for Payne's arrest, so he cannot be liable for participating in, directing, or failing to prevent the alleged excessive force. Griesel was present for the decision on whether to transport Payne to jail. But Plaintiff has already asserted a due process claim against Griesel in his individual capacity. Making a claim in his purported supervisory capacity is redundant. Either way, for the reasons explained, neither Griesel nor the other defendant officers deprived Payne of his due process rights, and they did not lose the qualified immunity to which they are entitled, since among other reasons the officers called medics who determined that it was safe to transport Payne to jail.

## IV. Tort Claims

Plaintiff asserts tort claims for battery, the intentional infliction of emotional distress, and negligence. Tort claims cannot be maintained separately from Section 1983 claims when they are based on the same facts, so these claims should be dismissed. *See, e.g.*, *Woods v. Gutierrez*, 2012 WL 6203170 at *12 (D. Or. Dec. 12, 2012); *Whitfield v. TriMet*, 2009 WL 839484 at *11 (D. Or. Mar. 30, 2009); *Saberi v. City of Portland*, 2006 WL 2707995 at *4 (D. Or. Sept. 18, 2006); *Shilo v. City of Portland*, 2005 WL 3157563 at *1 (D. Or. Nov. 22, 2005). Even if the tort claims could be separately maintained, they all fail on their merits and are time barred.

### A. Battery

A *battery* is a "voluntary act that is intended to cause the resulting harmful or offensive contact." *Walthers v. Gossett*, 941 P.2d 575, 578 (1997). The battery claim here is presumably



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

based on the force the defendant officers used in arresting Payne. Oregon law authorizes a police officer to use reasonable force to effect an arrest. ORS 161.233; *see Ballard v. City of Albany*, 191 P.3d 679, 686–87 (Or. App. 2008). For this reason, the officers cannot be liable for battery if the force they used was not excessive under the Fourth Amendment. *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1157 (D. Or. 2013). As explained, the officers did not use excessive force. Summary judgment should therefore be granted against the battery claim. *See, e.g.*, *Bracken v. Douglas County*, 2023 WL 4886971 at *5 (D. Or. Aug. 1, 2023) (granting summary judgment against a battery claim after finding that police officers did not use excessive force).

**B. IIED**

An IIED claim requires a plaintiff to prove among other elements that the defendant engaged in outrageous conduct far beyond the bounds of socially tolerable behavior. To qualify, it must be "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *House v. Hicks*, 179 P.3d 730, 736 (Or. App. 2008). "A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing" whether the alleged conduct meets this high standard. *Id*.

The IIED claim is presumably based on the circumstances of Payne's arrest. But as with battery, a police officer cannot be liable for IIED based on an arrest if he used reasonable force. Among other rationales, an officer who used reasonable force did not engage in sufficiently outrageous conduct. As explained, the officers used reasonable force in arresting Payne. Summary judgment should therefore be granted against the IIED claim. *See*, *e.g.*, *Cruz-Manjarrez v. City of Portland*, 2007 WL 2607464 at *3 (D. Or. Sept. 4, 2007) (granting summary judgment on an IIED claim after finding that officers used reasonable force); *Hicks v. City of Portland*, 2006 WL 3311552 at *14 (D. Or. Nov. 8, 2006) (similar).

**C. Negligence**

The negligence claim is presumably based on allegations that the defendant officers



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

should have transported Payne to a hospital rather than jail. By default, people owe a duty of care to refrain from conduct that creates a foreseeable risk of harm to others. But that broad duty of care changes when parties "invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Fazzolari v. Portland School District No. 1J*, 734 P.2d 1326, 1336 (1987). Here, various laws, department policies, and accepted practice among law enforcement serve to establish whether and what duty of care the officers owed Payne. *Cf. Thomas v. Deschutes County*, 2022 WL 2704176 at *5 (D. Or. July 12, 2022) (describing the duty of care jailers owe inmates).

Until he was in custody, the officers did not owe Payne an actionable duty of care to provide him with medical treatment. *Coppedge v. City of Hillsboro*, 2022 WL 21828133 at **12–13 (D. Or. Mar. 31, 2022). Relatedly, the officers did not owe, and could not have owed, Payne a duty of care to arrest him and force his hospitalization under the officer–hold statute. *Nattell v. Curry County*, 2013 WL 5372539 at *9 (D. Or. Sept. 23, 2013) (noting how officers lacking probable cause under the officer–hold statute cannot owe a duty of care that would require them to violate a person's Fourth Amendment rights); *cf. Walden v. Dawson*, 2014 WL 5810824 at *4 & n. 8 (D. Or. Nov. 7, 2014) (expressing doubt on whether officers had probable cause to effect an arrest under the officer–hold statute). After they arrested Payne on his warrant, the officers owed a duty of care which required them to summon medics to evaluate whether it was safe to transport Payne to jail. The officers discharged that duty of care, and so were not negligent.

