**Andrea D. Coit, OSB #002640**
**acoit@eugenelaw.com**
**Ariana Denley, OSB #173314**
**adenley@eugenelaw.com**
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone: (541) 686-9160
Facsimile: (541) 343-8693
Of Attorneys for Lane County, Riley, Jester, McClure, Fifer, Fisher, Foley,
Baeuerlen, Gent, Gawith, Edwards, Santini, and Wilson

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DISTRICT

| | |
|---|---|
| ANZHELIKA PAYNE, personal representative to the estate of LANDON JAY PAYNE,<br><br>    Plaintiff,<br><br>    v.<br><br>JAIRO SOLORIO, an individual, ANDREW ROBERTS, an individual, JACOB THOMAS, an individual, ROBERT GRIESEL, an individual, JUSTIN WILSON, an individual, ZACHERY FULTON, an individual, EMMA GROTEFEND, also known as EMMA EDWARDS, an individual, COLTER GAWITH, an individual, NATHAN GENT, an individual, MICHAEL BAEUERLEN, an individual, STEPHEN FOLEY, an individual, JOSEPH FISHER, an individual, JEREMY FIFER, an individual, WILLIAM MCCLURE, an individual, LANCE JESTER, an individual, RICHARD CLINTON RILEY, an individual, CONNOR WEST SANTINI, an individual, LANE COUNTY, and CITY OF EUGENE, a municipal corporation.<br><br>    Defendants. | Case No. 6:22-cv-00471-MC<br><br>**LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

Page(s)

I.     SUMMARY OF THE ARGUMENT ................................................................ 1

II.    STANDARD OF REVIEW ........................................................................... 2

III.   STATEMENT OF MATERIAL FACTS ...................................................... 3

IV.   SPECIFIC INVOLVEMENT OF EACH INDIVIDUALLY NAMED DEFENDANT... 12

     1.    Justin Wilson.......................................................................... 12

     2.    Zachery Fulton ....................................................................... 13

     3.    Emma Grotefend also known as Emma Edwards ................................. 13

     4.    Colter Gawith ........................................................................ 13

     5.    Nathan Gent .......................................................................... 14

     6.    Michael Baeuerlen .................................................................. 14

     7.    Stephen Foley ........................................................................ 14

     8.    Joseph Fisher ......................................................................... 14

     9.    Jeremy Fifer .......................................................................... 15

     10.   William McClure ................................................................... 15

     11.   Lance Jester .......................................................................... 15

     12.   Richard Clinton Riley .............................................................. 15

     13.   Connor West Santini ............................................................... 15

V.    LAW AND ARGUMENT ........................................................................ 16

     A.    Plaintiff's Claim for 42 U.S.C. § 1983 Against the Individual County Defendants for Violation of Mr. Payne's Fourth Amendment Right to be Free from the Use of Excessive Force ........................................................................ 16

          1.    There Is Insufficient Evidence to Support a Fourth Amendment Constitutional Violation............................................................ 16

          2.    Each of the Individual County Defendants is Entitled to Qualified Immunity.............................................................................. 19

     B.    Plaintiff's Claim for 42 U.S.C. § 1983 Against the Individual County Defendants for Violation of Mr. Payne's Fourteenth Amendment Right to Adequate Medical Care ....................................................................................... 23

          1.    There is Insufficient Evidence to Support a Fourteenth Amendment Constitutional Violation............................................................ 23

              a.    Failing to provide prompt medical attention................................. 25

              b.    Failing to recognize Landon Payne's serious medical situation... 26

              c.    Failing to refuse to intake Landon Jay Payne and demand Eugene Police transfer Landon Payne from the Lane County Jail to a hospital for diagnosis and treatment prior to entry into the Lane County Jail ................................................................... 26

        2.    The Individual County Defendants are Entitled to Qualified Immunity .. 27

C.    42 U.S.C. § 1983 Claims Against Lane County ................................................... 28

        1.    No Constitutional Violation ................................................................... 28

        2.    Insufficient Evidence that a County Policy, Custom or Practice Resulted in
               a Violation of Mr. Payne's Constitutional Rights.................................... 29

               a.    A policy custom or practice of providing insufficient medical and
                      mental health assessments............................................................. 29

               b.    A policy, custom or practice of denying people in medical and
                      mental health crisis medically necessary transfers to hospitals;... 29

               c.    A policy, custom or practice of failing to respond properly to the
                      serious medical needs of arrestees and/or inmates; ...................... 30

               d.    A policy, custom or practice of failing to respond properly to
                      inmates experiencing drug or alcohol overdose or withdrawal; ... 30

               e.    A policy, custom or practice of kneeling on restrained inmates
                      and/or arrestees; ............................................................................ 30

D.    42 U.S.C § 1983 – Supervisor Liability Against Captain Riley .......................... 31

E.    State Law Claims ................................................................................................ 32

        1.    Negligence ............................................................................................. 32

        2.    Intentional Infliction of Emotional Distress ........................................... 33

        3.    Battery.................................................................................................... 33

VI.    CONCLUSION............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Nguyen*,
  78 F.4th 1140, 1145 (9th Cir. 2023) ...................................................................... 24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248, 250 (1986) ............................................................................... 3

*Ashcroft v. Iqbal*,
  556 U.S. 662, 676 (2009) .......................................................................... 16, 19, 20

*Ballard v. City of Albany*,
  221 Or. App. 630, 640–41 (2008) ......................................................................... 34

*Baynes v. Cleland*,
  799 F.3d 600, 612–13 (6th Cir. 2015) ................................................................... 22

*Bd. of Cnty. Comm'rs v. Brown*,
  520 U.S. 397, 404 (1997) ...................................................................................... 28

*Bell v. Wolfish*,
  441 U.S. 520, 540 (1979) ...................................................................................... 18

*Board of County Comm'rs of Bryan County v. Brown*,
  520 U.S. 397, 410 (1997) ...................................................................................... 24

*Castro v. County of Los Angeles*,
  833 F.3d 1060, 1071 (9th Cir. 2016) ..................................................................... 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 323 (1986) ........................................................................................ 2

*City and Cnty. of San Francisco v. Sheehan*,
  575 U.S. 600 (2015) ............................................................................................... 20

*City of Canton*,
  489 U.S. 378, 385 (1989) ...................................................................................... 28

*City of Los Angeles v. Heller*,
  475 U.S. 796, 799 (1986) ...................................................................................... 28

*Colvin v. Capello*,
  No. 2:10-cv-297, 2012 WL 1190174, at *5 (W.D. Mich. Apr. 9, 2012) ................ 17

*Comstock v. McCrary*,
  273 F.3d 693, 703 (6th Cir. 2001) ......................................................................... 23

*Cunningham v. Gates*,
  229 F.3d 1271, 1287 (9th Cir. 2000) ..................................................................... 20

*Delaney v. Clifton*,
  180 Or. App. 119, 129, (2002) .............................................................................. 33

*Edmo v. Corizon, Inc.*,
  935 F.3d 757, 786 (9th Cir. 2019) ......................................................................... 25

*Espinosa v. City & Cnty. of S.F.*,
  598 F.3d 528, 537 (9th Cir. 2010) ......................................................................... 17

*Estelle v. Gamble,*
    429 U.S. 97, 105–06, (1976)................................................................ 23, 25

*First Nat'l Bank of Ariz. v. Cities Serv. Co.,*
    391 U.S. 253, 288–89 (1968)....................................................................... 3

*Gibson v. Cnty. of Washoe, Nev.,*
    290 F.3d 1175 (9th Cir. 2002) .............................................................. 22, 23

*Gigler v. Klamath Falls,*
    21 Or. App. 753, 763 (1975).................................................................... 34

*Gordon v. Cnt.y of Orange,*
    888 F.3d 1118, 1124 – 1125 (9th Cir. 2018) ......................................... 23, 24

*Graham v. Connor,*
    490 U.S. 386, 395 (1989)....................................................................... 16, 23

*Green v. Branson,*
    108 F.3d 1296, 1302 (10th Cir. 1997) ...................................................... 31

*Harlow v. Fitzgerald,*
    457 U.S. 800, 818 (1982) ......................................................................... 19

*Harris v. Pameco Corp.,*
    170 Or.App. 164, 171 (2000)..................................................................... 33

*Inouye v. Kemna,*
    504 F.3d 705, 712 (9th Cir. 2007) ............................................................ 20

*Kisela v. Hughes,*
    584 U.S. 100 (2018).................................................................................. 20

*Leath v. Webb,*
    323 F. Supp. 3d 882, 894–95 (E.D. Ky. 2018) .................................... 21, 22

*Lee v. City of Norwalk,*
    529 F. App'x 778, 782 (6th Cir. 2013) ....................................................... 3

*Lindke v. Freed,*
    601 U.S. 187, 188 (2024)........................................................................... 16

*Long v. City & Cty. of Honolulu,*
    511 F.3d 901, 907 (9th Cir. 2007) ............................................................ 29

*Malley v. Briggs,*
    475 U.S. 335, 343 (1986)........................................................................... 19

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 587 (1986)............................................................................. 3

*Meade v. Grubbs,*
    841 F.2d 1512, 1527 (10th Cir.1988) ........................................................ 31