### D. OTCA Requirements

Tort claims against public bodies are subject to the provisions of the Oregon Tort Claims Act. All claims made under state law that are not for breach of contract are considered tort claims. *See Griffin v. TriMet*, 870 P.2d 808, 811 (Or. 1994). A claim for a tort allegedly committed by a municipal employee is subject to the OTCA if he was acting within the course and scope of his employment at the time. In making this determination, a court considers "whether the conduct was of the kind the defendant was hired to perform," and "whether the defendant was



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

motivated at least in part by a purpose to serve the employer." *C.O. v. Portland Public Schools*, 406 F. Supp. 2d 1157, 1174 (D. Or. 2005).

The individual defendants are police officers who allegedly committed torts while arresting Payne and transporting him to jail. The complaint itself alleges that they were acting within the course and scope of their employment with the city at all relevant times. (Amended Complaint ¶¶ 9–12.) And whatever the complaint might allege, a police officer acts within the course and scope of his employment when he effects an arrest and transports an arrestee to jail. *See generally Brungardt v. Barton*, 685 P.2d 1021 (Or. App. 1984) (involving an officer who allegedly used excessive force). Because Plaintiff is asserting tort claims arising out of the course and scope of the individual defendants' employment, the claims are all subject to the provisions of the OTCA.

**1. *Notice of Claim***

The OTCA requires that "notice" of a tort claim for wrongful death be given within one year from the "alleged loss or injury"; all other claims are subject to a 180-day notice period. ORS 30.275(1)–(2). A person must provide a public body with notice of his intent to bring a tort claim within the applicable notice period or the claim is time barred. ORS 30.275(1), (2)(b), (7). Tort claim notice can be satisfied by the commencement of a suit. ORS 30.275(3). Plaintiff alleges that she satisfied her obligation to provide timely notice by commencing this suit on March 27, 2022. (Amended Complaint ¶ 5.) For notice as to any wrongful death claim asserted in the complaint to be timely, it must have accrued after March 27, 2021. For notice as to any other tort claim to be timely, it must have accrued after September 23, 2021.

The relevant events all occurred well outside these notice periods. Plaintiff alleges that her notice was nonetheless timely because she did not know until a newspaper article published on July 22, 2021, that Payne had suffered his cardiac arrest while being restrained by deputies at the jail. Previously, she had been "misled" into believing that Payne had simply "collapsed." (Amended Complaint ¶¶ 5, 105–12, 115.)



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

Even accepting these allegations as true, the 180-day notice period applicable to claims other than wrongful death expired before this suit was commenced. A wrongful death claim is one in which a defendant's alleged acts or omissions caused or at least contributed to the death. *Martineau v. McKenzie-Willamette Medical Center*, 533 P.3d 1, 9–11, 16–17 (Or. 2023); *see* ORS 30.020. Yet the tort of IIED protects against only the injury of emotional distress. Because it cannot be a claim for wrongful death by definition, the IIED claim is time barred by Plaintiff's failure to give notice within 180 days from when she alleges it accrued.

Unlike IIED, battery and negligence claims can be wrongful death claims. For notice of any wrongful death claim asserted by Plaintiff to be timely, it must have accrued after March 27, 2021. However, any wrongful death claim properly asserted here accrued on the date—March 27, 2020—when the relevant events occurred.

Claims subject to the OTCA accrue when a plaintiff either knew or should have known that another's wrongdoing caused him at least some "injury," where an *injury* is a harm to a legally protected interest. *Gaston v. Parsons*, 864 P.2d 1319, 1323 n. 8 (Or. 1994); *Dunn v. City of Milwaukie*, 348 P.3d 301, 304–05 (Or. App. 2015); *Uruo v. Clackamas County*, 997 P.2d 269, 274 (Or. App. 2000). Accrual does not await for the plaintiff to know the "full extent" of his harm, *Dunn* 348 P.3d at 305, and it does not require that the plaintiff know whether known facts or events have any legal significance, *Duyck v. Tualatin Valley Irrigation District*, 742 P.2d 1176, 1183 (Or. 1987).

Wrongful death claims subject to the OTCA do not accrue any differently. They accrue with the "injury" that allegedly caused the death, not the death itself. The injury and the death are often but not always contemporaneous; the actionable injury can precede the death. *Repp v. Hahn*, 609 P.2d 398, 400–01 (Or. App. 1980) (clarifying this point); *Estate of Duncan v. Wallowa County Sheriff's Department*, 2020 WL 13749990 at *6 (D. Or. Oct. 27, 2020) (applying the rule in finding wrongful death claims time barred).

The allegations made to establish a later accrual date are based on Plaintiff's belated discovery of the county deputies' acts or omissions at the county jail. These have no relevance



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

whatsoever to the timeliness of the claims against the city and its officers. Obviously, the claims against the city and its officers can only be based on their alleged acts or omissions. Any claim over their alleged acts or omissions accrued when Plaintiff knew or should have known 1) about the acts or omissions, and that 2) they caused some harm to a legally protected interest.