*Miller v. Clark Cnty.,*
    340 F.3d 959, 964 (9th Cir. 2003) ............................................................ 17

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978)................................................................................... 28

*Mullenix v. Luna,*
    577 U.S. 7, 13 (2015) (per curiam) ........................................................... 20

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*,
  210 F.3d 1099, 1102–03 (9th Cir. 2000) ............................................................... 3

*Nordenstrom for Est. of Perry v. Corizon Health, Inc.*,
  No. 3:18-CV-01754-HZ, 2021 WL 2546275, at *19–20 (D. Or. June 18, 2021) ................... 32

*Pearson v. Callahan*,
  555 U.S. 223, 230-32, 235-36 (2009) ................................................................... 19

*Pembaur v. Cincinnati*,
  475 U.S. 469, 479 (1986) .................................................................................. 28

*Rich v. Cooper*,
  234 Or. 300, 309 (1963) .................................................................................... 34

*Romero v. Kitsap County*,
  931 F.2d 624, 627 (9th Cir. 1991) ....................................................................... 19

*Sandoval v. Cnty. of San Diego*,
  985 F.3d 657, 665 (9th Cir. 2021), *cert. denied* 142 S. Ct. 711 (2021) ....................... 2

*Scott v. Harris*,
  550 U.S. 372, 378–81 (2007) .......................................................................... 3, 19

*Son v. Ashland Cmty. Healthcare Servs.*,
  239 Or. App. 495, 506 (2010)) ............................................................................ 32

*Spence v. Stambaugh*,
  No. 214CV1170WBSACP, 2021 WL 929507, (E.D. Cal. Mar. 11, 2021) ............................. 21

*Starr v. Baca*,
  652 F.3d 1202, 1205–06 (9th Cir. 2011) ............................................................... 31

*Sullivan v. Bornemann*,
  384 F.3d 372, 378 (7th Cir. 2004) ....................................................................... 17

*Terry v. Ohio*,
  392 U.S. 1, 20–22 (1968) .................................................................................. 17

*Walthers v. Gossett*,
  148 Or. App. 548, 552 (1997) ............................................................................. 33

*White v. Pauly*,
  137 S. Ct. 548, 552 (2017) (per curiam) ............................................................. 4, 20

*Williams v. Brann*,
  No. 02-C-940, 2006 WL 2401112, at *7–8 (E.D. Wisc. Aug. 18, 2006) .......................... 17

**Rules**

Fed. R. Civ. P. 56 ......................................................................................... 1, 2, 34

**Statutes**

42 U.S.C. § 1983 .................................................................... 16, 23, 24, 26, 28, 31

**CERTIFICATE OF COMPLIANCE WITH LR 7-1**

The undersigned attorney certifies, in compliance with LR 7-1, that the parties made a good faith effort through a telephone conference to resolve the issues raised by this motion but have been unable to resolve them.

**LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Defendants Lane County (the County), Cpt. Richard Clinton Riley, Sgt. Lance Jester, Deputy William McClure, Deputy Jeremy Fifer, Deputy Joseph Fisher, Deputy Stephen Foley, Deputy Michael Baeuerlen, Deputy Nathan Gent, Deputy Colter Gawith, Deputy Emma Grotefend, Deputy Connor West Santini, Deputy Justin Wilson, and Deputy Zachary Fulton (Individual County Defendants) move for judgment as a matter of law against all claims asserted by Plaintiff against them. As is set forth below, the undisputed material facts show that Plaintiff cannot prove her claims as a matter of law.

This Motion is supportted by the record herein, the following memorandum of points and authorities, and the Declaration of Andrea D. Coit ("Coit Dec"), with its attached exhibits, filed herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    SUMMARY OF THE ARGUMENT**

On March 27, 2020, Lane County was in the initial stage of the COVID-19 lockdown. Many medical and mental health services relied on by its residents for help in times of need were either closed or discouraging all but the most urgent of visitors. The County jail remained open. On March 27, 2020, Landon Payne was high on methamphetamine and undergoing a mental health crisis. When his wife, the plaintiff in this matter, sought help, the only help available was law enforcement. As the facts set forth below demonstrate, the best place for Mr. Payne on the night of March 27, 2020, was not the Lane County jail. By the time Eugene Police Officer Jairo Solario delivered Mr. Payne to the jail, he was yelling incoherently, sweating profusely, and flailing his body. Nevertheless, he was brought to the jail and delivered into the hands of the Lane County jail deputies. In accordance with their newly implemented COVID-19 policy, the

deputies had to have Mr. Payne medically cleared by the jail nurse before he could be booked into the jail.  To do that, they had to remove him from Officer Solario's vehicle and place him in a position where the nurse could safely check his temperature.  While the deputies tried to hold Mr. Payne's body and head still on the ground of the sally port so his temperature could be taken and leg restraints applied, he became unresponsive.  The deputies immediately began CPR and called for their internal medical team and for an ambulance.  The responding EMT workers removed Mr. Payne from the jail for delivery to the hospital.  He was breathing at that time.

Mr. Payne died on March 30, 2020, at Riverbend Hospital.  As the undisputed material facts set forth below show, nothing the County or the Individual County Defendants did or did not do caused Mr. Payne's death.  They were presented with a man high on drugs, who had been tased multiple times, who was yelling, thrashing and incoherent, and told to house him.  Before they could complete their medical screening to see if housing Mr. Payne in the jail was allowed, he stopped breathing.  There is no evidence that the deputies used excessive force or failed to provide necessary medical care for Mr. Payne.  There is no evidence that any of the decisions made during those anxious few minutes with Mr. Payne were negligent.  The deputies did everything they could to help Mr. Payne.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment must be granted when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021), *cert. denied* 142 S. Ct. 711 (2021).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc*., 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the

nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). The nonmovant need not establish a material issue of fact conclusively in its favor. *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. However, when there is a videotape capturing the events in question, the court must view the facts in the light depicted by the videotape. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). So, "[a]lthough ordinarily the plaintiffs' version of the facts must be accepted as true when deciding the defendant's motion for summary judgment, a video that contradicts a nonmovant's version of the facts can support a grant of summary judgment." *Lee v. City of Norwalk*, 529 F. App'x 778, 782 (6th Cir. 2013).

## III.    STATEMENT OF MATERIAL FACTS

On March 27, 2020, Plaintiff Anzhelika Payne, called 911 to report that her husband, Landon Payne, was acting erratically and yelling that someone was trying to kill him. Plaintiff reported to Eugene City Police dispatch that Mr. Payne was likely under the influence of alcohol and methamphetamine. Coit Dec., Ex. 1, Reporting Officer Narrative report – Officer Solario. Eugene Police Officer Defendant Solario arrived first to Plaintiff's home and encountered Mr. Payne, whom he described in his report as "aggressive, yelling in anger, stating that his family threatened to hurt him." *Id.* Mr. Payne was sweating and confrontational. *Id.* A neighbor had also called the Eugene City Police by this time, reporting that Mr. Payne was outside of Plaintiff's home, screaming and banging on front door. *Id.*

Eugene Police Officer Defendant Thomas also responded to Plaintiff's home. While in route, he was informed by Eugene City Police dispatch that several neighbors had called 911 to report Mr. Payne yelling that he was being murdered, that Plaintiff reported that Mr. Payne thought her family was going to murder him, that he was likely under the influence of methamphetamine, and that there were children inside of Plaintiff's home. Coit Dec., Ex. 2, Case Supplemental Report – Officer Thomas. Officer Thomas also learned from dispatch that Mr. Payne had a warrant for his arrest from Marion County, Oregon. *Id.*

Plaintiff requested the Eugene City Police to send Cahoots out to the house to assist with her husband. Mr. Payne hoped they could take him to the White Bird Clinic, a local mental health resource that can provide short-term housing for people suffering mental health crises. *See* First Amended Complaint (FAC) ¶¶ 32, 46. Cahoots responded to the scene, but there was nowhere for them to take Mr. Payne. Due to COVID-19, all of the local mental health crisis centers, including White Bird, were closed. FAC ¶ 64.

After half an hour at Plaintiff's house, Eugene Police Officer Solario decided to arrest Mr. Payne on the Marion County warrant so he could be removed from the home. FAC ¶¶ 53, 54. Officer Solario and another Eugene officer moved in to arrest Mr. Payne and place him in handcuffs. Mr. Payne backed away from the officers and resisted the arrest. FAC ¶¶ 66, 67. Officer Thomas deployed his taser on Mr. Payne, successfully tasing him multiple times. Coit Dec., Ex. 2. During the effort to arrest Mr. Payne and him being tased, Mr. Payne reported that he could not breathe. FAC ¶ 71.

Mr. Payne was incoherent after being tased multiple times. As he was escorted by the police to Officer Solario's police vehicle, he was short of breath, pale and nearly collapsed. FAC ¶¶ 76, 77. Mr. Payne was placed in the back of Officer Solario's police vehicle, where he continued yelling. Mr. Payne was sweating profusely and one of the officers repeatedly offered him water. FAC ¶ 85. In accordance with City of Eugene Police policy, emergency medical responders were called to the location to medically assess Mr. Payne for complications from being tased and possible excited delirium to determine if he was medically stable enough to be

lodged in the Lane County jail.  FAC ¶ 81; Coit Dec., Ex. 2.  Mr. Payne's physical condition at that point was so alarming that the Cahoots employee asked if medical response had been called to sedate Mr. Payne.  FAC ¶ 83.