The battery and IIED claims are based on the circumstances of Payne's arrest, including the alleged excessive force. The legally protected interests guarded by these torts are harmful or offensive contact and severe emotional distress, respectively. Plaintiff herself was present the whole time and *witnessed* the arrest, and the emotional distress it allegedly caused Payne. The battery and IIED claims therefore accrued on March 27, 2020. On that date Plaintiff knew—having witnessed them—about the alleged wrongful conduct and the alleged harm to the legally protected interests which the torts are meant to guard.

The negligence claim is based on allegations that the officers should have taken Payne to a hospital rather than jail, and that he suffered a cardiac arrest because they did not. Negligence protects against personal injury caused by the fault of another. Once again, Plaintiff knew of the allegedly negligent conduct on the date of Payne's arrest, because she knew then that the officers took him to jail. She also believed that this allegedly negligent conduct contributed to Payne's cardiac arrest (that is, taking Plaintiff's allegations as true). Plaintiff told a detective soon after Payne's death how she had thought he was about to have a "heart attack," and that "more could have been done" if the officers had taken him to a hospital straightaway. The negligence claim accrued on March 27, 2020, because, on that date, Plaintiff knew about the allegedly negligent conduct and its alleged role in Payne's personal injury.

Plaintiff alleges that the defendant officers' acts or omissions, all of which occurred before Payne arrived at the jail, contributed to his death. Because a wrongful death claim accrues with the injury that allegedly contributed to the death, the March 27 accrual date for the tort claims is totally unaffected by when—if ever—Plaintiff learned that Payne suffered the cardiac arrest while being restrained by deputies at the county jail.

In *Mann v. Department of Transportation*, 836 P.2d 1353 (Or. App. 1992), a husband and



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

wife were driving on an icy highway when an oncoming car crossed the center line, collided with them, and killed the wife. The husband was told by a police officer that the highway had been recently sanded. He concluded from this assurance that there had been no negligence. Three years later, the husband discovered that the highway had not been sanded. He filed a wrongful death claim, alleging that the defendant Department of Transportation was negligent in three ways, including in failing to sand.

The husband argued that the claim did not accrue until he learned the truth about the "misrepresentation" on whether the road had been sanded. The court rejected that argument, and dismissed the claim for being untimely. The court held that the claim accrued on the date of the accident because, on that date, the husband knew or should have known of at least some of the defendant's allegedly negligent conduct. *Id*. at 1355.[4]

Like the husband in *Mann*, Plaintiff alleges that the negligence claim is timely because she had been "misled" about whether Payne had suffered a cardiac arrest while being restrained. In *Mann*, the court held that the claim accrued when the plaintiff knew or should have known of at least *some* of the defendant's allegedly negligent conduct. Here, Plaintiff knew about *all* the negligent conduct she alleges against the defendant city and its officers on the date of Payne's arrest. Even if the alleged conduct of the county and its deputies had any relevance, per *Mann*, the negligence claim nonetheless accrued on that date.

For these reasons, Plaintiff's claims accrued the same date as all the relevant events, or March 27, 2020. Because Plaintiff did not provide tort claim notice until March 27, 2022, the tort claims are long time barred.

**2. *Individual Defendants***

The complaint names all the individual defendants to all the tort claims. But unless a complaint pleads damages above the tort cap, the "sole cause of action" for a tort claim subject to

---

4 *Mann* was reversed and remanded on other grounds. On remand, the Court of Appeals adhered to the relevant part of its earlier decision. 856 P.2d 1055 (Or. App. 1993).



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**

the OTCA "is an action against the public body." ORS 30.265(1)–(4). The complaint does not include a prayer for damages above the applicable tort cap limit. *See* ORS 30.272 (setting the tort cap limits). Therefore, the only proper defendant as to the tort claims is the defendant city. The individual officers should be dismissed from the tort claims. *See, e.g.*, *Wimett*, 2013 WL 3973866 at *3 (dismissing tort claims against individual officers).

### V. Punitive Damages

The complaint includes requests for punitive damages. (*See, e.g.*, Amended Complaint ¶¶ 2, 128, 142, 189.) These must be dismissed. Punitive damages are not available in claims subject to the OTCA. ORS 30.269(1). Meanwhile, municipalities are immune from punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Punitive damages are available against an individual defendant under Section 1983, but only on a showing of "evil motive or intent, or reckless or callous indifference to [] federally protected rights." *Child v. City of Portland*, 547 F. Supp. 2d 1161, 1168 (D. Or. 2008). There is no evidence capable of establishing this.

## CONCLUSION

For the reasons given above, the Court should grant summary judgment in the defendants' favor and against each of Plaintiff's claims.

HART WAGNER LLP

Dated July 17, 2024

By: */s/ Kimberlee C. Morrow*

Kimberlee C. Morrow, OSB No. 830280
kcm@hartwagner.com

Of Attorneys for Defendants
City of Eugene, Jairo Solario,
Andrew Roberts, Jacob Thomas,
and Robert Griesel



**HART WAGNER LLP**
**1000 S.W. Broadway, Twentieth Floor**
**Portland, Oregon 97205**
**(503) 222-4499 | fax (503) 222-2301**