When the emergency responders arrived at Plaintiff's home, they observed Mr. Payne in the back of Officer Solario's car.  Coit Dec., Ex. 3, Incident Response Report of Firefighter.  Mr. Payne was not cooperative, would not sit still and was yelling the entire time the responders were with him.  *Id.*  The emergency responders tried twice to obtain physical vital statistics from Mr. Payne, but were unsuccessful due to his behavior and the fact that he was handcuffed.  *Id.*  The emergency responder explained to Eugene Police Sgt. Robert Griesel, the Eugene Police sergeant who responded to the scene, that they could not obtain vitals from Mr. Payne in his condition.  *Id.*  In addition to being told of the inability to obtain Mr. Payne's vitals, Sgt. Griesel also recalls being told by the emergency responders that they were not going to take Mr. Payne to the hospital.  Coit Dec., Ex. 4, Deposition of Robert Griesel (Griesel Depo) 65:23-66:9.  Instead, Sgt. Griesel and the emergency responder decided that the easiest course would be to transport Mr. Payne to the Lane County jail without an on-scene medical clearance because there was a "more robust medical staff on site at the jail that would evaluate Mr. Payne when we [Eugene police and Mr. Payne] arrived."  Griesel Depo 69:12-16.

Sgt. Griesel thereafter assured Plaintiff that Mr. Payne would be medically evaluated and taken care of by the medical staff at the Lane County jail.  Sgt. Griesel wrote in his police report: "I explained [to Plaintiff that] Payne was being transported to the Lane County Jail.  I knew the jail had medical staff and deputies waiting in the sally port to evaluate custodies due to COVID-19 and told her [Plaintiff] he would be medically evaluated there."  Coit Dec., Ex. 5, Case Supplemental Report – Sgt. Griesel.

Having made the decision to rely on the Lane County jail to perform the required medical evaluation, Sgt. Griesel instructed Officer Solario to deliver Mr. Payne to the Lane County jail. Griesel Depo 65:11-18. Having received this instruction, Officer Solario believed that Mr. Payne had been medically evaluated and cleared to be booked into the Lane County jail.  According to

Officer Solario, because of the City of Eugene Policy 809.5 requiring medical clearance of a suspect who has been tased prior to transport to the jail, Sgt. Griesel could not have instructed him to transport Mr. Payne to the jail if he had not actually been medically cleared by the emergency responders. Officer Solario cannot recall who told him that Mr. Payne had been cleared but, because of the requirement for medical clearance after being tased, he is certain someone did. Otherwise, he would not have taken Mr. Payne to the jail. Coit Dec., Ex 21, Deposition of Jairo Solario (Solario Depo) 77:3- 78:18.

Officer Solario testified:

> Q. But as the transporting officer who -- you know, as the -- as the officer who drove Landon Payne from the scene to the jail, you would not have left the scene with him unless he had been medically cleared, correct?
>
> A. Yes, unless he was medically cleared by the medics that were on scene.

Solario Depo 78:12-18.

Sgt. Griesel failed to inform Officer Solario that both he and the emergency responders were relying on Lane County to perform the medical evaluation of Mr. Payne to determine if he was medically fit for booking in the jail after being tased and showing signs of excited delirium. Officer Solario testified that he was not relying on the Lane County jail to do this evaluation because, he believed, it was already done at the scene. Solario Depo 79:20-24. He was simply dropping Mr. Payne off to be booked into the jail.

Sgt. Griesel's failure to inform Officer Solario that the City of Eugene was delegating to Lane County its duty to medically clear Mr. Payne after being tased is a key misstep in Mr. Payne's journey. Because Officer Solario assumed Mr. Payne had already been medically cleared, he did not alert the Lane County jail that no medical evaluation had been performed or provide them with the additional information from the scene that would have been instrumental in evaluating Mr. Payne's condition. Specifically, Officer Solario did not tell Lane County that Mr. Payne had been relatively calm and coherent prior to being tased. He did not tell them that it was only after being tased four or five times that Mr. Payne began sweating profusely and

yelling unintelligibly.  And he did not tell Lane County that emergency responders had been summoned to the scene not only to evaluate the adverse impact of the taser, but also to evaluate Mr. Payne for possible signs of excited delirium.  Officer Solario did not share any of this information with Lane County because he believed the City of Eugene's policy had been followed and all of those issues had been evaluated by the emergency responders.  Had he shared that information with the County, it is almost certain Mr. Payne would have been sent directly to the hospital, never being removed from Officer Solario's vehicle in the sally port.  See Coit Dec., Ex. 6, Deposition of Sgt. Lance Jester (Jester Depo) 75:7-11 ("At any given time if our medical staff decides that, you know, there needs to be some sort of outside medical clearance, then they would actually go right back to the arresting officer and have to go to the hospital.").

Mr. Payne continued having outbursts of yelling and screaming during the ride to the Lane County jail.  Solario Depo 83:24-84:2.  During transport, Officer Solario contacted the Lane County jail to let them know he was bringing in a combative male subject for booking.  Jester Depo 35:23-36:4. The Lane County jail was trying to minimize its population due to COVID-19, so the County records department contacted Marion County to see if they wanted to transport Mr. Payne on its warrant.  Jester Depo 58:1-13.  Sgt. Jester was alerted that Marion County did not want to transport Mr. Payne on the warrant and that, as a result, the warrant was cleared. Jester Depo 36:5-20.

When Officer Solario arrived at the jail, he spoke first with Deputy Baeuerlen.  Deputy Baeuerlen was wearing a body camera throughout the entire Lane County interaction with Mr. Payne.  A copy of that body camera recording is included as Exhibit 20 to the Declaration of Andrea D. Coit and referred to herein as "BodyCam."  As noted, he told Deputy Baeuerlen only that Mr. Payne had been tased, was resisting arrest, and had been screaming since he was placed in the vehicle. Coit Dec., Ex. 7, Deposition of Michael Baeuerlen (Baeuerlen Depo) 34:10-35:9; BodyCam starting at 00:31.  Deputy Baeuerlen then contacted Mr. Payne inside the vehicle, asking him some initial screening questions.  Deputy Baeuerlen asked Mr. Payne if he had any injuries or illnesses, if he had been hurt or was suicidal.  Mr. Payne did not respond to Deputy

Baeuerlen's questions.  Instead, he continued "yelling and screaming at the top of his lungs."
Baeuerlen Depo 35:10-17.  Mr. Payne did not make any intelligible statements during that
encounter, although it does appear from the video recording that Mr. Payne responded in the
negative when asked by Deputy Baeuerlen if he was suicidal. *Id.* 35:18-21; BodyCam, starting at
01:01.  Deputy Baeuerlen let Mr. Payne know that he would have to remove him from the car,
causing Mr. Payne to shriek.

Lane County's initial step in the booking process is to assess whether the proposed
inmate is medically cleared for booking into the jail.  If the person is not deemed medically fit
for booking, they are transported to the hospital for further evaluation.  Jester Depo 75:7-11. On
this night of March 27, 2020, during the shift that Mr. Payne was brought in on, Lane County
implemented a new COVID-19 protocol that required the jail nurse to screen all persons for
COVID-19 in the sally port before entry into the jail for further medical clearance.  Because of
the trace-testing protocols in place in the state, the County would not allow any person to enter
the jail until they had shown a normal temperature reading. If the person was cleared from that
screening, they would be taken into the jail booking area for further medical evaluation if
applicable prior to being cleared for booking.  Coit Dec., Ex. 8, Lane County Jail Security
COVID-19 Protocols in effect on March 27, 2020; Coit Dec., Ex. 9, Deposition of Cpt. Richard
Clinton Riley (Riley Depo) 53:15-55:23.

Upon hearing Mr. Payne's shrieking reaction to being told he would be taken from the
vehicle, Sgt. Jester told Officer Solario that Marion County had cleared its warrant, so there was
no basis to hold Mr. Payne in the jail other than the City of Eugene charges stemming from the
arrest.  Sgt. Jester asked him if the City of Eugene police could just cite and release Mr. Payne on
the resisting arrest charge.  Jester Depo 36:14-23.  Officer Solario told Sgt. Jester that the City of
Eugene wanted Mr. Payne booked into the jail on the resisting charge so that they did not end up
having to go back out to Plaintiff's home again that night to deal with him.  *Id.*; BodyCam 02:15-
02:33. The City of Eugene contracts with Lane County for a number of beds in the Lane County
Jail.  Officer Solario insisted that Sgt. Jester book Mr. Payne into one of the City's reserved beds

in the Lane County jail.  According to Sgt. Jester, he had no authority to insist that Officer Solario cite and release Mr. Payne. Jester Depo 61:20-62:4.

The deputies had to first remove Mr. Payne from Officer Solario's vehicle before the nurse could take his temperature because, for safety purposes, Lane County practice did not allow the jail nurse to enter the police vehicle with the arrested person.  According to Sgt. Jester: "We have no idea how he's going to react and you don't want to crawl into the back of the car with somebody who has – again, their legs are free.  They can turn.  They can kick you.  They can do anything.  We have no information.  We're not going to put a nurse in a situation like that."  Jester Depo 65:16-66:2.

The deputies also decided to further restrict Mr. Payne's movement by placing leg cuffs on his ankles once he was out of the vehicle.  At this time, the Lane County jail's policy regarding leg restraints was to place them on any person who was combative or kicking their legs because the legs are the strongest part of the body and need to be controlled if the person is using them aggressively.  Jester Depo 63:15-22.  According to Sgt. Jester, Mr. Payne needed to be restrained in leg restraints because Officer Solario had informed Lane County that Mr. Payne had fought with the officers on the scene and had indicated that he was aggressive.  Jester Depo 68:7-15.  Sgt. Jester also felt Mr. Payne needed to be placed in leg restraints because inside the vehicle and when he was removed, Mr. Payne was kicking his legs, thrashing about, and his body was not in control.  *Id.* 63:23-64:6.  Per Lane County practice, Mr. Payne also had to be placed in leg irons before being taken into the jail to stop his kicking and prevent him from hurting anyone.  Jester Depo 37:2-13; Baeuerlen Depo 37:4-5.  Finally, it is evident from the BodyCam video that Mr. Payne was acting aggressively inside the car.  He refused to cooperate in removing himself from the vehicle and pulled against the deputies who were trying to remove him. BodyCam starting at 03:25.

Mr. Payne was removed from Officer Solario's police car by three deputies.  BodyCam starting at 03:25. He resisted that action, pulled away and began kicking with his legs.  He was then lowered to the ground and placed on his stomach so the leg restraints could be applied. *Id.*;

Baeuerlen Depo 37:9-13; Jester Depo 37:9-13.  The jail nurse approached Mr. Payne at that point to try to get his temperature reading.  Mr. Payne continued to grunt and thrash, making it difficult for the nurse to obtain the reading.  BodyCam, *e.g,* at 04:25.  Sgt. Jester's intent was to have the leg restraints secured in place so they could stand Mr. Payne up and take him into the jail for medical evaluation.  Jester Depo 37:14-19.

      While deputies worked to secure Mr. Payne's legs into leg irons, Sgt. Jester kneeled down by Mr. Payne's head and tried to communicate with him, asking if he had taken any drugs or of there was anything they should be aware of.  Jester Depo 37:20-23.  Deputies assisted with Mr. Payne in various ways, including holding down Mr. Payne's legs and arms while restraints were applied to his ankles, applying the restraints, and searching his pockets.  At times, Mr. Payne's head was held in place on the ground.  In March 2020, Lane County's practice and training on defensive tactics instructed deputies that a resisting person's head should be gently but firmly held down while they were being restrained or placed in restraints for safety and security reasons. According to Sgt. Jester: "That's to keep them from turning around, spitting or anything else.  You are controlling the head at this point."  Jester Depo 106:2-107:5.

      Lane County deputies are trained not to put pressure on a person's upper torso to avoid positional asphyxia.  Controlling a person's head does not contribute to positional asphyxia. Jester Depo 106:2-107:5. The deputies are trained not to put weight on a person's back so as to avoid impeding their breathing.  At the jail, in furtherance of that training, the deputies make every effort if they are involved in a use of force, not to be on top of the person.  Jester Depo 69:8-16.  Sgt. Jester was specifically watching the deputies as they held onto Mr. Payne's limbs to make sure nobody was putting any weight on the middle of his back.  Jester Depo 38:2-8.

      In this case, there was a single instance of one deputy placing his knee in a location on Mr. Payne's arm that could have placed pressure on Mr. Payne's back.  Deputy Conner Santini was positioned at one of Mr. Payne's arms.  He testified that at one point he knelled on Mr. Payne's tricep area to hold him still.  Another deputy, Deputy Fifer, was positioned at Mr. Payne's other arm and quickly noticed Deputy Santini's knee placement and told him to

move off of Mr. Payne's arm.  Deputy Santini testified that he did so immediately, aware that

pressure on the tricep could result in pressure to his upper torso.  Coit Dec., Ex. 10, Deposition

of Conner Santini (Santini Depo) at 75:17-25 ("When you placed your knee on Landon Payne's

tricep while he was handcuffed behind his back, did that place pressure on Landon Payne's upper

torso? A. It may have, and that was kind of an ongoing observation for, I think, all involved and I

think someone had pointed that out, and it was immediately moved off – when I realized that

there could have been excessive or additional pressure."). Deputy Santini's knee was on

Mr. Payne's tricep for only a couple of seconds.  Santini Depo 77:2-12. *See also* BodyCam at

04:53 (Deputy Fifer telling Deputy Santini to move his knee further down Mr. Payne's arm.

Mr. Payne is observed to be conscious, continuing to grunt, move and make other noise for 30

more seconds after Deputy Fifer's statement is made and Deputy Santini's knee placement is

adjusted.).

    All of the involved deputies have been deposed in this case.  No other deputies have been

identified as having placed pressure anywhere on Mr. Payne's body that could have resulted in

pressure on his upper torso.  All of the Lane County deputies who were present during

Mr. Payne's time in the sally port completed memoranda describing their involvement with the

incident.  Those memoranda are attached to the Coit Dec., as Exhibit 11.  All are consistent in

the following recitation of facts: Once Mr. Payne was on the ground, various deputies helped

control different parts of Mr. Payne's body while the nurse tried to obtain a temperature reading

and he was placed in leg restraints.  This included holding down Mr. Payne's legs and arms.  No

one placed any sustained weight or pressure on Mr. Payne's back or neck.  Mr. Payne was also

patted down at this time to make sure he did not have anything concealed on him.  Coit Dec.,

Ex. 11.

    Less than 90 seconds after Mr. Payne was placed on his stomach on the floor of the sally

port, he stopped moving, having apparently suffering a cardiac event. BodyCam, between 03:58

(laid on the ground) and 05:25 (became unresponsive).  Deputies initially believed Mr. Payne

was calming down.  However, within 25 seconds of him stopping moving, they realized

Mr. Payne was unresponsive and he was rolled to his side to evaluate. BodyCam at 05:50. Deputies began CPR within 60 seconds of Mr. Payne becoming unresponsive. BodyCam at 06:24. Deputies called immediately to their internal medical department for a crash cart and directed central control to summon an ambulance. Deputies rotated CPR duties, continuing to perform CPR until the ambulance arrived and EMTs took over, around 10 minutes later. BodyCam at 16:41. The EMTs were able to regain Mr. Payne's breathing. He was loaded onto the ambulance and taken to the hospital.

Mr. Payne was pronounced dead on March 30, 2020, by Dr. Jaime Fair. Dr. Fair's discharge summary reported that Mr. Payne had suffered a cardiac arrest "out of hospital", associated conditions resulting from the lack of oxygen to his brain after his heart stopped beating (anoxic brain injury, rhabdomyolysis), and methamphetamine use. Coit Dec., Ex. 12, Medical Examiner's Report. The medical examiner agreed with Dr. Fair, finding Mr. Payne's cause of death to be lack of oxygen to the brain upon resuscitation from a cardiopulmonary arrest. Other contributing factors were found to be methamphetamine use and excited delirium. *Id.*

## IV.    SPECIFIC INVOLVEMENT OF EACH INDIVIDUALLY NAMED DEFENDANT

Plaintiff must prove her claims against each of the individual defendants. Each of their individual actions must be identified and evaluated to determine if Plaintiff has sufficiently carried her burden on summary judgment on each claim against each defendant. The undisputed material facts show the following involvement of each individual with Mr. Payne.

### 1.    Justin Wilson

When Mr. Payne arrived at the Lane County Jail, Deputy Wilson spoke with the Eugene Police to find out more information about the arrest. Coit Dec., Ex. 13, Deposition of Justin Wilson (Wilson Depo) 36:5-10. While Mr. Payne was being removed from the vehicle, Deputy Wilson was on the other side of the vehicle providing coverage. *Id*. at 36:12-21. Deputy Wilson was not part of the physical removal of Mr. Payne from the vehicle. After Mr. Payne was

removed from the vehicle, Deputy Wilson kneeled next to Mr. Payne to attempt to talk to

Mr. Payne but was not involved in restraining him. *Id.* at 36:7-12. At the direction of the onsite

medical personnel, Deputy Wilson assisted in administering CPR and other emergency treatment

from the time Mr. Payne stopped breathing until emergency services arrived at the scene.

*Id. a*t 37:18-39:21; *see also* Coit Dec., Ex. 11 at p. 1 ("Wilson Memo").

### 2.    Zachery Fulton

After Mr. Payne was removed from the vehicle, Deputy Fulton assisted in lowering

Mr. Payne to the ground. Coit Dec., Ex. 14, Deposition of Zachary Fulton (Fulton Depo) 41:18-22.

Once Mr. Payne was on the ground, Deputy Fulton helped restrain Mr. Payne by holding

Mr. Payne's head. Coit Dec., Ex. 11 at pp. 2-3 ("Fulton Memo"). After Mr. Payne stopped

breathing, Deputy Fulton assisted in rolling him to his back and assisted with chest compressions

until emergency services arrived. *Id.*

### 3.    Emma Grotefend also known as Emma Edwards

Deputy Edwards (as she was known at the time) entire involvement with Mr. Payne was

to help control his legs when he was on the ground, to check his pulse, and to retrieve scissors

and start cutting his shirt off while CPR was being performed.  Coit Dec., Ex. 15, Deposition of

Emma Grotefend (Grotefend Depo) 68:17-69:2 and 75:5-13; *see also* Coit Decl., Ex. 11 at p. 8

("Edwards Memo"). She was not involved with removing Mr. Payne from the vehicle. Grotefend

Depo 64:24-65:2. Although she was available to assist with chest compressions if needed,

Deputy Edwards did not do so. *Id.* at 80:1-6.

### 4.    Colter Gawith

Deputy Gawith's direct involvement with Mr. Payne began after he was placed on the

ground when Deputy Gawith took responsibility to help control Mr. Payne's feet. Coit Dec.,

Ex. 11 at p. 9 ("Gawith Memo"). Deputy Gawith then assisted in placing leg irons on Mr. Payne

and removed them when CPR was started. *Id.*; *see also* Coit Dec., Ex. 16, Deposition of Colter

Gawith (Gawith Depo) 14:4-18 and 15:25-16:14. Deputy Gawith had no other involvement with Mr. Payne. Gawith Depo. 14:20-21 and 16:17-19.

### 5.    Nathan Gent

Deputy Gent assisted in removing Mr. Payne from the vehicle and helped place him on the ground. Coit Dec., Ex. 11 at p. 6 ("Gent Memo"). Once Mr. Payne was on the ground, Deputy Gent restrained one of Mr. Payne's legs. *Id.* After Mr. Payne stopped breathing, Deputy Gent initiated chest compressions until he was relieved by another deputy. *Id.*

### 6.    Michael Baeuerlen

Deputy Baeuerlen wore a body camera during his interaction with Mr. Payne. *See e.g.* Baeuerlen Depo 17:7-13. When Mr. Payne arrived at the Lane County Jail, Deputy Baeuerlen attempted to ask Mr. Payne initial assessment questions but did not receive intelligible responses. Baeuerlen Depo 35:10-21. Deputy Baeuerlen assisted in lowering Mr. Payne to the ground and helped control one of his arms once Mr. Payne was on the ground. *See e.g. id.* at 77:23-25 and 82:2-5.

### 7.    Stephen Foley

Deputy Foley was a bystander for this entire incident. Coit Dec., Ex. 17, Deposition of Stephen Foley (Foley Depo) 36:25-37:6. Other than briefly touching Mr. Payne's arm for a moment, Deputy Foley had no other physical contact with Mr. Payne. *Id.*

### 8.    Joseph Fisher

Deputy Joseph Fisher was not involved in the Landon Payne incident.  There is no evidence that he was present at the Lane County jail at the time that Mr. Payne was brought in. Deputy Stephen Fisher was present, prepared an incident memo, and appeared for a deposition in this case.  Deputy Stephen Fisher had no physical contact with Mr. Payne, was not involved in any decision making about Mr. Payne, and was purely a bystander. Coit Decl., Ex. 11 at p. 12 ("Fisher Memo") ("My involvement during the entire incident was that of a bystander.").

### 9.    Jeremy Fifer

Deputy Fifer became involved in the incident with Mr. Payne after he had been removed from the vehicle and was on the ground. Coit Dec., Ex. 18, Deposition of Jeremy Fifer (Fifer Depo) 32:3-6 and 33:15-21. Deputy Fifer assisted in controlling Mr. Payne by placing a knee on Mr. Payne's lower left arm. *Id.* at 33:18-34:23. Deputy Fifer ensured that no one placed any weight on Mr. Payne's back by telling another Deputy [Deputy Santini] to move his knee further down on Mr. Payne's right side. *Id.* at 35:15-36:23. Once Mr. Payne stopped breathing, Deputy Fifer's involvement with Mr. Payne ended. *Id.* at 38:23-39:5.

### 10.    William McClure

Deputy McClure was present while Sgt. Jester spoke with the Eugene Police arresting officer and heard Sgt. Jester attempt to have Eugene Police release Mr. Payne. Coit Dec., Ex. 19, Deposition of William McClure (McClure Depo) 29:16-23. However, the arresting officer refused to do so based on Mr. Payne's alleged resisting arrest. *Id.* After that point, Deputy McClure's involvement with Mr. Payne was limited to assisting with placing ankle chains on him. Coit Dec., Ex. 11 at p. 14 ("McClure Memo"); *see also* McClure Depo 30:21-31:7.

### 11.    Lance Jester

Sgt. Jester attempted unsuccessfully to have Mr. Payne cited and released by the Eugene Police. Jester Depo 36:5-23. Although he was present the entire time, Sgt. Jester had no physical contact with Mr. Payne. He spoke to Mr. Payne while he was on the ground.  Coit Dec., Ex. 11 at p. 10 ("Jester Memo").

### 12.    Richard Clinton Riley

Captain Riley was not present when Landon Payne was brought to the Lane County jail on March 27, 2020, but became aware of Mr. Payne after medics had been called to the scene. Riley Depo 38:24-39:15. Captain Riley never had any direct involvement with Mr. Payne.

### 13.    Connor West Santini

Deputy Santini was training Deputy Baeuerlen when Mr. Payne was brought to the Lane County jail. Santini Depo 60:13-14. After Deputy Baeuerlen was unsuccessful at attempting to

talk with Mr. Payne, Deputy Santini attempted to ask Mr. Payne questions, but was equally unsuccessful at getting any intelligible response. *Id.* 47:3-11. After Mr. Payne was removed from the vehicle, Deputy Santini assisted in controlling Mr. Payne's right arm by placing a knee on Mr. Payne's upper arm. Santini Depo 74:14-75:2. After Mr. Payne stopped breathing, Deputy Santini assisted with CPR until emergency services responded. Coit Dec., Ex 11 at pp. 4-5 ("Santini Memo").

## V.    LAW AND ARGUMENT

### A.    Plaintiff's Claim for 42 U.S.C. § 1983 Against the Individual County Defendants for Violation of Mr. Payne's Fourth Amendment Right to be Free from the Use of Excessive Force

For Plaintiff's Sixth Claim for Relief, she alleges that each of the Individual County Defendants violated Mr. Payne's Fourth Amendment right to be free of excessive physical force, resulting in his death. FAC ¶¶ 157-159. She brings her claim under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives someone of a federal constitutional or statutory right. *Lindke v. Freed*, 601 U.S. 187, 188 (2024). "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

### 1.    There Is Insufficient Evidence to Support a Fourth Amendment Constitutional Violation

A claim that law enforcement officers used excessive force is analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests." *Id.* To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which

involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "Graham factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (*citing Graham*, 490 U.S. at 396–97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Here, the force to be evaluated is the force used by each deputy to remove Mr. Payne from the vehicle and to hold Mr. Payne still while his temperature was taken, and leg restraints were placed. For those individuals who did not touch Mr. Payne at all (Foley, Fisher, Jester and Riley), and Wilson, who touched him only to perform CPR, the claims against them must be dismissed. They used no force against Mr. Payne at all.

For the others who had some involvement in the removal of Mr. Payne from the vehicle and holding him still on the ground, the force used must be weighed against the governmental interest at stake, namely the need to obtain assurance that (1) Mr. Payne was not infected with COVID-19 (taking his temperature) and (2) that he would not pose a physical danger to himself, deputies, or other bystanders in the jail once he was allowed inside (placement of leg restraints). The first interest is significant because "the state has a substantial interest in assuring the medical stability of its pretrial detainees." *Sullivan v. Bornemann*, 384 F.3d 372, 378 (7th Cir. 2004); *See also Colvin v. Capello*, No. 2:10-cv-297, 2012 WL 1190174, at *5 (W.D. Mich. Apr. 9, 2012) (holding that a forced blood-pressure and weight check did not violate rights of prisoner engaged in hunger strike); *Williams v. Brann,* No. 02-C-940, 2006 WL 2401112, at *7–8 (E.D. Wisc. Aug. 18, 2006) (restraining detainee to facilitate rectal exam did not violate Fourth Amendment).

Page 17 – LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Here, the Lane County jail had implemented a COVID-19 policy requiring all persons have a temperature check before being brought into the jail.  There can be no legitimate argument against the grave import on March 27, 2020, of the government's interest in taking all reasonable measures to stop the introduction of COVID-19 to the jail population.  At that point in the County's COVID-19 understanding, a temperature check was a reasonable measure to implement. Likewise, Lane County had a policy that all combative person be placed in leg restraints before being brought into the jail for safety reasons.  The Supreme Court has specifically recognized the "legitimate interests that stem from [the government's] need to manage the [jail] facility in which the individual is detained," appropriately deferring to "policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979).

Requiring Mr. Payne to be removed from the vehicle for the initial temperature screening was likewise reasonable.  As Sgt. Jester explained, it is not a safe or acceptable practice to require a jail nurse to enter a vehicle with a combative subject to take his temperature.  Once Mr. Payne was out of the vehicle, the BodyCam shows that he was not cooperative in standing still for a temperature read.  The memoranda attached at Exhibit 12 explain that he dropped his weight when pulled from the car.  He also needed to be placed in ankle restraints, which could only be accomplished while he was on the ground.

Once on the ground, the facts show that a reasonable amount of force was used to hold him still while the ankle restraints were placed, and his temperature was checked.  Sgt. Jester positioned himself at Mr. Payne's head so he could watch down the line of Mr. Payne's back to make sure he was being held down safely.  When one deputy momentarily placed his knee on a location on Mr. Payne's arm that could have potentially resulted in pressure on Mr. Payne's upper torso, that action was immediately noticed and corrected.  There is no evidence that any deputy placed weight directly on Mr. Payne's back or neck. There is no evidence that any of the

pressure applied to Mr. Payne's body to hold him in place was too hard or unnecessary.  There is certainly no evidence that any force was used gratuitously or that it caused pain to Mr. Payne.[1]

The undisputed facts, as clearly seen on the BodyCam, show that the force used on Mr. Payne was reasonable under the circumstances.

### 2. Each of the Individual County Defendants is Entitled to Qualified Immunity

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Iqbal*, 563 U.S. 662, 743 (2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). To successfully rebut an affirmative defense of qualified immunity, "a plaintiff must show that the officer's conduct was so egregious that any reasonable person would have recognized a constitutional violation." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). "In resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in a light most favorable to the plaintiff)." *Cunningham v. Gates*, 229 F.3d 1271,

---

[1] Despite having reviewed the video evidence and having deposed all of the involved deputies, Plaintiff continues to allege in the FAC that Mr. Payne "informed the deputies kneeling on him, 'I cannot breath.'"  FAC ¶ 111.  The BodyCam conclusively shows that Mr. Payne made no such statement while being held on the ground by the Lane County deputies.  "When there is a videotape capturing the events in question, the court must view the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 381 (2007).

1287 (9th Cir. 2000). Additionally, courts must take care to "consider the state of the law at the time of the alleged violation." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).

Importantly, the Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015). "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S. 100 (2018) (internal citation omitted).

As discussed above, there is insufficient evidence to establish that any of the Individual County Defendants violated Mr. Payne's Fourth Amendment right to be free from excessive force. Setting that aside and assuming for the moment that a constitutional violation can be found, the deputies are entitled to qualified immunity on the second prong. The constitutional right allegedly violated was not sufficiently clearly established on March 27, 2020.

A right is not clearly established for qualified immunity purposes "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)). Accordingly, officers facing excessive force claims are entitled to qualified immunity unless "existing precedent" put the unreasonableness of the particular law enforcement conduct, in this particular factual context, "beyond debate." *Mullenix*, 577 U.S. at 13-14 (*quoting Ashcroft*, 563 U.S. at 741). As a general rule, defendants are entitled to qualified immunity unless the district court can "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

As noted, Plaintiff appears to be asserting that Mr. Payne had a Fourth Amendment right not to be removed from the vehicle and not to be held down while his temperature was taken and

leg shackles applied.  Alternatively, or perhaps in addition, Plaintiff may be asserting a Fourth

Amendment right not to have a deputy momentarily kneel on Mr. Payne's tricep while he was

held in the prone position.  Regardless of how Plaintiff may frame the right she believes was

violated, she cannot carry her burden of showing that the right was clearly established at the time

of the alleged violation.

To the contrary, in *Spence v. Stambaugh*, No. 214CV1170WBSACP, 2021 WL 929507,

(E.D. Cal. Mar. 11, 2021), report and recommendation adopted, No. 214CV1170WBSACP, 2021

WL 1388472 (E.D. Cal. Apr. 13, 2021), a district court reviewing a claim for qualified immunity

in a case with relatively similar facts on the use of force issue explained that:

> [t[he undersigned has identified no authority extant at the time of
> plaintiff's arrest (or since announced) that holds the Fourth
> Amendment is violated by the use of force to obtain vital signs
> involuntarily from a pretrial detainee during medical intake.
> Indeed, there is a complete absence of authority on the question.
> Accordingly, it was not "beyond debate" at the time of defendants'
> actions that they were violating plaintiff's rights by placing him on
> the floor and restraining him so that his vital signs could be taken
> at medical intake. And as the court has already determined,
> plaintiff has not produced evidence sufficient for a jury to find that
> the degree of force used was unreasonable in relation to that
> purpose.
>
> Because no clearly established law provided that the taking of vital
> signs by force violates the Constitution, defendant Croley is
> entitled to qualified immunity on Claim Two and defendants
> Mrozinski, Mundy and Ogle are entitled to qualified immunity on
> Claim Three, insofar as those claims challenge the use of force to
> obtain vital signs.

2021 WL 929507, at *10–11

Similarly, in *Leath v. Webb*, 323 F. Supp. 3d 882, 894–95 (E.D. Ky. 2018), the court

reviewing a claim of excessive force for restraint during a medical clearance and granted the

defendants qualified immunity, finding that "several cases suggest that restraining a detainee for

medical purposes does not violate the Constitution." In Leath, the plaintiff was intoxicated and

combative when brought to the jail and refused to allow the jail nurse to conduct the vital signs

and temperature check needed to allow him to be booked into the jail.  The defendants then

forcibly transported the plaintiff to the hospital and held him down while a hospital nurse

conducted the medical screening examinations.  The court first found no constitutional violation from the force used under the circumstances in which it was used.  It went on, though, to also discuss qualified immunity:

> But even if a constitutional violation occurred, it was far from clearly established. Leath's arguments fail for two reasons. First, his claim would require defining his clearly established rights at a high level of generality—the right to refuse any medical treatment in any context. But this is precisely what the Supreme Court has warned against: "[t]he 'clearly established' standard ... requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.  Leath does not even attempt to explain how acquiring minimally invasive vital signs—in a jail setting, from a hostile and intoxicated detainee, who could be a danger to himself and others—violates clearly established rights. In short, Leath fails to establish that the officers' conduct was unlawful in the situation they confronted.

*Leath,* 323 F. Supp. 3d at 894 (internal citations omitted).

*Leath* went on: "[i]ndeed, other cases involve medical treatment far more invasive than what Leath endured. In short, the case law governing detainee and prisoner medical treatment is not so clear as to establish that every reasonable officer would understand that what he is doing violates Leath's rights. The officers and nurses did not have "fair warning" that their actions would violate a clearly established constitutional right, and they are entitled to qualified immunity. *Id. (*citing *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015)).

In *Gibson v. Cnty. of Washoe, Nev*., 290 F.3d 1175 (9th Cir. 2002), the court reviewed a claim for qualified immunity arising from facts strikingly similar to those at issue here.  In *Gibson*, the plaintiff-arrestee refused to get out of the patrol car at the jail. Four jail deputies pulled the plaintiff from the car and carried him into the jail's sally port. There, they placed the plaintiff face down on the floor, holding him in that position while he was searched and restrained in a waist chain, leg irons and wrist chains. As the officers searched and shackled the plaintiff, he repeatedly called out, "Help me, Jesus."  Once restrained, the officers dragged the plaintiff through the booking area. *Id.* at 1182.

When reviewing the reasonableness of the force used on the plaintiff, the court explained that it had to "examine the circumstances underlying a Fourth Amendment claim from the

viewpoint of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Citing *Graham*, 490 U.S. at 396, *Gibson* explained that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Gibson,* 290 F.3d at 1198. Applying these standards to the case before it, Gibson concluded that the individual defendant deputies could not be held liable for the use of excessive force against Gibson because "from the moment Gibson arrived at the jail, he was struggling against the deputies, hurling invective, and generally behaving very strangely and violently. Because we have determined that there is no proof the deputies on duty at the jail were aware that Gibson's behavior was connected to his treatable mental illness, we cannot hold them accountable for having treated Gibson as a dangerous prisoner rather than a sick one, despite the tragic consequences of this error." *Id.*

For the foregoing reasons, Plaintiff cannot carry her burden of showing that the right she claims was violated was so clearly established on March 27, 2020, as to preclude the Individual County Defendants from invoking qualified immunity.

**B.    Plaintiff's Claim for 42 U.S.C. § 1983 Against the Individual County Defendants for Violation of Mr. Payne's Fourteenth Amendment Right to Adequate Medical Care**

**1.    There is Insufficient Evidence to Support a Fourteenth Amendment Constitutional Violation**

The Due Process Clause of the Fourteenth Amendment provides pretrial detainees with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment. *Gordon v. Cnt.y of Orange*, 888 F.3d 1118, 1124 – 1125 (9th Cir. 2018). A detainee's constitutional rights are violated "when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). A medical professional's negligence in diagnosing or treating a medical condition does not violate the Constitution. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (Eighth Amendment context). Only acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs rise to the level of a constitutional violation.  *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.")

Construing the allegations in Plaintiff's favor, for purposes of this Motion only, the County Defendants will assume that Mr. Payne was a pretrial detainee in its custody during his time at the Lane County jail.[2] A pretrial detainee alleging failure to provide constitutionally adequate medical care must prove the following elements to establish a claim under 42 U.S.C. § 1983:

> (i)    the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

> (ii)   those conditions put the plaintiff at substantial risk of suffering serious harm;

> (iii)  the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

> (iv)   by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

Regarding the third element, *Gordon* emphasized that: "mere lack of due care by a state official" is not enough to show a constitutional violation. *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (internal quotation marks omitted)). The plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro*, 833 F.3d at 1071). *Alexander v. Nguyen*, 78 F.4th 1140, 1145 (9th Cir. 2023). "Typically, a difference of opinion between a physician and the prisoner –

---

[2] There is dispute as to whether Lane County ever had custody of Mr. Payne, or whether the City maintained his custody until he was cited and released at the hospital.  Under the latter circumstance, the constitutional requirement to provide adequate medical care remained always with the City. However, for the sake of this Motion only, the County proceeds on the assumption that it owed Mr. Payne a duty to provide adequate medical care.

or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference." *Edmo v. Corizon, Inc*., 935 F.3d 757, 786 (9th Cir. 2019).

As explained by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976):

> In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Id.* (internal citations omitted).

Plaintiff alleges that each of the Individual County Defendants violated Mr. Payne's constitutional right to receive adequate medical care by: failing to provide Landon Payne with prompt medical attention for his serious medical needs; failing to recognize the serious medical situation Landon Payne was in; failing to properly treat Landon Payne's serious medical needs; in failing to refuse to intake Landon Jay Payne and demand Eugene Police transfer Landon Payne from the Lane County jail to a hospital for diagnosis and treatment prior to entry into the Lane County jail.  FAC ¶ 131. Looking at each allegation separately, summary judgment in favor the Individual County Defendants is required on this claim.

### a.    Failing to provide prompt medical attention

The entire purpose of laying Mr. Payne on the ground, getting his temperature reading, and placing ankle restraints was so that he could enter the jail and undergo a medical screening prior to booking.  There was no opportunity for the County to discover Mr. Payne's serious medical needs before he suffered a cardiac arrest.  There can be no argument that as soon as the deputies became aware that Mr. Payne was unresponsive, they provided immediate and thorough life saving efforts through the provision of CPR, calling for the crash cart and applying the AED, and calling immediately for an ambulance.

While not alleged anywhere in the complaint, there has been some indication from Plaintiff in depositions that the jail nurse may have been too slow to bring the crash cart with the

AED after it was requested, and that she was not capable of administering the oxygen cannister. True or not, those allegations of alleged failures have no relevance to the claims against the Individual County Defendants. The jail nurse is not a defendant, nor is she a County employee. On a 42 U.S.C. § 1983 claim, there is no vicarious liability. The constitutional violation must be shown to have been committed by the individual defendant named in the claim.

> **b.** **Failing to recognize Landon Payne's serious medical situation**

As explained above, Officer Solario delivered Mr. Payne to the jail believing that he had been examined and medically cleared by the emergency responders for booking in the jail. Sgt. Jester testified that he heard one of the Eugene officers say that on-scene medics had medically cleared Mr. Payne from the taser deployment. Jester Depo 67:7-16. The Individual County Defendants had no reason to suspect that Mr. Payne's temperament, ability to speak, and physical presentation had changed in dramatic respect after he was tased. They had no reason to suspect that he was not just an angry and combative arrestee, as Officer Solario described him to be, but rather was a methamphetamine user who may have been pushed into excited delirium or another concerning medical state when repeatedly tased. So, while the County had intended to subject Mr. Payne to another screening before booking him, a screening that would occur after leg restraints were placed and his temperature taken, it had no reason to suspect that a more urgent medical evaluation needed to occur.

Based on these undisputed material facts, Plaintiff cannot show that any of the Individual County Defendants were aware of Mr. Payne's serious medical condition and the risks it presented, much less that any of them made the intentional decision to ignore those risks.

> **c.** **Failing to refuse to intake Landon Jay Payne and demand Eugene Police transfer Landon Payne from the Lane County Jail to a hospital for diagnosis and treatment prior to entry into the Lane County Jail**

As with the foregoing allegation, the Individual County Defendants did not have the information needed to evaluate whether Mr. Payne should be taken directly to the hospital. Beyond that, though, the facts show that the Individual County Defendants had no power or

Case 6:22-cv-00471-MC    Document 57    Filed 07/17/24    Page 33 of 41

authority to "demand" that the City of Eugene do anything with Mr. Payne.  The City of Eugene is its own governmental entity.  While Mr. Payne was inside Officer Solario's patrol car, he was indisputably in the City of Eugene's custody and subject to its control.  Lane County, while it owns and operates the jail, has no power over the City of Eugene's police officers and no ability to dictate who they arrest or how they medically clear arrestees for booking at the jail.

When Officer Solario told Sgt. Jester that he was not going to cite and release Mr. Payne, the County had to move forward with its own actions.  And it did so.  As set out above, when Officer Solario said he was leaving Mr. Payne at the jail, the Individual County Defendants moved forward with their plan of action to remove Mr. Payne from the police car, take his temperature and restrain him in leg restraints, and then move him into the jail for a more thorough medical evaluation.  Had the Individual County Defendants gotten Mr. Payne to that point, it is quite likely they would have discovered that his medical condition warranted a more comprehensive review at the hospital.  They would have "refused to intake" Mr. Payne and transported him to the hospital.  But, again, they did not get to that point.  Mr. Payne suffered a cardiac arrest before the initial screening test and leg restraint placement were complete.

Based on the undisputed facts, Plaintiff cannot prove that the Individual County Defendants were deliberately indifferent to Mr. Payne's serious medical needs by not demanding that the Eugene Police transport him to the hospital.

Plaintiff cannot show that any of the Individual County Defendants engaged in actions or inactions rising to the level of deliberate indifference to Mr. Payne's serious medical needs.

### 2.    The Individual County Defendants are Entitled to Qualified Immunity

Even if it is assumed Plaintiff could establish a Fourteenth Amendment violation, the Individual County Defendants are all entitled to qualified immunity.  Plaintiff cannot point to any case law or precedent existing in 2020 that would have put the deputies on notice that their actions or inactions violated Mr. Payne's Fourteenth Amendment right.  For example, there is not a case that holds that starting CPR less than 60 second after the person has become

Page 27 – LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

unresponsive is a failure to provide adequate medical care.  Nor is there a case stating that removing an arrestee from a patrol car in the sally port of the jail and attempting to screen them for COVID-19 so they can be medically evaluated inside the jail constitutes deliberate indifference because the serious medical needs of the arrestee should have been identified while they were still in the car.  And finally, there is no case that states that a local government agency violates a pretrial detainee's right to adequate medical care when it fails to force another local government agency to send someone to the hospital.

### C.    42 U.S.C. § 1983 Claims Against Lane County

Plaintiff brings a direct action against Lane County under 42 U.S.C. § 1982, claiming that its actions violated both Mr. Payne's Fourth and Fourteenth Amendment rights.  FAC ¶¶ 144-152. Lane County is a "person" for purposes of § 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  However, municipalities are only responsible for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). A plaintiff seeking to impose liability under § 1983 must demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.; see also City of Canton,* 489 U.S. 378, 385 (1989) ("Our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

### 1.    No Constitutional Violation

Lane County's liability under § 1983 is contingent on there first being a constitutional violation caused by one or more of the Individual County Defendants.  If there is no constitutional violation suffered, the County cannot be liable under § 1983.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("Neither *Monell*...nor any other of our cases

authorizes the award of damages against a municipal corporation based on the actions of one of its officers when...the officer inflicted no constitutional harm."); *see also Long v. City & Cty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If no constitutional violation occurred, the municipality cannot be held liable and whether 'the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.'") (*quoting Heller*, 475 U.S. at 799).

As explained above, none of the Individual County Defendants engaged in conduct that violated Mr. Payne's constitutional rights. For that reason, summary judgment for the County is warranted.

> ### 2. Insufficient Evidence that a County Policy, Custom or Practice Resulted in a Violation of Mr. Payne's Constitutional Rights

Plaintiff alleges the following alleged policies, customs or practices of Lane County caused the Individual County Defendants to violate Mr. Payne's constitutional rights.

> #### a. A policy custom or practice of providing insufficient medical and mental health assessments

As explained at length herein, Mr. Payne suffered a cardiac arrest before the deputies and medical staff were able to conduct a medical or mental health assessment. Plaintiff has no idea what Mr. Payne's medical or mental health assessments would have entailed had he been given them at the Lane County jail. This claim cannot be proven.

> #### b. A policy, custom or practice of denying people in medical and mental health crisis medically necessary transfers to hospitals;

Lane County did not deny Mr. Payne a transfer to the hospital. The City of Eugene had control over and made that decision. The County did not deny Mr. Payne a transfer to the hospital. Thus, even if it has such a policy, custom or practice, it could not have caused a constitutional violation to Mr. Payne.

      c.     **A policy, custom or practice of failing to respond properly to the serious medical needs of arrestees and/or inmates;**

As explained above, the Individual County Defendants took immediate action as soon as Mr. Payne's serious medical need became evident. Thus, there is no evidence to show either that such a policy exists or, if it does, that it resulted in a constitutional violation for Mr. Payne.

      d.     **A policy, custom or practice of failing to respond properly to inmates experiencing drug or alcohol overdose or withdrawal;**

Again, Lane County had no opportunity to "respond properly" to Mr. Payne's drug overdose or withdrawal.  The City of Eugene made the decision not to medically clear Mr. Payne in the field, not to take him to the hospital, and not to otherwise respond to Mr. Payne's drug-related symptoms with any action other than dropping him at the Lane County jail.  Plaintiff cannot show that the County has any such policy, custom or practice or, if it does, that it resulted in a constitutional violation for Mr. Payne.

      e.     **A policy, custom or practice of kneeling on restrained inmates and/or arrestees;**

As explained above, the force used to hold Mr. Payne still while he was being placed in leg restraints and having his temperature taken was reasonable under the circumstances.  The Individual County Defendants are entitled to use the amount of force reasonably necessary to accomplish those legitimate purposes.  There is no evidence that the placement of pressure on Mr. Payne's limbs with a deputy's knee caused harm to Mr. Payne or was excessive under the circumstances.

Plaintiff is trying to sweep this case into the category of George Floyd cases, where officers kneel on a suspect's neck while the life is suffocated out of him.  That is why Plaintiff continues to include in the complaint an allegation that Mr. Payne's last words were "I cannot breathe."  That did not happen.  This is not that case.

Police brutality is never acceptable, under any circumstances. The officers in the George Floyd case acted intentionally to hurt Mr. Floyd.  There is no evidence here to even suspect, let alone infer, that the Individual County Defendants acted with evil intent or deliberate indifferent to Mr. Payne's needs.  Quite the opposite, they did all they could to help Mr. Payne.  Yes, there

is evidence that Deputy Santini placed his knee on Mr. Payne's tricep for a few seconds while helping to hold him still.  But there is no evidence or allegation that he or anyone else kneeled on Mr. Payne's back or upper torso.  Just his tricep – but even that was deemed unacceptable by the other deputies because it could potentially put pressure on Mr. Payne's upper torso.  Deputy Santini he was called on his knee placement immediately and he moved.  That is not excessive force, and it is certainly not evidence of a policy, custom or practice of the Lane County Sheriff's Department to kneel on the backs or necks of people being restrained.

Plaintiff cannot prove that Lane County had a policy, custom or practice that caused a deprivation of Mr. Payne's constitutional rights.

**D.      42 U.S.C § 1983 – Supervisor Liability Against Captain Riley**

For her Eleventh Claim, Plaintiff asserts that Cpt. Riley failed to stop his subordinates from following the County's allegedly unconstitutional policies and failed to train them not to engage in the conduct identified in the complaint as being in violation of Mr. Payne's constitutional rights.

Supervisory liability under 42 U.S.C. § 1983 is imposed against a supervisory official in their individual capacity for their "own culpable action or inaction in the training, supervision, or control of [their] subordinates, acquiescence in the constitutional deprivations of which the complaint is made or conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011) (internal citations omitted). To be guilty of "deliberate indifference", the defendant must know he is "creating a substantial risk of bodily harm." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997). Finally, to establish a supervisor's liability under § 1983, a plaintiff must show that an affirmative link exists between the constitutional deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'" *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988)).

Here, Plaintiff makes no effort to show any connection between Cpt. Riley's alleged lack of supervision or his failure to train, and the actions of the individual deputies. The fact he was a supervisor is not sufficient to establish liability under § 1983. There is no respondeat superior liability. Plaintiff has failed to identify any action by Cpt. Riley in his role as a supervisor that was both deliberately indifferent to Mr. Payne's rights and caused the individual deputies to engage in a constitutional violation.

### E.    State Law Claims

Plaintiff also asserts three state law claims against "all defendants."

#### 1.    Negligence

Plaintiff alleges that "defendants" actions violated the standard of care and created an unreasonable and foreseeable risk of harm to Mr. Payne. FAC ¶¶ 173-177.

"To prevail on a common-law negligence claim under Oregon law, a plaintiff must prove:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiffs harm, and (5) that plaintiff was within the class of persons and plaintiffs injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Nordenstrom for Est. of Perry v. Corizon Health, Inc.*, No. 3:18-CV-01754-HZ, 2021 WL 2546275, at *19–20 (D. Or. June 18, 2021) (quoting *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010)).

When evaluating this claim against the County defendants, it is important to remember what they did and did not know at the time they took actions involving against Mr. Payne. They did not know he was acting markedly different after being tased and they did not know that he had not, despite Officer Solario's statement to the contrary, been medically evaluated and cleared by emergency responders at the scene after being tased.

With this in mind, it could not have been reasonably foreseeable that removing Mr. Payne from the car, placing him on the ground and holding him still, and applying leg restraints would

result in him suffering a cardiac arrest 90 second later.  To that same end, there is no evidence from which a reasonable jury could infer that the foregoing conduct, including a momentary kneel on Mr. Payne's tricep, caused him to suffer a cardiac arrest.

Finally, assuming the court agrees that there was no excessive force used on Mr. Payne and that the individual deputies did not fail to provide adequate medical care to Mr. Payne's serious medical needs, then a jury could also not find that the individual deputies' actions were unreasonable in light of the "risk".  The risk was Mr. Payne suffering a cardiac arrest.  If all actions taken with regard to Payne were reasonable, there was no foreseeable risk of cardiac arrest resulting from that conduct.

While negligence is generally a question of fact, here the undisputed facts show that no reasonable jury could conclude that the individual defendants (and thus, the County), acted negligently with respect to the actions and decisions involving Mr. Payne.

### 2.    Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a plaintiff must allege that: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Delaney v. Clifton*, 180 Or. App. 119, 129, (2002).  Determining whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is initially a question of law.  *Harris v. Pameco Corp*., 170 Or.App. 164, 171 (2000).

Plaintiff has failed to identify the act or acts that she believes constituted an extraordinary transgression of the bounds of socially tolerable conduct.  None of the actions of any of the individual deputies rise to such a level as a matter of law.

### 3.    Battery

A "battery" is a "voluntary act that is intended to cause the resulting harmful or offensive contact."  *Walthers v. Gossett*, 148 Or. App. 548, 552 (1997). A police officer is justified under

Oregon law in using physical force when he or she believes it is reasonably necessary to make an arrest. *Gigler v. Klamath Falls*, 21 Or. App. 753, 763 (1975). A police officer is presumed to be acting in good faith in determining the amount of force necessary to make the arrest. *Rich v. Cooper*, 234 Or. 300, 309 (1963). However, the use of excessive force by a police officer in carrying out an arrest can give rise to civil liability for battery. *Ballard v. City of Albany*, 221 Or. App. 630, 640–41 (2008).

As explained, Plaintiff cannot prove a claim of excessive force against the Individual County Defendants. Absent excessive force, justification is a complete defense to Plaintiff's battery claim. *Rich,* 234 Or. at 309.

## VI.   CONCLUSION

There is no genuine issue of material fact, and the Lane County Defendants are entitled to judgment as a matter of law. Under Fed. R. Civ. P. 56, the Court should grant them summary judgment on all claims.

DATED this 17th day of July, 2023.

HUTCHINSON COX

By:    s/Andrea D. Coit
Andrea D. Coit, OSB #002640
acoit@eugenelaw.com
Ariana Denley, OSB #173314
adenley@eugenelaw.com
Of Attorneys for Lane County, Riley, Jester,
McClure, Fifer, Fisher, Foley, Baeuerlen, Gent,
Gawith, Edwards, Santini, Wilson, and Fulton

## CERTIFICATE OF SERVICE

I certify that on July 17, 2024, I served or caused to be served a true and complete copy of the foregoing **LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

☒ Via the Court's Efiling System

☐ Via First-Class Mail, Postage Prepaid

☐ Via Email

☐ Via Personal Delivery

☐ Via Facsimile

| | |
|---|---|
| Willow R. Hillman<br>Law Office of Willow Hillman, LLC<br>44 Broadway, Suite 222<br>Eugene, OR 97401<br>willow@willowhillmanlaw.com | Ben Miller<br>Eugene City Attorney's Office<br>101 W 10th Avenue, Suite 203<br>Eugene, OR 97401<br>bmiller@eugene-or.gov |
| Derek Larwick<br>Larwick Law Firm, PC<br>1190 West 7th Avenue<br>Eugene, OR 97402<br>derek@larwick.com | Kimberlee Collins Morrow<br>Hart Wagner, LLP<br>1000 SW Broadway<br>Suite 2000<br>Portland, OR 97205<br>kcm@hartwagner.com |
| Of Attorneys for Plaintiff | Of Attorneys for Defendants |

HUTCHINSON COX

By:    s/Andrea D. Coit
       Andrea D. Coit, OSB #002640
       Ariana Denley, OSB #173314
       Of Attorneys for Lane County, Riley, Jester,
       McClure, Fifer, Fisher, Foley, Baeuerlen, Gent,
       Gawith, Edwards, Santini, and Wilson