**Andrea D. Coit, OSB #002640**
acoit@eugenelaw.com
**Ariana Denley, OSB #173314**
adenley@eugenelaw.com
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone: (541) 686-9160
Facsimile: (541) 343-8693
Of Attorneys for Lane County, Riley, Jester, McClure, Fifer, Fisher, Foley,
Baeuerlen, Gent, Gawith, Edwards, Santini, and Wilson

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DISTRICT

| | |
|---|---|
| ANZHELIKA PAYNE, personal representative to the estate of LANDON JAY PAYNE,<br><br>Plaintiff,<br><br>v.<br><br>JAIRO SOLORIO, an individual, ANDREW ROBERTS, an individual, JACOB THOMAS, an individual, ROBERT GRIESEL, an individual, JUSTIN WILSON, an individual, ZACHERY FULTON, an individual, EMMA GROTEFEND, also known as EMMA EDWARDS, an individual, COLTER GAWITH, an individual, NATHAN GENT, an individual, MICHAEL BAEUERLEN, an individual, STEPHEN FOLEY, an individual, JOSEPH FISHER, an individual, JEREMY FIFER, an individual, WILLIAM MCCLURE, an individual, LANCE JESTER, an individual, RICHARD CLINTON RILEY, an individual, CONNOR WEST SANTINI, an individual, LANE COUNTY, and CITY OF EUGENE, a municipal corporation.<br><br>Defendants. | Case No. 6:22-cv-00471-MC<br><br>**DECLARATION OF ANDREA D. COIT IN SUPPORT OF LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Andrea D. Coit, do hereby declare as follows:

1.    I am one of the attorneys for the Lane County Defendants in this matter.

2.    Attached hereto as Exhibit 1 is a true and accurate copy of Reporting Officer Solario's Narrative report.

3.    Attached hereto as Exhibit 2 is a true and accurate copy of Officer Thomas's Case Supplemental Report.

4.    Attached hereto as Exhibit 3 is a true and accurate copy of the firefighter's Incident Response Report.

5.    Attached hereto as Exhibit 4 are true and accurate excerpts of the deposition of Robert Griesel.

6.    Attached hereto as Exhibit 5 is a true and accurate copy of Sgt. Griesel's Supplemental Report.

7.    Attached hereto as Exhibit 6 are true and accurate excerpts of the deposition of Lance Jester.

8.    Attached hereto as Exhibit 7 are true and accurate excerpts of the deposition of Michael Baeuerlen.

9.    Attached hereto as Exhibit 8 is a true and accurate copy of the Lane County Jail Security COVID-19 Protocols in effect on March 27, 2020.

10.    Attached hereto as Exhibit 9 are true and accurate excerpts of the deposition of Richard Clinton Riley.

11.    Attached hereto as Exhibit 10 are true and accurate excerpts of the deposition of Conner Santini.

12.    Attached hereto as Exhibit 11 are true and accurate copies of the memoranda of all of the Lane County Deputies who were present during Mr. Payne's time in the sally port describing their involvement with the incident.

13.    Attached hereto as Exhibit 12 is a true and accurate copy of the Medical Examiner's Report.

14.     Attached hereto as Exhibit 13 are true and accurate excerpts of the deposition of Justin Wilson.

15.     Attached hereto as Exhibit 14 are true and accurate excerpts of the deposition of Zachary Fulton.

16.     Attached hereto as Exhibit 15 are true and accurate excerpts of the deposition of Emma Grotefend.

17.     Attached hereto as Exhibit 16 are true and accurate excerpts of the deposition of Colter Gawith.

18.     Attached hereto as Exhibit 17 are true and accurate excerpts of the deposition of Stephen Foley.

19.     Attached hereto as Exhibit 18 are true and accurate excerpts of the deposition of Jeremy Fifer.

20.     Attached hereto as Exhibit 19 are true and accurate excerpts of the deposition of William McClure.

21.     Deputy Baeuerlen wore a body camera throughout the entire Lane County interaction with Mr. Payne.  A true and accurate copy of that video footage is contained on a thumb drive identified as Exhibit 20, which will be mailed to the court and all parties.

22.     Attached hereto as Exhibit 21 are true and accurate excerpts of the deposition of Jairo Solario.

Pursuant to ORCP 1E, I hereby declare that the above statements are true to the best of my knowledge and belief, and I understand they are made for use as evidence in court and are subject to penalty for perjury.

DATED this 17th day of July, 2023.

HUTCHINSON COX

By: ___s/Andrea D. Coit_____
        Andrea D. Coit, OSB #002640

## CERTIFICATE OF SERVICE

I certify that on July 17, 2024, I served or caused to be served a true and complete copy of the foregoing **DECLARATION OF ANDREA D. COIT IN SUPPORT OF LANE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

⊠ Via the Court's Efiling System

☐ Via First-Class Mail, Postage Prepaid

☐ Via Email

☐ Via Personal Delivery

☐ Via Facsimile

Willow R. Hillman
Law Office of Willow Hillman, LLC
44 Broadway, Suite 222
Eugene, OR 97401
willow@willowhillmanlaw.com

Derek Larwick
Larwick Law Firm, PC
1190 West 7th Avenue
Eugene, OR 97402
derek@larwick.com

Of Attorneys for Plaintiff

Ben Miller
Eugene City Attorney's Office
101 W 10th Avenue, Suite 203
Eugene, OR 97401
bmiller@eugene-or.gov

Kimberlee Collins Morrow
Hart Wagner, LLP
1000 SW Broadway
Suite 2000
Portland, OR 97205
kcm@hartwagner.com

Of Attorneys for Defendants

HUTCHINSON COX

By:    s/Andrea D. Coit
       Andrea D. Coit, OSB #002640
       Ariana Denley, OSB #173314
       Of Attorneys for Lane County, Riley, Jester,
       McClure, Fifer, Fisher, Foley, Baeuerlen, Gent,
       Gawith, Edwards, Santini, and Wilson

# REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Eugene Police Department* | | 20-05537 |
| Victim | Offense | Date / Time Reported |
| *Society* | *RESISTING ARREST - DIS CONDUCT* | *Fri 03/27/2020 21:28* |

**THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY**

BODY WORN CAMERA/ CEPDJBS 2145 HOURS 3/27/2020

SOURCE OF ACTIVITY:

On 3/27/2020, I responded to 3829 Meadow View Dr for a report of a disorderly subject. The call was placed by Anzhelika Payne. The disorderly subject was later identified as Landon Payne. For the purposes of the last name, Landon and Anzhelika will be referred to by their first name. Prior to my arrival, Dispatch informed me that Landon was acting erratic, making statements that someone was trying to murder him. Anzhelika informed dispatch that Landon was possibly under the influence of alcohol and or Methamphetamines.

OFFICER`S INVESTIGATION/ OBSERVATIONS:

I arrived on scene and made contact with Anzhelika and Landon. I observed Landon, wearing a black shirt and dark colored pants. Landon was aggressive with our interaction, by yelling in anger, stating that his family in the home threatened to hurt him. I observed Landon sweating and very confrontational. He did not understand simple instruction, at times, repeating his statements. Landon said things like "If I remain here, I`m going to be killed" and "I`m being threatened".

When asked, Anzhelika was asked to move away from Landon and speak to police. During this time, she informed police that Landon had left the home and returned, possibly under the influence of Amphetamines. She confirmed Landon has a history of drug use but had been a "while" since the last time he used. When he returned home, he acted very paranoid and aggressive when spoke to. After stepping outside of the home, he began to yell that his family is trying to kill him. There was another caller (neighbor) who informed dispatch that she had heard a male screaming and banging on the door of the home.

During this conversation, dispatch informed me that Landon Payne had prior history with police, including a mental hold and felony weapon offenses. Dispatch also informed me that Landon had an unconfirmed and valid warrant for contempt of court. Landon continued being belligerent with police as I attempted to assist him with his possible mental crisis. While speaking to him, cahoots was contacted on scene for counseling purposes, at Landon`s request. Landon was told multiple times that "White Bird", a city resource, was closed for the time being.

Landon showed aggression as he ignored my request to have a seat on the doorstep. Landon yelled at police as we attempted to calm him down. Cahoots arrived shortly after and attempted to have a conversation with him. It was at this time, I confirmed Landon`s warrant from Marion County. Once the warrant was confirmed. Prior to my contact with Landon, there was no information provided to police that Landon had any medical issues.

ARREST/ CUSTODY:

I approached Landon and told him to put his hands behind his back. As I made this statement, I grabbed Landon`s right arm and attempted to place his behind his back. Landon then pulled away from my grasp and placed his hand high by his chest as he tried to push officers away and pull from our grasp. Officer Roberts and I both tried to take control of his arms as Landon pushed away. At one point, officers directed Landon to the ground in order to effect the arrest. Landon continued to push and pull from me as I continued to gain control. Once on the ground, I was able to gain control of his arm and while struggling, place Landon`s arm behind his back. Landon screamed and yelled uncontrollably as officers struggled to place handcuffs on him.

During the scuffle, Landon was tased by K9 Officer Thomas, in order to gain control. Landon continued to be uncooperative and resist the arrest while being tased. Once officers placed handcuffs on Landon, he was escorted to

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000053

Exhibit 1
Page 1 of 2

## REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Eugene Police Department* | | *20-05537* |
| Victim | Offense | Date / Time Reported |
| *Society* | *RESISTING ARREST - DIS CONDUCT* | *Fri 03/27/2020 21:28* |

<mark>THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</mark>

my patrol vehicle. While escorting him, I pat searched Landon for weapons and pulled two taser probed from Landon's right buttocks and leg area. Medical was called on scene for a medical evaluation after the incident. Once medically cleared, Landon was transported to The Lane County Jail.

At this time, I determined I had probable cause for resisting arrest and had a confirmed warrant. Refer to K9 Officer Thomas' supplement for further information regarding the incident and taser deployment. Refer to Officer Roberts supplement for further information on his observations and arrest.

BOOKING:

I arrived at The Lane County Jail where I made contact with jail staff. Landon was still being uncooperative and yelling as I drove and arrived at the jail. Jail staff were informed of the incident and took Landon out of my vehicle, from the sally port of the jail as a precaution. While taking Landon out of my vehicle and at some point, Landon collapsed onto the ground in the sally port. Landon remained on the ground as I observed jail staff perform CPR on Landon. Landon remained unconscious until medics were called on scene and transported Landon to Riverbend Hospital, where he was treated and medically evaluated. Due to his condition, I was unable to lodge Landon at the jail and instead served him a Cite In Lieu of Custody at the hospital.

Landon was treated for any injury or medical condition and was in stable condition after I served his citations.

Reporting Officer: *SOLORIO, J.*
R_CS3NC                                           03/29/2021 11:52                                           Page 6

Payne v. Solorio et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000054

Exhibit 1
Page 2 of 2

## CASE SUPPLEMENTAL REPORT

Printed: 03/29/2021  11:52

*Eugene Police Department*

OCA: **2005537**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *CLEARED BY ARREST* | **Case Mng Status:** *NA* | **Occurred:** |
| **Offense:** *.F.* | | |

| | |
|---|---|
| **Investigator:** *THOMAS, J. (EPD603)* | **Date / Time:** *03/28/2020 01:27:46, Saturday* |
| **Supervisor:** *GRIESEL, R. (EPD378)* | **Supervisor Review Date / Time:** *03/28/2020 03:30:57, Saturday* |
| **Contact:** | **Reference:** *Supplemental Officer Statement* |

BWC/ CEPDJLT 03/27/20 @ 2144 HOURS

| | |
|---|---|
| AO/ Sergeant Griesel | EPD |
| Officer Solario | EPD |
| Officer Roberts | EPD |

DETAILS: On March 27, 2020, at approximately 2128 hours, while on patrol I responded with additional Officers to 3829 Meadow View Lane regarding a disorderly subject. Dispatch advised they had received several calls from neighbors regarding a subject outside yelling about possibly being murdered. Dispatch then advised they received a call from the wife of the disorderly male, who identified him as Landon Jay Payne. The wife advised Payne was "acting crazy" and saying his family was trying to murder him. Payne's wife told dispatch she believed Payne was possibly under the influence of methamphetamine and stated there were children inside of the home.

While en route to the location dispatch advised Payne had a warrant for his arrest out of Marion County and had prior arrests for Felon in Possession of Firearms. Payne's local record listed him as a white male, 37 years of age, 6'1" tall and 210 pounds.

Upon arrival Officers contacted Payne and his wife on the front stoop of the listed residence. Payne appeared animated in his movements and seemed very paranoid which was consistent with methamphetamine use. Officers spoke with Payne and attempted to deescalate. Payne was concerned about his father- in- law evicting him from the home and requested assistance from WhiteBird. I spoke with Payne's father-in-law inside. I learned Payne had a previous drug addiction and was told he had run from police on an earlier occasion where he jumped out of a second story window.

CAHOOTS responded to assist with keeping Payne calm and talked about available services.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

.F.

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000057

Exhibit 2
Page 1 of 3

**CASE SUPPLEMENTAL REPORT**

Printed: 03/29/2021  11:52

*Eugene Police Department*

OCA: **2005537**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*      Case Mng Status: *NA*         Occurred:

Offense:  *.F.*

While CAHOOTS was speaking with Payne, Dispatch advised the warrant out of Marion County was confirmed.

Officers were speaking with Payne in the front yard of the residence. I moved up on to the front porch to position myself between Payne and the front door into the residence, fearing based on his unstable behavior and passed criminalhistory, he would attempt to run into the house where children and other family were present.

Officer Solario and Officer Roberts attempted to place Payne in handcuffs while in the front yard. Payne immediately raised his arms up and started backing away from Officers as they tried to control his arms. Payne kept pulling backaway from Officers as they told him to put his arms behind his back. I displayed my TASER and pointed at him as Officers continued to struggle to control his arms. I know from training and experience fighting with a resistive suspect can be very dangerousfor everyone involved. I know the longer a physical confrontation, the more fatigued Officer's become which greatly increases the risk of injury. I knew Payne was a much larger person than anyone of the Officers on scene. I knew the effective use of a TASERwould momentarily incapacitate his movements so we could get him into physical custody without further risk to anyone.

As I announced I would deploy my TASER and raised it up to a stable firing position, Payne broke free from one of the Officer's control and reached over and batted the TASER away from him. Officer's thrust Payne forward where they allthree fell on the front lawn. Payne rolled around as Officer tried to control him. I moved up and again announced the use of the TASER. I deployed the TASER from a very close distance to the backside of Payne while he was on the ground. Payne immediately rolledover on to his back and reached up swiping at the TASER in my hand. Payne then kicked and wrapped his legs in the TASER wires in an apparent attempt to break them. The TASER was not effective.

Payne continued to resist arrest as Officer's struggled to get control of his arms. I removed the cartridge from my TASER making it only useful as a drive stun pain compliance device. I drive stunned Payne on his quad. Payne kept buckingand rolling around causing the TASER to not make contact with his body, again having no effect. Payne was able to roll over on to his stomach and was starting to get up on his knees. While doing this, Payne's shirt came up exposing some skin. I transitionedthe TASER and drive stunned Payne on his lower right back. This deployment was effective only as temporary pain compliance.

Officers were yelling at Payne to lay on his stomach and "stop resisting" and "you're under arrest." After the cycle of the drive stun, Payne again tried to stand up pulling away from Officers. I deployed another drive stun to his lowerright back area where Payne said something to the effect of "owe okay I'm stopping." I then heard Officer Roberts yell at Payne to lay on his stomach and let go of his (Officer Roberts') hand. I placed my knees on top of Payne's legs in an attempt to keep himfrom further kicking. While holding this position Officer were still telling Payne to "relax your

Investigator Signature                    Supervisor Signature

.F.

Exhibit 2
Page 2 of 3

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000058

## CASE SUPPLEMENTAL REPORT

Printed: 03/29/2021  11:52

*Eugene Police Department*

OCA: **2005537**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status:  *CLEARED BY ARREST*          Case Mng Status:  *NA*                    Occurred:

Offense:  *.F.*

arms" as they still were unable to get them behind his back. Payne was admonished again to he would be tased if he did not stop resisting. I delivered a thirddrive stun to Payne's lower back which appeared to be effective. Payne said "okay I'm done I'm done."

Officer still did not have Payne's hands behind his back yet. Officer Solario told Payne he was going to get tased again. Payne replied "I'm done." Officer's still struggled to get his arms behind his back where he was eventually placedin handcuffs.

We rolled Payne up on to his side allowing to him breath freely. Medics responded to evaluate Payne for the TASER deployment and possible exited delirium. Medics cleared him to be transported to the Lane County Jail.

See additional Officer's reports for further details.

J. Thomas 603

---

Investigator Signature                              Supervisor Signature

.F.

Exhibit 2
Page 3 of 3

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000059

CONFIDENTIAL

Apr. 1. 2020  4:07PM                                          No. 2272   P. 3

| 00569 | OR | 3 | 27 | 2020 | 09 | 20-0079928 | 000 | Responding Units/Personnel |
| FDID | State | Incident Date | | | Station | Incident Number | Exposure | |

| Unit | | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|---|
| E9 St 09 E9 | | 22:30:31 | 22:33:29 | 22:39:47 | 22:49:22 |

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 14269 | Koss, Mark J | Incident Respons | Engineer | Engineer | |
| 1615 | Boettcher, Barry J | Incident Respons | Firefighter | Fire Fighter | |
| 20139 | Lockett, Jason A | Incident Respons | Captain | Captain | |

**Unit Narrative**
03/28/2020 23:56:08 CEFDJXL

EPD wanted vitals for a person in custody, person was non cooperative, EPD decided to transport without any vitals taken. E9 crew wore PPE based off of BSF PPE decision tree.
------------------------------------------------------------------
04/01/2020 10:23:49 CEFDJXL

EPD asked for vitals on a person in custody, handcuffed in the back of a police vehicle. Person in custody was not cooperative, he wouldn't sit still long enough for vitals to be obtained and was yelling the whole duration of our time on scene.  After two failed attempts at obtaining vitals signs, after conferring with EPD over inability to obtain vitals while the person in custody was handcuffed and not cooperating.  EPD decided to transport to the jail and have him evaluated on arrival.  E9 disregarded the M11 and cleared.

| M11 St 11 M11 | | 22:30:31 | 22:33:05 | 22:40:41 | 22:45:59 |
|---|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 20307 | Tomczyk, Sophie A | Incident Respons | Firefighter | Medic A | |
| 21746 | Hooklund, Andrew J | Incident Respons | Firefighter | Medic A | |

**Unit Narrative**
03/28/2020 23:56:19 CEFDJXL

staged

Exhibit 3
Page 1 of 2

COE 000186

**CONFIDENTIAL**

Apr. 1. 2020  4:07PM                                              No. 2272  P. 4

| 00569 | OR | MM 3 | DD 27 | YYYY 2020 | 09 | 20-0079928 | 000 | Responding Personnel |
|---|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | |

| Staff ID\Staff Name | Unit | Activity | Position | Rank | PaySal | Hrs | HrsPd | Pts |
|---|---|---|---|---|---|---|---|---|
| 14269 Koss, Mark J | E9 | IR Incident | E | E | | 0.31 | 0.00 | 0.00 |
| 1615 Boettcher, Barry J | E9 | IR Incident | FF | F | | 0.31 | 0.00 | 0.00 |
| 20139 Lockett, Jason A | E9 | IR Incident | C | C | | 0.31 | 0.00 | 0.00 |
| 20307 Tomczyk, Sophie A | M11 | IR Incident | MA | F | | 0.26 | 0.00 | 0.00 |
| 21748 Hookland, Andrew J | M11 | IR Incident | MA | F | | 0.26 | 0.00 | 0.00 |

Total Participants: 5                          Total Personnel Hours: 1.45



An 'X' next to the unit denotes driver.

EUGENE

00549    03/27/2020    20-0079928

Exhibit 3
Page 2 of 2

COE 000187



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DISTRICT

ANZHELIA PAYNE, personal
representative to the estate of
LANDON PAYNE,

       Plaintiff,

v.                    No. 6:22-CV-00471-MC

JAIRO SOLORIO, individual, ANDREW
ROBERTS, an individual, JACOB
THOMAS, an individual, ROBERT
GRIESEL, an individual, JUSTIN
WILSON, an individual, KIMBERLY
FULTON, an individual, EMMA
EDWARDS, an individual, COLTER
GAWITH, an individual, NATHAN GENT,
an individual, MICHAEL BAEUERLEN,
an individual, STEPHEN FOLEY, an
individual, JOSEPH FISHER, an
individual, JEREMY FIFER, an
individual, WILLIAM MCCLURE, an
individual, LANCE JESTER, an
individual, CLINT RILEY, an
individual, C. SANTINI, an
individual, LANE COUNTY, and CITY
OF EUGENE, a municipal corporation,

       Defendants.

_____

**VIDEOTAPED DEPOSITION OF**

**SERGEANT ROBERT GRIESEL**

**TAKEN ON**
**MONDAY, SEPTEMBER 18, 2023**
**1:45 P.M.**

**EUGENE POLICE DEPARTMENT**
**300 COUNTRY CLUB ROAD**
**EUGENE, OREGON  97401**

Exhibit 4
Page 1 of 5

1      A.   Yep.

2      Q.   Okay.  In this case, did you ever hear the

3   words that Mr. Payne was medically cleared?

4      A.   They said he was cleared to transport to

5   the jail.

6      Q.   Who said that?

7      A.   Whoever the medic was that I was talking

8   to.

9      Q.   You personally heard that from the medic?

10     A.   Yes.

11     Q.   Okay.  So did you make the decision, then,

12  to have Mr. Payne transported to the jail at that

13  point?

14     A.   Yes.

15     Q.   You gave Solorio direction to transport

16  Mr. Payne, despite the fact that no vitals had been

17  taken, to the jail at that point?

18     A.   Yes.

19     Q.   Despite the fact that you had observed him

20  having trouble breathing and had commented on that,

21  you gave a direction to have him go to the jail and

22  not the hospital?

23     A.   The medics refused to transport him to the

24  hospital.

25     Q.   Okay.  Who -- who told you that and why?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3345
NAEGELIUSA.COM

Exhibit 4
Page 2 of 5

1    A.    I don't know who told me that.  I don't

2    know why they said that.

3    Q.    So you asked the medics to -- I'm -- I

4    guess I need to back up.  The medics were asked to

5    transport him to the hospital?

6    A.    I asked them if they were going to take

7    him to the hospital, and they said they were not.

8    And I asked him if he was safe to be transported to

9    the jail, and they said he was.

10    Q.    Okay.  Do you recall who you were speaking

11    to when that conversation occurred?

12    A.    I do not.

13    Q.    Okay.  Do you recall if there was anyone

14    else around you when that conversation occurred?

15    A.    I do not.

16    Q.    Okay.  And have you -- you said you

17    reviewed your body-worn camera?

18    A.    Yes.

19    Q.    The majority of that is muted.  Would you

20    agree with that?

21    A.    Yes.

22    Q.    Would the person that you had the

23    conversation with still appear on your camera?

24    A.    Yes.

25    Q.    And does he?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 4
Page 3 of 5

1  individual that was at the 10 minute and 17 second

2  mark that I showed you?

3      A.   Well, there were -- there were two -- two

4  guys there.  I -- looked like I was talking to the

5  skinnier guy on the right.

6      Q.   And you don't know who that is?

7      A.   I don't.

8      Q.   But is your testimony today that that's

9  who told you that he was cleared to be transported

10  -- that Mr. Payne was cleared to be transported to

11  the jail?

12      A.   Yes.  We'd had a discussion about whether

13  he was safe to transport to the jail knowing that

14  they had a more robust medical staff on site at the

15  jail that would -- that would evaluate Mr. Payne

16  when we arrived.

17      Q.   And when you said, "We had a discussion",

18  who is "we"?

19      A.   The medic and I.

20          (WHEREUPON, Exhibit 217 was marked for

21  identification.)

22  BY MS. HILLMAN:

23      Q.   Okay.  Can you turn to what's been marked

24  as Exhibit 217?  On the second page there of that

25  exhibit, there's a section titled "Unit Narrative."

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 4
Page 4 of 5

```
 1                        CERTIFICATE

 2

 3        I, Ryan Batterson, do hereby certify that I

 4   reported all proceedings adduced in the foregoing

 5   matter and that the foregoing transcript pages

 6   constitutes a full, true and accurate record of said

 7   proceedings to the best of my ability.

 8

 9        I further certify that I am neither related

10   to counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   9th day of October, 2023.

15

16

17

18   _____

19                 Ryan Batterson

20

21

22

23

24

25
```

Exhibit 4
Page 5 of 5

## CASE SUPPLEMENTAL REPORT

Printed: 03/29/2021 11:52

*Eugene Police Department*                                                    OCA: **2005537**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*        **Case Mng Status:** *NA*                    **Occurred:**

   **Offense:** *.F.*

**Investigator:** *GRIESEL, R. (EPD378)*                  **Date / Time:** *04/01/2020 22:01:10, Wednesday*

**Supervisor:** *SALSBURY, C. (EPD659)*      **Supervisor Review Date / Time:** *04/01/2020 23:06:24, Wednesday*

   **Contact:**                                              **Reference:** *Supplemental*

Details:

On March 27th, at about 2220 hours, I responded to the 3800 block of Meadow View Dr. in Eugene, OR. Officers had responded to subject, identified as Landon Payne who had a warrant for his arrest and was yelling about murder near a residence. Officers had made contact with Payne, requested Cahoots to speak with him, and had taken him into custody for his warrants. When I arrived I observed Ofc. Thomas offering water to Payne who was seated in the back of a patrol car. Payne was yelling unintelligibly and exhibiting behavior typical of excessive methamphetamine use.

I spoke with officers about what had occurred. Ofc. Thomas advised he had deployed his Taser during the struggle to get Payne into custody. When Ofc. Solorio and Ofc. Roberts attempted to take Payne into custody he immediately resisted their efforts. Ofc. Thomas attempted to deploy his Taser but Payne slapped it away. Ofc. Thomas said he eventually was able to deploy it but the close proximity of the probes had no effect on Payne. As Ofc. Solorio and Ofc. Roberts continued to try to control Payne, Ofc. Thomas said he utilized the drive stun feature of the Taser to try to gain compliance, but it had no apparent effect.

Officers said they had already removed the probes from Payne and called the medics to evaluate him. The medics arrived shortly after and evaluated Payne. The medics told me they were unable to get good readings from Payne due to his erratic behavior. We told the medics our intent was to lodge Payne at Lane County Jail and they agreed he was safe to transport. Payne`s wife was standing in the front yard and asked where we were taking Payne. I explained Payne was going to be transported to the Lane County Jail. I knew the jail had medical staff and deputies waiting in the sally-port to evaluate custodies due to Covid-19 and told her he would be medically evaluated there, as well.

When Ofc. Solorio left, Payne was still yelling unintelligibly in the back of the patrol car.
A short time later I heard officers request a supervisor to the jail regarding a medical condition with a custody. Sgt. Biallas was close to the jail and responded to assist officers. I later responded to the hospital to check on Payne`s condition. Ofc. Solorio had followed the medics to RIverBend hospital and was standing by when I arrived. He told me that the hospital staff had and had moved Payne to ICU and that he was in stable condition. I spoke with Ofc. Solorio again in the early morning hours and he told me that hospital staff told him Payne was still in stable condition.

See additional reports for further information.

Investigator Signature                              Supervisor Signature

                                                                                        .F.

Payne v. Solorio et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000061

Exhibit 5
Page 1 of 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal          )

representative to the estate  )

of LANDON PAYNE,                  )

          Plaintiff,          )

    v.                        ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                           )

          Defendants.         )


DEPOSITION OF LANCE JESTER

October 16, 2023

Monday

2:00 P.M.


        THE VIDEO-RECORDED DEPOSITION OF LANCE

JESTER was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon, 97401, before

Sara Fahey Wilson, CSR/CCR, Certified Shorthand

Reporter in and for the State of Oregon and

Washington.

Exhibit 6
Page 1 of 18

1    would come in for swing shift he would still be

2    there.  As far as interaction, I don't know if you

3    want to be more specific.  But I saw him on a daily

4    basis during the week.

5        Q.    When you saw Captain Riley on a daily

6    basis during the week, did you usually begin -- or

7    begin your shift by talking to him and getting kind

8    of a briefing?

9        A.    No.

10       Q.    On a -- like, in a typical week, how many

11   times would you actually, like, have a conversation

12   with Captain Riley?

13       A.    As far as a briefing about jail policy or

14   procedure?

15       Q.    Or any other kind of conversation.

16       A.    Oh, several times a week I would have a

17   conversation with him.

18       Q.    Let's -- this might be a good time for you

19   to kind of give your summary of what you remember

20   happening on March 27th, 2020.  Can you describe

21   that incident as best you can beginning with when

22   the deputies assembled and went into the sally port?

23       A.    We received -- I received a phone call

24   from our central control saying that they had

25   received a phone call from the Eugene Police

Exhibit 6
Page 2 of 18

1    Department that they were bringing in a combative

2    male.  At that point in time I went downstairs to

3    await their arrival with the rest of our deputy

4    staff that had assembled for this.

5              We had the name of the person, the -- our

6    records department, due to COVID, contacted --

7    because there was a warrant, I believe, out of

8    another county that was the main thing he was being

9    arrested on at the time, and we were able to get

10   that warrant cleared because, again, COVID was here

11   and nobody wanted to transport on most of their

12   warrants, it seemed like, unless it was very

13   serious.

14             So after going out and initially speaking

15   with him, I received word that the warrant was

16   cleared, so I told the Eugene Police Department that

17   the warrant was cleared and if they wanted to cite

18   and release on whatever the other charge they had --

19   I think it was resisting at the time.  I'm not

20   really sure.

21             They told me no, that they would just have

22   to deal with him again, so at that point we needed

23   to evaluate Mr. Payne more thoroughly.

24             He was in the back of the car yelling,

25   moving around and stuff, and we received report from

Exhibit 6
Page 3 of 18

Lance Jester

 1    Eugene that he had fought with them.

 2            Staff tried to talk with him.  Really

 3    couldn't get much information out of him, so we --

 4    to better evaluate him, we needed to remove him from

 5    the vehicle.  We had our nurse out there.  Due to

 6    COVID protocols, the nurse was now outside -- so

 7    that was helpful -- and to try and get at least an

 8    initial reading on everything.

 9            So we removed Mr. Payne from the vehicle.

10    He was kicking, and -- his legs -- and just in

11    general, you know, resisting everybody.  So he was

12    laid on the ground to have leg restraints placed on

13    him to avoid us being kicked.

14            Our nurse moved in to try and talk to him,

15    get a temperature on him and stuff, but he was not

16    communicating with us.  He was just making grunting

17    noises and thrashing around so we needed to get him

18    further restrained so we could move him inside so

19    the medical staff could better evaluate him.

20            After a short period of time I bent down

21    and I was trying to communicate with him, asking him

22    if he had taken any drugs, anything that we need to

23    be aware of.  We need to know -- we ask everybody,

24    you know, if they've taken anything they are going

25    to withdraw from, anything -- you know, and he

Exhibit 6
Page 4 of 18

```
1    wouldn't answer.

2            Staff was trying to keep him under control

3    on the ground.  I was standing -- or I was kneeling

4    down at his head area while I was trying to talk to

5    him.  I also was making sure that nobody was, you

6    know, putting any weight in the middle of his back,

7    anything like that, so that, you know, he could

8    breathe better.

9            And initially we were just trying to get

10   the leg restraints on him and then we would get him

11   stood up and get them off their stomach -- we don't

12   want to keep people on their stomach very long --

13   and move him inside where we can better evaluate

14   somebody.  But at that point we noticed that, you

15   know -- we were telling him to calm down, and stuff,

16   and then he, you know, stopped fighting as much.

17   And then we realized that his lips were turning

18   blue, so we moved him onto his side to try and

19   evaluate him better.

20           And then we ended up not being able to

21   find a pulse, so he was -- CPR was started.  Called

22   for a crash cart of our own -- from our own medical

23   staff also called for an ambulance at that time.  We

24   continued lifesaving measures.  CPR was continued

25   until the ambulance got there.
```

Exhibit 6
Page 5 of 18

Janet Jester

58

```
 1      Q.    Why did you ask the arresting officer
 2   whether Landon Payne could just be cited and
 3   released?
 4      A.    To avoid having to lodge him in the jail.
 5      Q.    Why didn't you want to lodge Landon Payne
 6   in the jail?
 7      A.    With the COVID protocols and stuff like
 8   that, we were trying to keep our numbers down.  At
 9   that time that was right when COVID first started.
10   I mean, we don't know -- we didn't know back then
11   what we know now, so we were doing the best we can
12   to manage and not put people in jail if we didn't
13   absolutely have to.
14      Q.    And if the arresting officer -- did you
15   know that it's Officer Solorio?
16      A.    I did not know him.
17      Q.    Okay.
18            So I'll just call -- I'll just call him
19   the arresting officer.  You know who I'm talking
20   about, right, when I say "arresting officer"?
21      A.    Yes.
22      Q.    If the arresting officer had agreed to
23   allow just a citation and a release to occur, what
24   are the policies then for somebody like Landon
25   Payne?  Like, do you just open the door and let him
```

Exhibit 6
Page 6 of 18

1    middle, so . . .

2         Q.    Can you think of any other time where you

3    asked an arresting officer if they want to CLC the

4    person?  You know what that means.  Right?

5         A.    Yes.

6         Q.    -- and the arresting officer has agreed to

7    take the person away somewhere else, not the jail?

8         A.    Not -- I mean, we've had -- we've referred

9    custody for outside medical clearance.  They come

10   in.  They have something -- a blood pressure is, you

11   know, 220 over, you know, 163.  You know, Hey, you

12   know, they need to go to the hospital and get

13   cleared.

14            Once they get cleared, you can bring them

15   back, and sometimes we won't get them back so

16   obviously a CLC happened.  But we don't just, Hey,

17   you want to CLC them instead?  That's not -- you

18   know, unless we have a reason to ask the question,

19   we don't -- we don't do that.

20            I mean, the Eugene Police Department pays

21   for beds so, you know, we take the people they bring

22   us, unless there's something weird that happens like

23   in this case, and, like, COVID had just started, and

24   there's other things going on that had me ask that

25   question, you know, Do we need -- do we need to

Exhibit 6
Page 7 of 18

Janet Jester

1    bring him in or can you CLC?  That was my question,

2    you know.

3              And they told me, "He's coming in or we're

4    just going to have to deal with him again," so . . .

5        Q.    Did you get the sense when you talked to

6    the arresting officer that when he -- when you told

7    him that the warrant had been cleared -- that now

8    the arresting officer wanted him lodged based on the

9    resisting?

10              MR. MORROW:  Objection.  Calls for

11   speculation.  Form of the question.

12              You can go ahead and answer.

13              MS. COIT:  You can answer.

14       A.    That was the only thing to arrest him on,

15   so I would assume that he wanted him brought in for

16   the charge that he was bringing to the table, so to

17   speak, because the other one was cleared.  We

18   couldn't hold him on that one.  If there was no

19   other charge, the guy is free to go.  There's

20   nothing to hold him on.

21   BY MR. LARWICK:

22       Q.    Did the arresting officer say anything to

23   you about whether he wanted Landon Payne to be free

24   to go or not?

25       A.    No.

Exhibit 6
Page 8 of 18

```
 1        Q.    He didn't give any indication about that?

 2        A.    Absolutely not.

 3        Q.    Did the arresting officer say to you that

 4   he didn't want to deal with Landon Payne again that

 5   night?

 6        A.    Yes.

 7        Q.    What was that conversation?

 8        A.    When I asked him if he wanted to CLC, his

 9   response to me was, "No.  We're just going to have

10   to deal with him again."

11             That was pretty much the gist of --

12   exactly what he said.  I don't know if those are the

13   exact words, but he did say, "We're just going to

14   have to deal with him again," so he would not CLC.

15        Q.    In March 2020 what was the policy

16   regarding putting leg irons on somebody?  What

17   circumstances?

18        A.    We use leg restraints -- we need to

19   restrain somebody if they are combative, if they are

20   kicking, stuff like that, we need to control their

21   legs.  The legs are the one of the most dangerous

22   parts of the human body.  They are the strongest.

23        Q.    And was Landon Payne kicking?  Is that why

24   the jail put leg restraints on him?

25        A.    He was kicking his legs -- he wasn't
```

Exhibit 6
Page 9 of 18

Janet Jester

1  kicking at anybody at the moment, but he was kicking

2  his legs, he was thrashing around, his whole body

3  was not in control, so leg restraints were going to

4  be applied so that he did not kick anybody, whether

5  it be on accident or on purpose if he decided to

6  kick somebody.

7      Q.    So you mentioned that Landon Payne was not

8  kicking at anybody.  Did you see Landon Payne act

9  violent towards anybody that evening -- toward

10 anybody?

11     A.    Specifically toward anybody?  No.  Just

12 his whole body -- he was just thrashing around.

13     Q.    But there was nothing that you perceived

14 to be an attempt by Landon Payne to hurt anybody

15 like another deputy or anything.  Correct?

16     A.    I did not see something that looked like

17 he was legitimately attempting to hurt somebody at

18 that moment.

19     Q.    Did you ever hear Landon Payne say that he

20 wanted to hurt anybody or threaten anybody?

21     A.    No.

22     Q.    What actually did you observe with regard

23 to Landon Payne being either combative or

24 noncompliant?

25     A.    When we brought him out of the car he was

Exhibit 6
Page 10 of 18

1    thrashing around, moving his shoulders, his arms,

2    trying to pull away, which is another reason why we

3    placed him on the ground.  And, again, his whole

4    body was thrashing.  He was lifting his arms and

5    turning his whole torso.

6       Q.    So when you say, "he was lifting his arms

7    and turning his whole torso," was that when he was

8    face down on the ground?

9       A.    Yes.

10       Q.    Okay.

11       Continue.  Anything else you saw that was

12    combative?

13       A.    And I saw his upper body, but, I mean, his

14    whole body was thrashing around.  I could see the

15    deputies down at his legs struggling to control him.

16       Q.    At some point one of the nurses took the

17    temperature of Landon Payne.  Is that right?

18       A.    Yes.

19       Q.    Why couldn't that be done in the police

20    car where he was handcuffed and restrained with a

21    seat belt?

22       A.    We have no idea how he's going to react,

23    and you don't want to crawl into the back of the car

24    with somebody who has -- again, their legs are free.

25    They can turn.  They can kick you.  They can do

Exhibit 6
Page 11 of 18

1  anything.  We have no information.  We're not going
2  to put a nurse in a situation like that.
3      Q.    Was that the first day that the jail
4  started taking temperatures of people who were
5  brought to the jail?
6      A.    I believe so.
7      Q.    And the practice or the policy was to take
8  the person out of the police car and put them face
9  down on the ground and then take their temperature?
10      A.    No.
11      Q.    What was the policy?
12      A.    The policies were if somebody is
13  cooperative, you can just take their temperature and
14  then you walk somebody in.  We never put somebody on
15  the ground unless they are being uncooperative in
16  some way.
17      Q.    When you look back at Exhibit 230, do you
18  see where it says (as read):  EPD arrived and
19      reported that Payne had been tased and has
20      been yelling and screaming since they
21      arrested him?
22      A.    Yes.
23      Q.    What's the significance of the "had been
24  tased"?
25      A.    We just -- you know, it's just general

Exhibit 6
Page 12 of 18

1    Q.    Who was the arresting officer talking to?

2    Was it Baeuerlen or somebody else?

3    A.    It probably would have been Baeuerlen.

4    Baeuerlen was wearing the body camera to go try and

5    talk to Payne so he would have taken the initial

6    report from the arresting officer.

7    Q.    When you overheard the conversation from

8    the arresting officer, was there any discussion of

9    Landon Payne being violent or aggressive toward

10    anybody else before he had arrived to the jail?

11    A.    They said that they had to -- that he had

12    fought with them, so -- during the arrest.

13    Q.    The arresting officer said that Landon

14    Payne had fought with them?

15    A.    I believe so.

16    Q.    Are you sure that the arresting officer

17    didn't say that Landon Payne had been uncooperative?

18    A.    No, I'm not sure.

19    Q.    Okay.

20    So is the term "leg irons" -- is that the

21    same as leg restraints?

22    A.    Correct.

23    Q.    What material are they made out of?

24    A.    Stainless steel.

25    Q.    Are they similar to handcuffs?

Lance Jester

```
 1       A.    Yes.

 2       Q.    Did you see in your memo, Exhibit 230,

 3   where you wrote (as read):  Payne's breathing

 4       was labored, and I checked to make sure staff

 5       was not applying any pressure on his upper

 6       torso that would impede his breathing?

 7       A.    Yes.

 8       Q.    Why was that important not to place

 9   pressure on Landon Payne's upper torso?

10       A.    We're trained not to do that for

11   positional asphyxiation.  We don't want to have any

12   weight on their back to impede their breathing.  So

13   that's something that at the jail, if we're involved

14   in any kind of incident, use of force or something,

15   we do everything we can not to be on top of the

16   person.

17       Q.    When you wrote, "I checked to make sure,"

18   what did you do to check to make sure that staff was

19   not applying any pressure?

20       A.    I looked right down his centerline as I

21   was kneeling at his head.

22       Q.    And what did you see when you looked down

23   Landon Payne's centerline?

24       A.    I couldn't see anybody that was putting

25   pressure on his back.
```

Exhibit 6
Page 14 of 18

1    will take him in"?

2         A.     Not in those words, but, I mean, we were

3    going to -- it was our responsibility to evaluate

4    him for housing/lodging at that point once he said

5    that he wasn't going to CLC, so we were going to

6    have to go through our evaluation process.

7              At any given time if our medical staff

8    decides that, you know, there needs to be some sort

9    of outside medical clearance, then they would

10   actually go right back to the arresting officer and

11   have to go to the hospital.

12        Q.     Did you tell the arresting officer, "He

13   might end up back out anyways?  I mean, that's just

14   the way it is right now"?

15        A.     No.

16        Q.     Did you ever hear whether Landon Payne had

17   been cleared -- medically cleared after he had been

18   tased?

19              MR. MORROW:  Objection.  Asked and

20   answered.

21              MS. COIT:  I join.

22              Do you have anything to add to that

23   question?

24   BY MR. LARWICK:

25        Q.     You still have to answer.

1    Mr. Payne.

2        Q.    So the deputy who is holding Landon

3    Payne's head to the floor, that's for purposes of

4    getting a temperature?

5        A.    No.  That's to keep him from turning

6    around, spitting, or anything else.  You're

7    controlling the head at this point.

8        Q.    So that was within the policy to hold

9    Landon Payne's head to the floor like that?

10       A.    To hold onto his head, yes, to make sure

11   he doesn't turn his head and spit on you or anything

12   else.

13       Q.    Does the Lane County policy in March of

14   2020 say that the officer holding the head is

15   supposed to press it into the floor?

16       A.    There's -- nothing covers it at all.

17       Q.    There's no policy on that issue?

18       A.    No.

19       Q.    And in March of 2020 there was no policy?

20       A.    No.  It's for safety and security.  You

21   know, you're trying to control the head so that he

22   can't do anything.

23       Q.    Did deputies on or before March of 2020

24   receive training on controlling the head?

25       A.    Yeah, I mean, we do general defensive

Exhibit 6
Page 16 of 18

1    tactics training, and head control is, you know, one

2    of the things that we do.

3         Q.    Is pressure on a person's head part of

4    what can cause positional asphyxia?

5         A.    Not to my knowledge.

6         Q.    That wasn't part of the training on

7    positional asphyxia?

8         A.    I don't recall that.

9         Q.    Can you turn to Exhibit 165?  In this

10   Exhibit 165 where are you located?

11        A.    Right there (indicating) in the forescreen

12   standing up.  First person.

13        Q.    Let's turn to Exhibit 166.  So Exhibit 166

14   shows when the crash cart was brought to the scene.

15        A.    Uh-huh.

16        Q.    Correct?

17        A.    Looks like it, yes.

18        Q.    And you're the person farthest to the

19   left?

20        A.    Yes.

21        Q.    Not counting the police officers?

22        A.    Yes.

23        Q.    Were the Lane County deputies trained in

24   how to use the crash cart?

25        A.    A crash cart, all it does is transport

Janet Jester

131

```
 1   State of Oregon   )
                       )      ss.
 2   County of Lane    )

 3

 4       I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5   Reporter for the State of Oregon, certify that the

 6   witness was sworn and the transcript is a true

 7   record of the testimony given by the witness; that

 8   at said time and place I reported all testimony and

 9   other oral proceedings had in the foregoing matter;

10   that the foregoing transcript consisting of 130

11   pages contains a full, true and correct transcript

12   of said proceedings reported by me to the best of my

13   ability on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 30th

18   day of October 2023, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expiration Date:  March 31st, 2026
```

Exhibit 6
Page 18 of 18

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal       )

representative to the estate   )

of LANDON PAYNE,               )

       Plaintiff,            )

   v.                          ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                        )

       Defendants.           )


DEPOSITION OF MICHAEL BAEUERLEN

October 19, 2023

Thursday

10:02 A.M.


      THE VIDEO-RECORDED DEPOSITION OF MICHAEL

BAEUERLEN was taken at Hutchinson Cox, 940

Willamette Street, Suite 400, Eugene, Oregon, 97401,

before Sara Fahey Wilson, CSR/CCR, Certified

Shorthand Reporter in and for the State of Oregon

and Washington.

Exhibit 7
Page 1 of 8

1    Landon Payne incident?

2        A.    I don't recall.

3        Q.    Did you watch the sally port video, for

4    example, before you read the Eugene Weekly article

5    or after?

6        A.    I don't recall.

7        Q.    Who took the body camera that you were

8    wearing off of you and put it into the docking

9    station?

10       A.    I -- what happened was is when I began

11   my portion of the CPR, one of the deputies grabbed

12   my -- or asked for my body cam, which I gave it to

13   him.  And then it usually goes to the sergeant's

14   office there after that.  I don't have a real sharp

15   recollection of that point as I was busy working on

16   other things.

17       Q.    So after you gave the body camera to

18   another deputy, did you ever get it back?

19       A.    No.

20       Q.    Did you ever go and look at the footage

21   captured by that body camera that day or the day

22   afterward?

23       A.    No.

24       Q.    When was the first time that you saw the

25   body camera footage?

Exhibit 7
Page 2 of 8

Michael Baeuerlen

1     A.    Yes.

2     Q.    And then what happened next?

3     A.    Since I was a trainee on that point I was

4  one that would be taking the lead on it, so I had

5  started a body camera and gave a quick explanation

6  of the time and day and what was going on.

7          Then we'd all gather in there and we'd go

8  out to the sally port and contact the arresting

9  officer.

10     Q.    And did you have a conversation with the

11  arresting officer?

12     A.    A short one, yes.

13     Q.    And that was Officer Solorio?

14     A.    I don't remember who it was.  I just

15  remember it was the Eugene Police Department.

16     Q.    What's -- what do you remember about that

17  conversation, if anything?

18     A.    It was real quick.  He was just giving me

19  a quick synopsis of the individual, what they had

20  done, and how he was behaving.

21     Q.    Did the arresting officer say anything

22  about whether Mr. Payne had been tased?

23     A.    Yes.

24     Q.    What did he say?

25     A.    He told me he had to tase him to gain

Exhibit 7
Page 3 of 8

Michael Baeuerlen

1    control of him.

2        Q.    Okay.

3            And then what happened next?

4        A.    He also continued saying that he was

5    resisting arrest, so once they got him they put him

6    in the car and then they drove him to the jail.  And

7    then after -- and then we confirmed the individual's

8    name.  And then we got together and started talking

9    on how we were going to work this.

10           And the one thing that we do when we deal

11   with individuals like that is we start asking them

12   our initial assessment questions in the car, which

13   was what I started doing, and I noticed that --

14   observed Payne yelling and screaming at the top of

15   his lungs.  And when I asked if he had any injuries

16   or illnesses, or had he been hurt, or if he was

17   suicidal, he denied -- did not respond to me.

18       Q.    At any point that evening that you

19   interacted with Landon Payne did he ever say an

20   intelligible sentence that you heard?

21       A.    Not that I recall, no.

22       Q.    What about any -- even a single word?

23       A.    I don't remember -- if he said anything, I

24   don't remember what he said.

25       Q.    Okay.

Exhibit 7
Page 4 of 8

Michael Baeuerlen

37

```
1    right?

2         A.    Uh-huh.

3         Q.    Is that what was said?

4         A.    Yeah.  We were going to take him out, get

5    him into leg irons, and then we would take him in.

6         Q.    Okay.

7               So then what happened next after that plan

8    was formed?

9         A.    We had opened the door and we pulled him

10   out of the car.  And then he was really resistive

11   and not following our instructions so at that point

12   we decided to lay him on the ground so we can get

13   the leg irons on him.

14        Q.    When you say "we decided" that, who

15   decided that with you?

16        A.    It was just kind of a pull-out, let's get

17   him on the ground, and then . . .

18        Q.    Was there anybody in charge of the scene?

19        A.    Ultimately it would have been Sergeant

20   Jester.

21        Q.    So was Sergeant Jester giving commands and

22   coordinating with other deputies at that time?

23        A.    It was so chaotic and loud, I don't

24   remember.

25        Q.    Were you doing anything to control the
```

Exhibit 7
Page 5 of 8

Michael Baeuerlen

```
1        A.    Yes.

2        Q.    And are either of those arms yours?

3        A.    No.

4        Q.    Were you watching Landon Payne while he

5    was being removed from the vehicle?

6        A.    Yes.

7        Q.    You could see through the -- were you

8    looking through the glass rear door or were you

9    looking through the crack between the door and the

10   vehicle?

11       A.    Through the door in the vehicle -- through

12   the crack of the door in the vehicle.  The one

13   exhibit back here, I think it was 145, where you see

14   me standing at the end of the door right there

15   (indicating), that is pretty much where I was at

16   when they were pulling him out of the vehicle.  And

17   then as they passed me, that's when I had put my

18   hands on him.

19       Q.    And what did you do when you put your

20   hands on Landon Payne?

21       A.    I had control -- at that point I took

22   control of his right arm.

23       Q.    Did you ever let go of Landon Payne's

24   right arm?

25       A.    I don't believe so.  I may have, though.
```

ccreporting.com

Exhibit 7
Page 6 of 8

Michael Baeuerlen

1     A.    Yeah.  Right above his patch.

2     Q.    And what were you doing at this point in

3  time?

4     A.    I do not remember.  I think I was just

5  holding onto his arm area.

6     Q.    Do you think this is around the time when

7  Landon Payne stopped breathing, Exhibit 165?

8     A.    I don't know.

9     Q.    Okay.

10          Let's turn to Exhibit 166.  Do you

11  remember a cart of medical supplies being brought

12  out?

13     A.    Vaguely.  I don't remember when it was

14  brought out.

15     Q.    Did -- do you know who called for the

16  medical supply cart?

17     A.    I don't know who did.

18     Q.    Did you call that a crash cart, by the

19  way?

20     A.    No.

21     Q.    Have you ever heard the term "crash cart"?

22     A.    Yes.

23     Q.    What is a crash cart?

24     A.    It's for people who are having cardiac

25  arrest episodes.

Exhibit 7
Page 7 of 8

```
 1    State of Oregon     )
                          )        ss.
 2    County of Lane      )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 92 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 3rd

18    day of November 2023, in the City of Eugene, County

19    of Lane, State of Oregon.

20

21

22        _Sara Fahey Wilson_

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

Exhibit 7
Page 8 of 8

CONFIDENTIAL PER SPO

### Security Covid-19 Protocols

This document will reflect any protocols that are being implemented regarding Covid-19.  A new version will be sent out when there are updates.

**Intake/Medical Screening Protocols:** (Updated 3/27/20)
~~Signs have been posted asking arresting officers to call Book-In staff if their custody presents or states that they have a cough or a fever prior to entering the facility.  If this occurs medical staff will respond to the vehicle sally port and conduct a screening on the custody.~~

- ~~Plans are being discussed/formulated to have all custodies checked by medical for cough or fever in secure parking before bringing into the secure facility.~~

All new custodies will be screened by medical in the sally port prior to being admitted into the facility.  Arresting Officers will stop in front of the book in slider and wait for medical staff to evaluate the custody.  The Arresting Officer will not remove their custody from their vehicle unless directed by staff.

- Security Staff should maintain social distancing protocols while medical conducts their assessment.  Due to the medical evaluation having to occur within the social distancing protocols, medical staff will be utilizing appropriate PPE at that time.
- If medical determines that the custody is cleared to enter the facility, normal book in procedures will occur.
- If medical determines that the custody must be placed into medical quarantine or isolation protocols, staff will instruct the Arresting Officer to park, leave their custody in their vehicle, fill out a book in sheet and wait for future instructions.
  - Staff will collect the book in sheet from the arresting officer and immediately contact PTS to determine if the new custody is to remain in custody.
  - If it is determined that the new custody is to remain in custody, staff will make contact with the new custody wearing the proper PPE attire.
  - All of the standard Book In questions and screening will be conducted by Deputies and medical staff at the vehicle.
  - Staff will bring the new custody into Book In and conduct a pat down.  Once the pat down is complete, the custody will be taken immediately to the appropriate housing location and be housed.

Jail medical staff has expanded patient intake screenings to include a supplemental intake screening form with questions related to symptomology and exposure risk.

- Individuals that have a fever of 100.4° Fahrenheit (38°C) or higher **AND** exhibit symptoms of lower respiratory illness (e.g. cough, sore throat, shortness of breath) will be placed in Isolation.
- Individuals that answer yes to any of the following questions will be placed into quarantine for up to fourteen days from the point of contact.
  a. Had a close contact with a laboratory-confirmed COVID-19 case?
  b. Traveled to or from an affected geographic area with widespread community Transmission?
  c. Traveled internationally or on a cruise?

03/27/2020 Updates in red

Exhibit 8
Page 1 of 1

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 9
001275

Richard Clinton Riley

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate    )

of LANDON PAYNE,                )

       Plaintiff,            )

  v.                            ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                         )

       Defendants.           )


DEPOSITION OF RICHARD CLINTON RILEY

November 2, 2023

Thursday

9:11 A.M.


     THE VIDEO-RECORDED DEPOSITION OF RICHARD

CLINTON RILEY was taken at Hutchinson Cox, 940

Willamette Street, Suite 400, Eugene, Oregon 97401,

before Sara Fahey Wilson, CSR/CCR, Certified

Shorthand Reporter in and for the State of Oregon

and Washington.

Exhibit 9
Page 1 of 7

Richard Clinton Riley

38

1     A.    Well, to come into the jail, to come

2   through the threshold of the jail, everybody has to

3   be restrained and handcuffed.  In my experience of

4   working in the jail I haven't seen very many law

5   enforcement agencies not have somebody handcuffed

6   when they are in a patrol car.

7           I have seen numerous times where

8   someone -- we have breathalyzer machines and

9   different things out in our sally port.  It's up to

10  the arresting officer out there before they try to

11  bring them in the jail.  I've seen them have people

12  unrestrained out there as they are doing the course

13  of their duties and stuff.

14          But typically it's been my experience that

15  people come to jail handcuffed, and then before you

16  come into the jail you have to be handcuffed.

17    Q.    And is that a procedure for the jail, or

18  is that a GO somewhere that before somebody

19  enters --

20    A.    I recall -- I'm pretty sure it's a

21  procedure.  It would probably be in our book-in

22  procedures.  And it's been like that since I went to

23  work there in '95.

24    Q.    How did you first learn about the incident

25  in your sally port involving Mr. Payne on March

Exhibit 9
Page 2 of 7

Richard Clinton Riley

1    27th, 2020?

2         A.     The best of my recollection -- I'm on call

3    24/7, and so I remember getting a phone call at home

4    when he was in the sally port and they had called

5    the medics.

6         Q.     And who called you?

7         A.     The best of my recollection, it would have

8    probably been Lieutenant French.

9         Q.     And what did Lieutenant French tell you?

10        A.     That we had a person in the sally port

11   they were trying to book in.  They became

12   unresponsive.  Medics were on scene.  And I'm pretty

13   sure he relayed to me that they were doing CPR.

14        Q.     And did you respond to the jail, or --

15        A.     I did not.

16        Q.     You did not?  Okay.

17               What was the first thing that you did

18   related to the Landon Payne incident after that?

19        A.     I don't recall if I then continued, like,

20   the notifications to the chief deputy and the

21   sheriff.  I don't recall.  That would have been

22   something I may have done is notify them.  I don't

23   recall if Sheriff Harrold was the sheriff then or if

24   it was Sheriff Trapp.  But Sheriff Harrold would

25   have been the chief deputy before he became -- so I

Exhibit 9
Page 3 of 7

Richard Clinton Riley

53

1    question, some might be ten minutes of that going on

2    and then we have the arresting agency -- so the

3    arresting officer typically doesn't leave until we

4    give them the, "We're good to go."

5        Q.    In Mr. Payne's case you said you reviewed

6    the videos.  Obviously, that basic search occurred

7    in the video?

8        A.    When -- when Mr. Payne was coming in?

9        Q.    Yeah.

10       A.    Yeah.  The difference with that one was

11   COVID was really getting going right then and

12   temperatures were a big thing, so the first step for

13   him was to get his temperature taken as we started

14   the medical clearance.

15            And so we -- what I just described to you,

16   we moved out to that sally port -- starting, I

17   believe, on that shift was the first time we moved

18   it from inside the jail to the sally port.  Because

19   if someone had COVID symptoms, we didn't want them

20   coming inside the facility because of all the trace

21   tracking, so we moved everything out there.  So if

22   somebody had COVID -- any sort of COVID stuff -- we

23   were working with the courts and everyone to see if

24   we even needed to bring the person in the building.

25   And so that's why that occurred the way it did.  And

Exhibit 9
Page 4 of 7

Richard Clinton Riley

1    then the temperature was the big thing, in trying to

2    get his temperature taken.

3         Q.    Not referring specifically to Landon

4    Payne's case, but when did the medical clearance

5    protocol process begin?  Meaning, when -- and I

6    don't need a specific date -- but at what point in

7    your career did the jail start requiring a medical

8    clearance?

9         A.    What I just described to you?  It had been

10   after I was a lieutenant, so somewhere in 2017, '18,

11   in there.  It took a little more funding.  We had to

12   manipulate the budget a little bit.  We had to find

13   more money to pay our medical --

14        Q.    But that wasn't a new thing for COVID.  I

15   know that we're going to get to the COVID, but that

16   had been going on for a few years before 2020?

17        A.    Yes.  Yeah.  And, actually, that made

18   COVID a lot smoother for us having that resource

19   that was already dedicated down there as we made all

20   of our numerous COVID protocol changes.

21        Q.    Those COVID protocol changes that you

22   referred to for the medical clearances that were

23   occurring that night -- and it sounds like that was

24   the first night -- how were those new protocols

25   communicated to the -- not the medical staff yet --

Exhibit 9
Page 5 of 7

Richard Clinton Riley

1    but the deputies that were there that night?  How

2    would they have learned of those new protocols?

3        A.    We had an ongoing document -- COVID

4    document that we were updating at that point

5    probably daily, and that was getting emailed out to

6    everybody.

7            I don't know -- I do remember that

8    particular evening only because when we had those

9    debriefs with all the deputies we -- myself, and I

10   know Lieutenant French for sure -- we had met with

11   the swing swift deputies that were going to be

12   working in that book-in area to tell them of the

13   protocol changes of moving out to the sally port.

14   And it was kind of like, Here's what we got.  This

15   is how we think we should do it.  And then we were

16   going to take feedback over the next couple days to

17   see where we needed to make adjustments.

18           So I do remember meeting with some of the

19   folks that were working the book-in area on that

20   swing shift with the other lieutenant, and then we

21   had an ongoing document for the whole three years of

22   COVID protocols that would be updated all the time

23   as we kept changing it.

24           So that one in early March would have

25   been -- it was probably this (indicating) big, and

Exhibit 9
Page 6 of 7

Richard Clinton Riley

150

```
1    State of Oregon      )
                          )        ss.
2    County of Lane       )

3

4         I, Sara Fahey Wilson, CSR, a Certified Shorthand

5    Reporter for the State of Oregon, certify that the

6    witness was sworn and the transcript is a true

7    record of the testimony given by the witness; that

8    at said time and place I reported all testimony and

9    other oral proceedings had in the foregoing matter;

10   that the foregoing transcript consisting of 149

11   pages contains a full, true and correct transcript

12   of said proceedings reported by me to the best of my

13   ability on said date.

14        If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 15th

18   day of November 2023, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expiration Date:  March 31st, 2026
```

Exhibit 9
Page 7 of 7

Conner Santini

1

```
                UNITED STATES DISTRICT COURT
                    DISTRICT OF OREGON
                     EUGENE DIVISION



                              )
ANZHELIA PAYNE, personal      )
representative to the estate  )
of LANDON PAYNE,              )
                              )
      Plaintiff,              )
                              )
     v.                       )No. 6:22-CV-00471-MC
                              )
JAIRO SOLORIO, individual,    )
ANDREW ROBERTS, an            )
individual, JACOB THOMAS, an  )
individual, ROBERT GRIESEL,   )
an individual, JUSTIN WILSON, )
an individual, KIMBERLY       )
FULTON, an individual, EMMA   )
EDWARDS, an individual,       )
COLTER GAWITH, an individual, )
NATHAN GENT, an individual,   )
                              )
      Defendants.             )
_____)
```

DEPOSITION OF DEPUTY CONNER SANTINI

October 23rd, 2023

Monday

2:02 P.M.


THE DEPOSITION OF DEPUTY CONNER SANTINI was

taken at Hutchinson Cox Attorneys, 940 Willamette

Street, Suite 440, Eugene, Oregon, before Deborah M.

Bonds, CSR, CCR, RPR, Certified Shorthand Reporter

in and for the State of Oregon and Washington.

Exhibit 10
Page 1 of 7

1   was just yelling and unable to communicate.

2       Q.    And then what did you do after that?

3       A.    So then at that time, I attempt contact

4   with Mr. Payne to see if we can't answer any of

5   those questions and maybe obtain a little bit more

6   information prior to proceeding.

7             And I had a -- I think probably a similar

8   conversation where there was never any real dialogue

9   established with Mr. Payne and none of those

10  questions were really answered prior to bringing him

11  out of the car.

12      Q.    Okay.  So after you spoke with Mr. Payne

13  and Mr. Payne didn't really answer your questions,

14  what happened next?

15      A.    I think there was some more discussion

16  between the sergeant and the arresting officer.

17  There may have been additional EPD personnel there

18  at that point.  And I think that conversation

19  revolved around whether or not Mr. Payne should come

20  into the jail, one, due to the new COVID policies

21  and his out-of-county warrant and current charges,

22  whether or not we would be able to accept him from

23  that standpoint and also due to his current

24  condition, level of compliance -- whether it was

25  right to bring him into the jail and -- or if he

Exhibit 10
Page 2 of 7

Conner Santini

```
1        A.    I think -- as we went out, the expectation

2   was that Deputy Baeuerlen would take a primary or

3   lead position when communicating with Landon Payne

4   initially, and then kind of reporting back to the

5   group as far as a plan of action to get him inside

6   the jail safely.

7             And then obviously there is a group out

8   there, and amongst the group, there was a sergeant.

9   So if the sergeant had, you know, something that

10  needed to happen or, you know, any input, we would

11  divert to him or if another deputy were to have an

12  idea or plan, then they could also chime in.

13            But, initially, Deputy Baeuerlen, who I

14  was the FTO of, I think is what you're looking for.

15       Q.    And that's why Deputy Baeuerlen had the

16  body cam?

17       A.    Correct.

18       Q.    Okay.  So at the beginning, Deputy

19  Baeuerlen was sort of leading the effort to get

20  Landon Payne booked in; correct?

21       A.    Yes.

22       Q.    And then once Landon Payne was not

23  responsive to Deputy Baeuerlen's questions, he,

24  Deputy Baeuerlen told you that; correct?

25       A.    Correct.
```

Exhibit 10
Page 3 of 7

1   were words communicated to indicate that he was

2   struggling versus flailing, then that could be taken

3   into consideration.

4       Q.    At any point in time did you perceive

5   Landon Payne to be struggling to breathe?

6       A.    No.  Not until we realized that he was

7   unresponsive, then obviously he was not breathing.

8       Q.    Did the flailing, as you've described it,

9   occur shortly before Landon Payne became

10  unresponsive?

11      A.    Yes.

12      Q.    Okay.  Let's look at paragraph 3.

13            Do you see where it says (as read):

14      I assisted with maintaining control of his

15      upper body by placing my right knee on the

16      back of his right arm below the shoulder

17      ensuring excessive pressure wasn't placed on

18      his upper body.

19      A.    I see that.

20      Q.    What did that mean?

21      A.    So backing up to how we were describing

22  him moving the different parts of his body in

23  different directions -- not necessarily at any

24  particular individual or myself -- we wanted to make

25  sure that he was under control, one, so he couldn't

Exhibit 10
Page 4 of 7

1    take, you know, action to hurt others and also
2    himself.

3            So that would include placing pressure on
4    some of those appendages to control his body, and
5    that kind of starts with controlling his larger
6    appendages and legs and then arms, and then also his
7    head so he didn't hit his head on the ground so --
8    go ahead.

9        Q.    Are you finished?

10       A.    Yeah.

11       Q.    So you said "below the shoulder."  Where
12   is that on Landon Payne's body?

13       A.    In his tricep area.

14       Q.    And at the time Landon Payne was still
15   handcuffed behind his back?

16       A.    Correct.

17       Q.    When you placed your knee on Landon
18   Payne's tricep while he was handcuffed behind his
19   back, did that place pressure on Landon Payne's
20   upper torso?

21       A.    It may have, and that was kind of an
22   ongoing observation for, I think, all involved and I
23   think someone had pointed that out, and it was
24   immediately moved if -- when I realized that there
25   could have been excessive or additional pressure

Exhibit 10
Page 5 of 7

1    A.    I believe so.

2    Q.    How long was it in that position?

3    A.    I don't know.  A couple seconds.  Like I

4 said, I remember orienting myself and positioning

5 myself amongst the others as we went to the ground,

6 and then quickly thereafter someone pointing that

7 out because that was -- that was an ongoing, you

8 know, discussion and concern at the time in light

9 of, say, the George Floyd incident.  So that was

10 something we were all hypervigilant about and wanted

11 to make sure that, you know, we didn't repeat or,

12 you know, make the same mistake.

13    Q.    So the George Floyd incident, was that

14 before or after the Landon Payne situation?

15    A.    I believe it was before.

16    Q.    Okay.  So where was your knee before you

17 placed it on Landon Payne's right tricep?

18    A.    I think I was in a crouched position since

19 we're all kind of lowering to his level.  So my

20 weight would be on the balls of my feet and I was

21 crouched.

22    Q.    Before you moved your knee to the --

23 Landon Payne's right tricep, where was it?

24    A.    Probably hovering above his tricep on that

25 same side.

Exhibit 10
Page 6 of 7

Conner Santini

112

```
 1  STATE OF OREGON       )

 2                        )   ss.

 3  County of Lane        )

 4

 5       I, Deborah M. Bonds, CSR-RPR, a Certified

 6  Shorthand Reporter for the State of Oregon and

 7  Washington, certify that the witness was sworn and

 8  the transcript is a true record of the testimony

 9  given by the witness; that at said time and place I

10  reported all testimony and other oral proceedings in

11  the foregoing matter; that the foregoing transcript

12  consisting of 111 pages contains a full, true and

13  correct transcript of the proceedings reported by me

14  to the best of my ability on said date.

15       If any of the parties or the witness requested

16  review of the transcript at the time of the

17  proceedings, correction pages have been inserted.

18       IN WITNESS WHEREOF, I have set my hand and CSR

19  seal this 7th day of November 2023, in the City of

20  Eugene, County of Lane, State of Oregon.

21

22

23  Deborah M. Bonds, CSR, CCR, RPR

24  Oregon CSR No. 01-0374, Expires September 30, 2026

25  Washington CCR No. 21014344, Expires May 5, 2024
```

Exhibit 10
Page 7 of 7



# MEMORANDUM
# LANE COUNTY SHERIFF'S OFFICE
# CORRECTIONS DIVISION

**TO: Sgt L. Jester #366**
**FROM: Deputy J. Wilson #368**
**DATE: 3/27/20**
**SUBJECT: Landon Payne in custody medical emergency**

---

On 03/27/2020 at approximately 2306 I entered the sally port with other staff to assist with a combative arrestee from EPD. Landon Payne inmate #3915787 was in the back of the patrol car and was brought in for resisting arrest and out-of-county warrants. DS Santini contacted Payne from the front seat of the patrol car and the decision was made to assist Payne out of the vehicle. Payne was assisted out of the passenger side and I opened the driver side rear door to provide Taser Coverage. Once out of the vehicle, Payne was assisted to the ground into the prone position while staff applied leg irons. Payne was yelling and screaming and was very animated. Payne was not fighting staff but was physically resistive by attempting to twist his body and pull away from staff control.

The decision was made to conduct the preliminary pat search while Payne was still on the ground. Staff was holding Payne down by his legs and arms, but were not applying any pressure to his torso. Payne slowly started to calm down while the pat search was being conducted and within a few seconds, Payne became unresponsive. I told staff to roll Payne onto his side so I could check on him. Payne slowly started to turn blue around his mouth and was not responding to verbal or physical stimuli. Staff rolled Payne onto his back where medical staff checked for a pulse. Medical was not able to feel a pulse and could not see any visible signs of breathing. Staff immediately started chest compressions and a Code-3 for assistance was called by central control. Once the medical crash cart arrived, an AED was applied and staff continued compressions.

I kneeled at Payne's head and assisted the nurse in assembling the oxygen bottle, applying the bag valve mask, and performing a head-tilt chin-lift to position Payne's head while the nurse administered rescue breaths via the bag-valve mask. I also made sure that other deputies were switching out between cycles of compressions to stay fresh and provide effective CPR.

After several rounds of CPR, Paramedics arrived and took over patient care. Ultimately, Paramedics were able to get a heart rhythm and transported Payne via ambulance.

Exhibit 11
Page 1 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000035



# MEMORANDUM
# LANE COUNTY SHERIFF'S OFFICE
# CORRECTIONS DIVISION

**TO:** **Sergeant Jester**
**FROM:** **Deputy Fulton #432**
**DATE:** **3/27/2020**
**SUBJECT:** **Payne, Landon**

---

On 3/27/2020, around 2300 hour I was assigned as the Facility Support Deputy in the Lane County Adult Corrections Facility. I was informed that Eugene Police Department (EPD) was bringing in an uncooperative male. When EPD arrived one of the present deputies attempted to ask Payne, Landon #3915787 the initial booking questions.

Due to Payne's behavior and level of resistance the decision was made to place him on the ground, so we could apply leg irons and medical could evaluate him. We took Payne out of the patrol car and placed him on his stomach. Payne was still in handcuffs, but due to his resistance the decision was made to apply more restraints so medical could take his temperature. Payne was resistive during this process, and started to thrash around fairly violently. I placed my left knee on his right arm near the shoulder and used my left hand to hold his head against the ground. I attempted to talk to Payne about if, or how many drugs he had ingested recently. Payne was not able to communicate very well and was yelling mostly random noises.

While trying to speak to Payne I noticed he suddenly stopped yelling and thrashing around. I was trying to get a response out of him when I realized that he may have stopped breathing. I made a comment stating that I thought Payne wasn't breathing, and we rolled him on his right side. Another present Deputy performed a sternum rub in a further attempt to gain response from Payne.

The sternum rub was unsuccessful in gaining a response, so Payne was rolled to onto his back. D.S. Gent #346 began chest compressions on Payne. I was directly to Gent's right side and informed D.S. Gent that I was ready to take over chest compressions when he became fatigued. Sometime during this a Code-3 was called and medical was advised to bring a crash cart to our location. I switch out with D.S. Gent and took over chest compressions.

Exhibit 11
Page 2 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000036

While I was performing chest compressions an automated external defibrillator (AED) was prepared for use. I stopped chest compressions while the AED pads were placed on Payne, and the AED ran diagnostic tests on Payne. The AED recommended that a shock was not necessary, so I continued chest compressions until the AED was ready to conduct another read. Eventually I switch out with another Deputy who was across from me, and they conducted chest compressions. When they became fatigued I took back over. At this point the EMTs arrived and began to take over the scene.

Once the EMTs were setup, one of them located themselves across Payne's torso from me. As I became fatigued the Fireman took over chest compressions, and that was the last contact I had with Payne. The EMTs worked on Payne, and eventually said that he had a pulse. Shortly after that they put Payne into the ambulance and left with him.

Exhibit 11
Page 3 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000037



## MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DIVISION

TO:        **SGT. Jester**
FROM:      **DS Santini**
DATE:      **03/28/2020**
SUBJECT    **Landon Payne's Medical Incident in Secure Parking**

On 03/27/2020 at approximately 2300 hours while assigned to the Booking post of Lane County Adult Corrections, I was advised by Records that Eugene Police was on their way with a combative male. The male was identified as Landon Payne (inmate ID: 3915787.) Upon gathering in secure parking, the arresting officer advised that Payne had resisted arrest resulting in a TASER deployment. I had my trainee, DS Baeuerlen take lead and ask initial assessment questions. Payne could be heard yelling in the back of the patrol vehicle while DS Baeuerlen attempted the assessment. DS Baeuerlen advised support deputies that Payne was unable to answer any assessment questions and that he was only yelling. I attempted to contact Payne in the back of the patrol vehicle and found that he was unable to communicate verbally as he only continued to yell incoherently.

Due to Payne's inability to communicate his level of compliance and knowing that he had resisted arrest, it was decided that Payne would be removed from the vehicle and assisted to a prone position on the ground while still in handcuffs. I secured Payne's right arm while another deputy controlled his left arm and assisted him out of the vehicle. Payne dropped his weight backwards and he was assisted to a seated position before laying him on his front. I maintained control of Payne's right arm and his head to ensure he would not hit it on the ground.

While on the ground Payne continued yelling and began to flail his body. I assisted with maintaining control of his upper body by placing my right knee on the back of his right arm below the shoulder; ensuring excessive pressure wasn't placed on his upper body. I continued to tell Payne to "take a deep breath" and to try to relax. Deputies began a pat search on the ground as leg irons were applied as medical took his temperature.

Payne's yelling suddenly ceased and began to turn blue in the face as he became unresponsive. Payne was quickly rolled to his back and I attempted a sternum rub to get a physical reaction. Neither medical staff nor other deputies could feel a pulse on Payne so chest compressions were started. As other deputies were performing compressions, I attempted to provide a clear airway by tilting Payne's head back and lifting his chin. I relieved DS Fulton to do compressions when medical decided to connect Payne to an automated external defibrillator. All staff stood clear while the AED was connected and when it advised that no shock was required, deputies continued compressions. This

Exhibit 11
Page 4 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000038

continued until EMS arrived and relieved jail staff. To clear the area, other deputies and I were instructed to return inside the facility. I returned to the building and my contact with Payne ended.

Exhibit 11
Page 5 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000039



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
### CORRECTIONS DIVISION

**TO:**      **SGT. Jester**
**FROM:**    **DS Gent #346**
**DATE:**    **3/28/20**
**SUBJECT:** **Payne, Landon Medical Incident**

On 3/27/20 at approximately at 2300 while working the post of South Annex 1 I was advised that EPD was in route with a disorderly male. When in booking I learned that the disorderly subject was Payne, Landon (AIRS#3915787). EPD arrived in secure parking.  The arresting officer stated that Payne had been Tased and was arrested on a warrant and resisting arrest. Payne was contacted through the partition but did not answer any of the Deputy's questions and was yelling incoherently.

The rear door was opened and I unbuckled the seat belt on Payne. Payne was screaming and attempted to move away from me in the patrol car. I reached in and took control of his right arm. Payne was not complying and would not get out of the car. I was able to guide him closer to the door where I grabbed ahold of his pant leg in order to lift his feet out of the car. Once out of the car I controlled Payne's left arm and attempted to guide him to ground. Payne was resistive and tried to drop his weight by going to a seated position. Payne was controlled to the ground then rolled on to his stomach. Payne was tensing his entire body and yelling. He began to force his legs up into staff. I placed my knee over his calf in order to control his left leg while leg irons were being applied. Payne continued to resist and attempted to raise his legs with enough force that he was lifting my body.

Payne stopped resisting and yelling and went limp. At this time staff checked for a pulse and could not feel one. Payne was rolled to his back. I could see what appeared to be urine on the ground. I could not see any rise and fall on his chest. After staff could not feel a pulse I began chest compressions on Payne. I could see an unknown liquid coming from Payne's mouth. His lips and hands appeared blue in color. I continued to do chest compressions until becoming fatigued and was relieved by another Deputy. Medical staff arrived with an Automated External Defibrillator (AED). I removed the AED from the cart and placed the pads on Payne's chest once his shirt was cut off. The AED advised that no shock was needed. Staff continued chest compressions then AED reevaluated and again advised against a shock. EMS arrived and took over care for Payne ending my involvement with Payne.

Exhibit 11
Page 6 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000040



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DIVISION

TO:         **Sgt. Jester**
FROM:       **DS Baeuerlen #338**
DATE:       **3/28/20**
SUBJECT:    **Medical Emergency**

On 3/28/20 at approximately 2310 hours, while working in booking, I took lead on a combative subject brought in by EPD.

I began with asking Landon Payne (arrestee) some booking questions which he was not responding to. He continued to yell. I let my fellow deputies know I was not able to communicate with him so we could formulate a plan to get him out of the vehicle.

When we took him out of the vehicle, he was actively resisting while he continued yelling. We laid him on the ground and turned him on his stomach to place leg irons on him. I kept my hand on his arms to help control him.

While placing leg irons on him, Payne relaxed and stopped yelling. DS Fulton noticed Payne becoming non responsive and turning "blue." We turned Payne over onto his back. We checked for a pulse and breathing, which we could not determine. Fulton began CPR and chest compression. I helped taking turns with compressions until EMS arrived.

Exhibit 11
Page 7 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000041



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DIVISION

**TO: Sergeant Jester**
**FROM: Deputy Edwards #435/#58505**
**DATE: 3/28/20**
**SUBJECT: Payne, Landon**

On 3/27/20 at approximately 2305 I was informed the Eugene Police Department was bringing in a combative with the name Payne, Landon. We were informed the Payne had been tased and was very uncooperative with the arresting officers.

Eugene police arrived and stopped in front of our booking slider. I could hear Payne screaming hysterically from inside the patrol car. Payne was sweating profusely and his eyes were opened so wide. Due to current policy pertaining to the Covid-19 virus, medical staff is supposed to get a temperature on any incoming arrestees to make sure they do not have a fever. Deputies made contact with Payne at approximately 2310, who was continuing to scream. The door was opened and it took a few seconds to get Payne to get out of the car. Payne was standing but still very tense, screaming and trying to pull away from Deputies. Payne began to drop his weight and Deputies assisted him to the ground. Payne was on his stomach pushing back on Deputies with extreme strength. Leg irons were placed on Payne and his shoes were removed. Payne was still screaming despite our best efforts to calm him. Payne began to get quiet but was still pushing back leading us to believe that he was calming down.

Deputy Fulton and I soon observed that Payne was not responding. Payne was not breathing and was rapidly turning blue. Payne was rolled on to his right side and I could not feel a pulse. A medical code was called requesting a crash cart and Paramedics. Payne was rolled on his back and we began compressions. Deputies took turns so we could continue to provide quality compressions. I retrieved a pair of scissors and Payne's shirt was cut off so AED pads could be properly placed. After a few rounds of compressions Payne showed signs the he was beginning to respond. That lasted about 15 seconds before I could no longer feel a pulse and Payne was blue again. Handcuffs and leg irons were removed. Compressions resumed. The AED determined that no shock was advised so we continued compressions. Deputies continued to perform lifesaving efforts for approximately 10-15 minutes until Paramedics arrived on scene. Paramedics took over compressions and after some time were able to get a pulse back and transport Payne to the hospital.

Exhibit 11
Page 8 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000042



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DIVISION

**TO: Sergeant Jester**
**FROM: Deputy Gawith**
**DATE: 03/28/2020**
**SUBJECT: Landon Payne's medical incident in secure parking**

---

On 03/27/2020 I was assigned to the East Annex. At approximately 2250 hrs Central Control called and notified me that there was a combative male ten minutes out. I responded to Book In and waited for their arrival. When Eugene Police arrived with Landon Payne (the combative male), support Deputies walked out the secure parking.

Once I was in secure parking, I could hear Payne screaming very loudly. One of the deputies got a briefing from the arresting officer and then started to ask Payne question. From what I could hear Payne did not answer any of the medical question, yet only screamed at Deputies. Deputies Santini and Baeuerlen briefed the rest of the Deputies of Payne's behavior. Deputies opened the door and brought Payne out of the car and I closed the door. After the car door was closed I went right to helping control Payne's feet. Payne was screaming and flailing his entire body.

I helped apply leg irons onto Payne's ankles, checking for fit, and double locking them. Payne continued to fight against Deputies while medical tried to get his temperature. Shortly after the leg irons were applied, Payne suddenly stopped moving and fighting against Deputies. Payne was rolled onto his back and at this time I could see he was blue in the face. Deputy Gent started CPR and Sergeant Jester called a medical code.

Once the medical crash cart arrived, I saw Deputy Gent apply the AED. Deputies rotated giving chest compressions until EMT's arrived. Once EMT arrived, they fully took over and Deputies stood by giving any information they needed. Payne was then loaded in the ambulance and left at 2335hrs.

Exhibit 11
Page 9 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000043



# MEMORANDUM
# LANE COUNTY SHERIFF'S OFFICE
# ADULT CORRECTIONS DIVISION

**TO:**      LT French
**FROM:**   SGT Jester
**SUBJECT:**  **Medical Emergency: Payne, Landon #3915787**

---

On 03/27/20 at approximately 2300 hrs. we received a call that Eugene Police were bringing in a combative arrestee. The charges were an out of county warrant and resisting arrest. Records contacted the county the warrant was from and they chose to give a court date instead of holding for transport.

EPD arrived and reported that Payne had been Tased and has been yelling and screaming since they arrested him. Due to the warrant being cleared prior I asked if they wanted to CLC on the resisting charge. The arresting officer declined saying that they would just have to deal with him again. LCSO staff attempted to contact Payne in the back of the patrol car but he would not communicate with us. Payne appeared to be under the influence of some sort of intoxicant. Payne was helped from the car and assisted to the ground in the prone position. Payne was yelling and making grunting noises the whole time. Once on the ground staff applied Leg Irons while medical took his temperature as part of their Covid-19 protocols. Payne was jerking his whole body so staff held his arms and legs down to try to keep him as still as possible. Payne continued to make grunting noises. I positioned myself by his head and tried to talk with him. I was trying to get Payne to cooperate so medical could finish their evaluation to see if we could accept him into our custody. Payne would not respond verbally and would only grunt and make noises. Payne's breathing was labored and I checked to make sure staff was not applying any pressure on his upper torso that would impede his breathing. Staff were only holding his arms and legs down and no one was on his upper torso. Payne suddenly went quiet and his breathing slowed and then appeared to stop. Payne was turned onto his side and we attempted get him to respond. Payne was still unresponsive so he was turned onto his back to better assess him. Staff could not find a pulse and immediately started life saving efforts. Medical staff responded with the AED and oxygen. The AED was hooked up and did not advise a shock. CPR was continued by staff until EMS arrived and took over.

I asked EPD if they would CLC now due to the fact Payne was going to the hospital and they would not have to deal with him again tonight. Payne was transported by EMS after they were able to establish a heart rhythm.

Exhibit 11
Page 10 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000044



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DIVISION

**TO:    Sergeant Jester**
**FROM:  Deputy Foley**
**DATE:  4/9/2020**
**SUBJECT:    Landon Payne's medical incident in secure parking.**

---

On 3/27/2020 I was assigned to 3 South. At approximately 2250 hours Central Control called and notified me about a combative male about 10 minutes out. Eugene police arrived with Payne, Landon in secure parking. Deputies entered secure parking to hear Payne yelling. Deputy Baeuerlen and Deputy Santini attempt to speak to Payne. It was reported that Payne was just yelling and did not answer the initial booking/medical questions. Deputies opened the patrol car door to escort Payne out of the car and into the facility. Deputies assisted Payne out of the car and onto the ground to gain control of him and place leg irons on. I grabbed Payne's arm for about a second but other deputies were in a better position to assist. Payne was placed on his backside and then rolled onto his stomach. I grabbed the shoes from DS Gawith and placed them by the vestibule to bring them into the building. I observed Payne continuing to move his arms and legs while deputies held him down. Payne then stopped moving and shortly after this I saw Payne being rolled back to his back. I saw Payne was starting to turn blue in color. Deputy Gent started CPR and Sergeant Jester call a medical code and request the crash cart and an ambulance. Payne started to gain some of his color back. Once medical showed up with the crash cart the AED was applied to Payne's chest. The AED did not advise a shock. Deputies continued chest compressions until EMT's arrived; The EMT's took over the incident after being on scene. I took Payne's shoes and paperwork and placed it into a property bag and handed it the EMT's. At this time Sergeant Jester stated if you are not actively helping you can leave, at this time I left the scene.

Exhibit 11
Page 11 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000045



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
### CORRECTIONS DIVISION

**TO:**      Sgt Jester
**FROM:**    DS Fisher #460
**DATE:**    04/09/20
**SUBJECT:** Medical Incident in Sally Port

On 03/27/20 at approximately 2310 hours I was called to booking for a combative arrestee being brought in EPD. EPD arrived with an arrestee by the name of Payne, Landon. A booking deputy took lead and spoke with the A/O to hear charges. Payne was severely agitated in the backseat of the patrol vehicle. The booking deputy contacted Payne through the partition of the patrol vehicle. Payne was incoherent with the booking assessment questions. Payne was making nonsensical words, more like animalistic noises and grunts as he rocked back and forth in his restraints. The decision was made to remove Payne from the patrol vehicle. Support Deputies each grabbed an arm to control Payne as he was assisted to the prone position so leg restraints could be applied. As the leg restraints were being applied medical attempted to assess Payne. Payne was being asked if he had taken any illegal drugs that evening. Payne was continuing to move his arms and legs. Deputies were holding Payne to prevent him from breaking control. Payne was moved to the supine position. CPR was initiated by Deputies. A code three medical response was initiated by staff. After a brief delay I was instructed by Sgt Jester #366 to retrieve the crash cart from medical. Upon my arrival in booking the crash cart was being brought through booking by medical staff. At approximately 2335 hours I left the Sally Port to be relieved of duty for the shift. My involvement during the entire incident was that of a bystander.

Respectfully,
Stephen Fisher

Exhibit 11
Page 12 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000046



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
### CORRECTIONS DIVISION

**TO:**       **Sgt. Jester**
**FROM:**     **DS Fifer**
**DATE:**     **03/27/2020**
**SUBJECT:**  **Medical Incident**

On 03/27/2020 at 2306 hours, EPD arrived in secure parking with Payne, Landon #3915787.  Staff assembled in secure parking where we were briefed by the A/O that Payne had been arrested for a warrant and resisting arrest.  The A/O further advised us that Payne had resisted arrest which resulted in a TASER exposure.  I observed Payne through the patrol vehicle rear partition.  Payne appeared to be under the influence of some type of drug.  Payne was screaming and was unable to communicate with staff.

Payne was assisted out of the patrol vehicle by other staff members and placed on the ground in order for medical staff to get a body temperature reading.  Payne was placed on his stomach in the prone position.  RN Standing was able to get a body temperature reading on Payne.

Staff began a pat-search while Payne was on the ground.  I placed my left knee on the back of Payne's left arm in order to control his movements.  Payne appeared to stop breathing and lost consciousness a short time later.  Payne was rolled onto his back in order for medical staff to evaluate Payne.  Payne had stopped breathing and had no pulse.  CPR was started at about 2314 hours and a code-3 was initiated.   I assisted with removing the handcuffs from Payne.  Eugene Fire arrived a short time later and took over medical care for Payne.  Payne was transported by Eugene Fire at about 2331 hours.

Exhibit 11
Page 13 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000047



# MEMORANDUM
## LANE COUNTY SHERIFF'S OFFICE
## ADULT CORRECTIONS DIVISION

**TO:  Sgt. L. Jester**
**FROM: W. McClure**
**DATE: 04/08/2020**
**SUBJECT: Landon Payne**

---

On 3/27/2020 at approximately 2300 hrs. I was called up to Booking to assist with an uncooperative arrestee, Landon Payne.  While it was being decided if Payne was going to be accepted into custody of Lane County Adult Corrections I could hear Payne making a lot of noise from the back of a Eugene Police Department vehicle and he was causing the vehicle to rock back a forth.  Once it was decided to get Payne out of the car he was assisted to the ground by deputies. Payne was fighting against this and screaming. Once on the ground I assisted in placing ankle chains on his left foot and removed his shoes and socks to search them. This task was difficult due to the amount of resistance from Payne.  At this time Payne stopped thrashing about. A deputy called out that Payne was not breathing.  Payne was rolled over and checked for breathing and a pulse.  A code 3 was activated requesting a crash cart and code 3 medics.  CPR was begun and I waited for my turn on chest compressions.  I never got the chance as medics arrived and I was told to go back to my post as there were plenty of people helping.

William McClure #364

Exhibit 11
Page 14 of 14

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 4
000048

## LANE COUNTY DISTRICT ATTORNEY
## MEDICAL EXAMINER'S OFFICE
## MEDICAL EXAMINER'S REPORT OF INVESTIGATION

CASE #: 2020-0354

| NAME:<br>**PAYNE, Landon Jay**<br>**MR# 21154870** | DATE OF BIRTH:<br>March 9, 1983 | SEX:<br>Male |
|---|---|---|
| PLACE OF DEATH:<br>Riverbend Hospital<br>3333 Riverbend Drive<br>Springfield, Oregon 97477 | DATE OF DEATH:<br>March 29, 2020 | TIME:<br>1727 hours |
| ADDRESS STRICKEN:<br>Lane County Jail<br>101 West 5th Avenue<br>Eugene, Oregon 97401 | DATE STRICKEN:<br>March 27, 2020 | TIME:<br>2313 hours |
| HOME ADDRESS:<br>3829 Meadowview Drive<br>Eugene, Oregon 97408 | INFORMANT OR RELATIVE:<br>Angie Payne (spouse)<br>541 954-2476 | |
| AGENCY:<br>Eugene Police Department | OFFICER:<br>Haywood | CASE #:<br>20-05537 |

Introduction:
The deceased was a 37-year-old male declared dead in the hospital 2 days after becoming unresponsive while being restrained by law enforcement.

History:
At 1841 hour on 3/29/20, Investigator Penny was informed of a death by Kyle of Access PeaceHealth. Penny had a difficult time finding someone who had knowledge of the patient. Finally, at 2027 hours, Penny spoke with medical ICU Charge Nurse Kiera who provided the following information. The deceased, Landon Payne, had been at the Lane County Jail on 3/27/20 when he went into cardiopulmonary arrest and received bystander CPR. EMS reported that Landon was in PEA but after an epinephrine injection and airway placement, a return of circulation was achieved. His pulse was lost en route to the hospital, so he was shocked and ROSC was again achieved. Landon was admitted at 2354 hours on 3/27/20 and intubated before being transferred to the ICU, where he was swabbed to rule out COVID-19. Landon was placed on a 24-hour hypothermia protocol. It was determined that Landon had sustained an anoxic brain injury and was near brain death. He also had acute kidney injury and rhabdomyolysis. It was determined that he had a poor neurological prognosis and was made DNR. On 3/29 he was extubated and declared dead at 1727 hours. Landon had a history of

methamphetamine use and a rapid drug screen revealed methamphetamine, amphetamine, and diazepines. Family did not have a mortuary choice at that time.

Scene and Body Description:
Investigator Penny did not respond to the scene.

Assessment and Plan:
Investigator Penny was unsure as to the cause of death. As he had been in custody at the time of the cardiac arrest, jurisdiction was assumed and the body was transferred to the Riverbend morgue. It is anticipated that Dr. Dan Davis will perform an examination and sign the death certificate.

Medical History:
At 0816 hours on 3/30/20, Investigator Dean reviewed McKenzie-Willamette Medical Records and obtained the following information. Landon was last seen on 9/12/19 for a right-hand laceration sustained while moving a steel beam at work. He had no past medical history on file and no PCP listed.

At 0820 hours on 3/30/20, Investigator Dean reviewed Peace Health Medical Records and obtained the following information. Landon was tachycardic on arrival at the ED on 3/27 at 2345 hours from the jail and was intubated to protect his airway. He initially had no movement even with noxious stimuli, but developed non-purposeful movement that was determined to be myoclonic activity with attempted decreased sedation. Labs demonstrated lactic acidosis with questionable leukocytosis, and rhabdomyolysis. An EKG demonstrated prolonged QT interval. A COVID-19 nasopharyngeal swab was negative. A respiratory panel detected the presence of "rhinovirus/enterovirus". Per admission labs, ALT and AST were elevated at 522 (normal 9-54) and 412 (normal 13-40) respectively. WBC was elevated at 25.2 and CK was 2,065 (normal 49-397). A blood culture demonstrated gram positive bacilli. Landon was admitted to the ICU pending further testing and discussion with family regarding his prognosis. He was "progressing to brain death" despite over-breathing the ventilator. At 1641 hours on 3/28, Landon's wife agreed to place him on DNR status. At 1448 hours on 3/29, Fentanyl and propofol were discontinued and Landon was transitioned to comfort care per his wife's request. He was extubated at 1733 hours on 3/29 and his cardiorespiratory function ceased at 1757 hours. Per Dr. Jaime Fair's discharge summary, Landon's discharge diagnoses included anoxic brain injury, out of hospital cardiac arrest, acute kidney injury, rhabdomyolysis, rhinovirus positivity and methamphetamine abuse.

At 0853 hours on 3/30/20 Investigator Dean called Peace Health Labs and spoke with Rebecca. She located admission specimens to include blood collected at 2357 hours on 3/27 and a urine specimen collected at 0255 hours on 3/28. A hospital rapid urine drug screen was positive for methamphetamine, amphetamine and benzodiazepines. His serum ethanol level was negative.

At 0954 hours on 3/31/20, Investigator Hannon received and reviewed the Eugene Fire &

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000021

Exhibit 12
Page 2 of 12

Rescue report (Run# EU20079954). On 3/27/20 at 2313 hours, medics were dispatched to the Lane County Jail for a cardiac arrest. When they arrived at 2320 hours, they were told that Landon had used methamphetamine and later was Tased by police. When he arrived at the jail, he went into cardiac arrest and CPR was initiated. An AED was attached by jail personnel, which did not detect a shockable rhythm. A jail nurse facilitated the code prior to EMS arrival. When medics arrived, Landon was lying supine on the ground with CPR in progress. Oxygen was administered via BVM. Fire took over airway management and compressions that were performed continuously and rotated every two minutes with rhythm checks. The initial rhythm was asystole so a dose of epinephrine was administered while chest compressions continued. The third rhythm check initially had a pulse and after Landon was moved to the gurney, he converted into v-tach without a pulse so he was defibrillated once. A follow up rhythm check showed sinus rhythm with a return of circulation and a palpable pulse that continued throughout the transport. An I-Gel supraglottic airway was placed with lung sounds that were bilaterally clear with good air movement. It was noted that there was "bruising of right side of forehead" as well as dilated pupils at 5 mm. Vitals check at 2329 hours included BP 55/82, HR 136, SpO2 98%, GCS 3, and temperature 100.8°F. The ambulance arrived at the hospital at 2345 hours and care was transferred to the ED staff.

At 1000 hours on 3/31/20, Investigator Dean called the Eugene/Springfield Ambulance Billing office and left a voicemail message requesting a copy of the patient care report from 3829 Meadowview Drive on 3/27 be forwarded to LCME.

At 1435 hours on 4/1/20, Investigator Dean called the Eugene/Springfield Ambulance Billing office and left a second voicemail message requesting the above information.

At 1115 hours on 4/02/20, Investigator Cadiente reviewed the Eugene Fire report related to their encounter with Landon. At 2239 hours on 03/27, Fire arrived on-scene at Landon's residence. "EPD asked for vitals" while Landon was handcuffed in the back of a police vehicle. Landon was "not cooperative, he wouldn't sit still long enough for vitals to be obtained and was yelling the whole duration of our time on scene. After two failed attempts at obtaining vital signs, after conferring with EPD over inability to obtain vitals while the person in custody was handcuffed and not cooperating[,] EPD decided to transport to the jail and have him evaluated on arrival." Fire cleared the scene at 2249 hours on 3/27.

At 0929 hours on 4/7/20, Investigator Hannon emailed Health Administrator Maria Valenegro with Wellpath Health Care, requesting the jail nurse's statements and/or incident reports from the event.

At 0921 hours on 4/9/20, Investigator Hannon sent a second email to Health Administrator Maria Valenegro with Wellpath Health Care, requesting the nurse's statements and/or incident reports from the event. Maria responded quickly, stating she emailed her counsel and was waiting for a response.

At 1218 hours on 4/9/20, Investigator Hannon received an email from Stefan Cange,

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000022

Exhibit 12
Page 3 of 12

Director of Wellpath, who provided the following information. Stefan said he served as counsel for "Wellpath's Local Government Division" that provides support to the staff at the Lane County Jail. The primary nurse on scene, Brittani Standing, provided a written statement but the second supporting nurse did not. Stefan wrote, "The decedent was not in the custody of the Lane County Sheriff's Office (LCSO) at the time of the event, nor did he expire shortly after being released from LCSO custody, so Wellpath did not generate an incident report." The written statement from RN Standing was emailed to LCME for review.

At 1644 hours on 4/10/20, Investigator Hannon reviewed the written statement by RN Brittani Standing regarding the incident. Standing documented, "There was a 'combative' patient per arresting officers that needed clearance/temp check and Corona Virus Screening prior to medically allowing into facility. Initially pt heard yelling nonsensically in car. Deputies attempted to talk to pt while sitting in the car, however, this was unsuccessful. Deputies then opened the door to get pt out as pt was not answering any questions/just yelling. Pt was moved out of the car and put on the ground. This RN able to get temp of 97.7 degrees Farrenheit on pt. Deputies then continued attempts to get pt to comply, but pt just continued yelling nonsensically/making loud grunting-type noises. At some point pt stopped yelling, stopped fighting, and closed his eyes. Pt then would not respond to all voice nor painful stimuli. Pt's lips then face began turning a bluish tint. This RN nor DS able to find pulse. Chest compression started by the deputies at that time, a code 3 Ambulance was called, and our crash cart requested. A few times throughout chest compressions pt making gargling type noises. Head turned, but nothing came out of mouth. Pt's tongue was sticking out of his mouth the majority of the time that he was having chest compressions done. Once crash cart arrived AED was placed onto pt. No shock advised from initial check until the time the EMS arrived. At one point after CPR initiated pt was responsive, breathing, a faint pulse was felt in carotid. This was brief, however, and very shortly after this pt required chest compressions again as no pulse able to be felt. Unable to acquire any vital signs. A few different deputies took turns doing compressions. There was, unfortunately, not a scribe. Timing and number of chest compressions not counted. Fellow RN set up Ambu-bag and oxygen mask. As this RN attempted to fix the oxygen tank (as it was not working for fellow RN), the EMTs arrived and took over care and chest compressions. Pt was showing asystole while EMTs practiced ACLS. They were able to get a heart rhythm and pulse, got pt on a gurney and up into ambulance. Pt was again showing some responsiveness and appeared to be breathing at that time. Left the Sally Port area at 2336."

NOK/Informant Input:
At 1715 hours on 4/3/20, Investigator Hannon left a voicemail message for Angie Payne (541.954.2476), Landon's spouse, requesting she contact LCME.

At 1410 hours on 4/6/20, Investigator Hannon spoke to Angie Payne (541.954.2476), Landon's spouse, who provided the following information. Angie told Hannon that she and Landon had been together for approximately 10 years and had a blended family with children from previous relationships. Landon had told her that before they got

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000023

Exhibit 12
Page 4 of 12

together, he went through an "experimental phase" with drugs but had stopped when he attended college and subsequently started dating her. Approximately three years ago, there was "an incident" that was a "similar situation." Angie assumed Landon had used an amphetamine of some sort but wasn't certain of it being methamphetamine or not. Since then, he maintained his sobriety and was doing really well. Angie told Hannon that Landon's father had died about a year ago and since then, Landon had lost his grandfather and a close friend, recently. On 3/25, Landon was up in Salem visiting a longtime friend and when he returned home on 3/27, he told Angie had had "used." Angie explained how "he said he made a huge mistake" and "he felt ashamed and depressed" about it. To clear his head, Landon said he needed to go on a walk but didn't return home for about five hours. Angie was concerned at the length of the walk, but when Landon returned, "He seemed fine, just seemed drained." She tried to get Landon to take a shower and go to bed but he was "kinda amped up and not able to relax." Angie invited Landon to go to the store with her, which he did but he stayed outside in the vehicle. When she returned, he "started acting weird" and "was twisting my words" in a way that didn't make sense. They returned home and again Angie tried to help Landon by getting him to drink water as well as to take a shower and go to bed, but it wasn't working. Landon "admitted he wasn't sober" and was obviously "delusional." Angie described him as having a "panic attack" and was "asking for help and to call the police." While she was talking with Landon, he became very loud so she decided to call 911 and explain the circumstances to police because "he needed medical help" instead of the neighbors calling in about all of the yelling. When officers arrived, they talked with Landon to "try and find a solution" but Angie said "he looked pale" and "I could tell his heart rate was up." Landon talked about going to his friend's house but it was further away and not a realistic option. Cahoots arrived and while Angie was talking with them about the different options. "Everything escalated so quickly." She didn't see what precipitated the physical altercation, but Angie knew that Landon was resisting when police were trying to restrain him. Angie described how while Landon "was struggling, they Tased him" and described how "that made things so much worse." Landon was placed in the back seat of the patrol car and was "struggling for air" while "screaming." An ambulance arrived and Angie assumed Landon was going to be transported to the hospital because "I thought he was going to have a heart attack." Instead, Landon was taken to jail and she later received a call shortly after saying "he collapsed." Angie expressed feeling guilty about calling 911 and repeatedly asked why Landon didn't receive "a tranquilizer" or be taken to the hospital instead of the jail. She would contact LCME the following day with the name of a funeral home.

Law Enforcement Input:
At 0830 hours on 3/30/20, Investigator Dean spoke with LCSO Chief Deputy Sheriff Wilkerson and was told the following. Per jail staff, Landon was brought to the jail by Eugene Police Department Officers and was possibly unresponsive on arrival. Jail staff performed CPR in the sally port, continuing until EMS and transported Landon to SH-RB. Wilkerson stated that no LCSO staff members were engaged in any type of altercation with Landon and their only contact was to perform CPR. He agreed to gather pertinent reports and any photos or video that may exist with regard to the incident and contact LCME as soon as possible.

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000024

Exhibit 12
Page 5 of 12

At 0845 hours on 3/30/20, Investigator Dean spoke with Det. Sgt. Tim Haywood. Haywood stated that he would begin the process of gathering reports, photos, videos, etc. and contact Dean as soon as possible with additional information.

At 1357 hours on 3/30/20, Investigator Dean reviewed EPD's incident report from 3/27/20 and obtained the following information. EPD Officers responded to a disorderly subject shortly before 2130 hours on 3/27. The call was placed by Anzhelika "Angie" Payne, who was Landon's spouse, and she reported that he was "acting erratic, making statements that someone was trying to murder him," and was possibly under the influence of alcohol or methamphetamine. Officer Solorio responded and contacted Anzhelika at the scene. He also observed Landon, who was "aggressive in our interaction, by yelling in anger, stating that his family in the home threatened to hurt him." Landon appeared to be sweating and was confrontational and did not appear to understand simple instructions. He stated, "If I remain here, I'm going to be killed". Anzhelika told police that Landon had "left the home and returned, possibly under the influence of amphetamines". On his return home, he "acted very paranoid and aggressive when spoke [sic] to". A neighbor at the scene had called dispatch and reported a male "screaming and banging on the door of the home". Solorio was advised by dispatch that Landon had a prior history with the police, including a mental hold and felony weapon offenses, as well as an unconfirmed and valid warrant for contempt of court from Marion County. CAHOOTS was contacted on scene for counseling purposes at Landon's request. Per Solorio, Landon "showed aggression as he ignored my request to have a seat on the doorstep." Solorio approached Landon and told him to put his hands behind his back and simultaneously "grabbed" Landon's right arm. Landon pulled away from Solorio's grasp and tried to push away from officers' grasp. Officer Roberts tried to assist in taking control of Landon's arms and was ultimately directed to the ground to effect arrest. Although Landon continued to push and pull away from Solorio, Solorio was able to gain control and place Landon's arms behind his back. Meanwhile, Landon "screamed and yelled uncontrollably as officers struggled to place handcuffs on him." During the incident, K9 Officer Thomas Tased Landon to gain control, although Landon continued to be uncooperative and resist arrest while being Tased. As he was placed in handcuffs, Landon was pat-searched and Solorio removed two TASER probes, both from the right buttock and leg areas. Medics were called to the scene for a medical examination at that time and cleared Landon for transport to SH-RB. Solorio stated that Landon was still uncooperative and yelling in the police vehicle during transport. Jail staff were informed of the incident and removed Landon from the police vehicle into the sally port of the jail "as a precaution". Solorio stated that "While taking Landon out of my vehicle and at some point, Landon collapsed onto the ground in the sally port". Jail staff began CPR. He remained unconscious until medics were called and he was transported to SH-RB.

Dean then reviewed EPD Officer Thomas' report regarding the incident, which was consistent with Solorio's. Regarding deployment of his TASER, Thomas stated the following. As two officers were attempting to gain control of Landon, all three fell to the ground on the front lawn of the residence. Landon "rolled around" trying to evade

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000025

Exhibit 12
Page 6 of 12

officers and Thomas announced that he would deploy the TASER, which he did from a very close distance to Landon's "backside". Landon rolled over onto his back and reached up, swiping the TASER in Thomas' hand. Landon then "kicked and wrapped his legs in the TASER wires" in an apparent attempt to break them. He continued to resist arrest and struggled with the officers. Thomas then removed the cartridge from the TASER which rendered it useful only as a "drive stun pain compliance device". Thomas drive stunned Landon on his quad (not specified left or right). Landon "kept bucking and rolling around causing the TASER to not make contact with his body" and having no effect. As Payne rolled onto his stomach and was starting to get up on his knees, his shirt "came up exposing some skin". Thomas stated that he "transitioned the TASER" and drive stunned Landon on his lower right back. This was "effective only as temporary pain compliance" according to Thomas. After this cycle of the drive stun, and as officers were yelling at Payne to lie on his stomach and "stop resisting" and "you're under arrest", Landon again tried to stand up. Thomas deployed another drive stun to the lower right back area, at which time Landon said "something to the effect of 'Oh okay I'm stopping'". He then laid on the ground on his stomach and Thomas placed his knees on top of Landon's legs in an attempt to keep him from further kicking. The other officers were unable to get Landon's hands behind his back and he was told that he would be Tased again if he did not stop resisting. Thomas then delivered a third drive stun to Landon's lower back "which appeared to be effective". Landon said, "okay I'm done I'm done". Landon's hands were still not behind his back, so he was warned that he was going to be Tased again, and he replied, "I'm done". After officers "struggled to get his hands behind his back", Landon was eventually placed in handcuffs. He was then rolled to his side to allow him to breathe freely. Medics responded to evaluate Landon for the TASER deployment and possible excited delirium and subsequently cleared him for transport to the Lane County Jail.

At 1655 hours on 3/30/20, Lane County Council Stephen Dingle sent an email to Dean which was received by Dean at approximately 0930 hours on 3/31/20. Dingle stated that he was made aware of LCME's request for information and asked that Dean contact him prior to release of information. Dean attempted to contact Dingle at 0945 hours and 1120 hours on 3/31 and left voicemails requesting a return call.

At 1530 hours on 3/31, Investigator Dean called Dingle again and left a voicemail message requesting a return call to LCME as soon as possible as Dr. Davis would be performing the examination on 4/1/20.

At 0945 hours on 4/1/20, Investigator Dean spoke with Dingle and was advised that a request form would need to be completed and faxed to Lane County Adult Corrections. This form contained language stating that the requesting party "agrees to keep these records private and confidential to the extent possible". Dean received the form by email, completed it and faxed it to LCAC at 1023 hours on 4/1/20.

At around 1330 hours on 4/2/20, Investigator Hannon responded to the Lane County Jail and obtained the sally port video from LCSO Lieutenant Steven French.

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000026

Exhibit 12
Page 7 of 12

At 1446 hours on 4/2/20, Dr. Davis reviewed the Lane County Jail video. Having reviewed the video, Dr. Davis decided to perform a complete autopsy the next morning, 4/3/20.

At 1352 hours on 4/2/20, Investigator Hannon received an email forwarded from Investigator Dean, with the written statements by the LCSO deputies who were involved with Payne on the late evening of 3/27/20.

At 1337 hours on 4/4/20, Investigator Hannon reviewed the written statements from the LCSO deputies who assisted with Landon while at the Lane County Jail.

LCSO Deputy J. Wilson #368
On 3/27/20 at around 2306 hours, Wilson entered the sally port to assist with a combative arrestee by EPD after he was arrested for out-of-county warrants and resisting arrest. Landon was assisted out of the passenger side while Wilson opened the driver's rear door to provide Taser coverage. Once out of the vehicle, Landon "was assisted to the ground into the prone position while staff applied leg irons." During that time Landon "was not fighting staff but was physically resistive by attempting to twist his body away from staff control." Staff decided to perform a pat search while Landon was still lying on the ground while "staff was holding Payne down by his legs and arms, but were not applying any pressure to his torso. Payne slowly started to calm down while the pat search was being conducted and within a few seconds, Payne became unresponsive. I told staff to roll Payne onto his side so I could check on him. Payne slowly started to turn blue around his mouth and was not responding to verbal or physical stimuli. Staff rolled Payne onto his back where medical staff checked for a pulse. Medical was not able to feel a pulse and could not see any visible signs of breathing. Staff immediately started chest compressions and a Code-3 for assistance was called by central control." Wilson stated "an AED was applied and staff continued compressions" while he knelt by Landon's head to assist with applying the oxygen mask and "performing a head-tilt chin-lift to position." Wilson stated that he made sure deputies were switching out between compression cycles to "provide effective CPR." When medics arrived, they took over care and transported Landon to the hospital after they were able to obtain a heart rhythm.

LCSO Deputy Fulton #432
On 3/27/20 at around 2300 hours, he was informed that EPD was bringing in an "uncooperative male." Another deputy unsuccessfully attempted to ask Landon initial booking questions. So, due to Landon's "behavior and level of resistance, the decision was made to place him on the ground, so we could apply leg irons and medical could evaluate him. We took Payne out of the patrol car and placed him on his stomach. Payne was still in handcuffs, but due to his resistance, the decision was made to apply more restraints so medical could take his temperature. Payne was resistive during this process, and started to thrash around fairly violently. I placed my left knee on his right arm near the shoulder and used my left hand to hold his head against the ground. I attempted to talk to Payne about if, or how many

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000027

Exhibit 12
Page 8 of 12

drugs he had ingested recently. Payne was not able to communicate very well and was yelling random noises. While trying to speak with Payne I noticed he suddenly stopped yelling and thrashing around. I was trying to get a response out of him when I realized that he may have stopped breathing. I made a comment stating that I thought Payne wasn't breathing, and we rolled him on his right side. Another Deputy performed a sternum rub in a further attempt to gain response from Payne. The sternum rub was unsuccessful in gaining a response, so Payne was rolled onto his back." Deputy Gent initiated chest compressions and Fulton took over from him when he became fatigued. Fulton stated that "When I was performing chest compressions an automated external defibrillator (AED) was prepared for use. I stopped chest compressions while the AED pads were placed on Payne, and the AED ran diagnostic tests on Payne. The AED recommended that a shock was not necessary, so I continued chest compressions until the AED was ready to conduct another read." Another Deputy continued compressions for Fulton and soon medics arrived and took over care and was able to regain a pulse before transportation to the hospital.

LCSO Deputy Santini
On 3/27/20 at around 2300 hours, Deputy Santini learned that EPD was on their way with "a combative male" arrestee that resulted in a TASER deployment. Santini had his trainee, Deputy Baeuerlen, take lead on the initial assessment questions. Landon was heard yelling in the back of the patrol vehicle and Baeuerlen later reported that Landon "was unable to answer any assessment questions and that he was only yelling. I attempted to contact Payne in the back of the patrol vehicle and found that he was unable to communicate verbally as he only continued to yell incoherently." Santini stated that "due to Payne's inability to communicate his level of compliance and knowing that he had resisted arrest, it was decided that Payne would be removed from the vehicle and assisted to a prone position on the ground while still in handcuffs. I secured Payne's right arm while another Deputy controlled his left arm and assisted him out of the vehicle. Payne dropped his weight backwards and he was assisted to a seated position before laying him on his front. I maintained control of Payne's right arm and his head to ensure he would not hit it on the ground. While on the ground, Payne continued yelling and began to flail his body. I assisted with maintaining control of his upper body by placing my right knee on the back of his right arm below the shoulder; ensuring excessive pressure wasn't placed on his upper body. I continued to tell Payne to "take a deep breath" and to try to relax. Deputies began a pat search on the ground as leg irons were applied medical took his temperature. Payne's yelling suddenly ceased and began to turn blue in the face as he became unresponsive. Payne was quickly rolled to his back and I attempted a sternum rub to get a physical reaction. Neither medical staff nor other deputies could feel a pulse on Payne so chest compressions were started. As other deputies were performing chest compressions, I attempted to provide a clear airway by tilting Payne's head back and lifting his chin." Santini took over chest compressions for a period and an AED was connected that "advised no shock was required" so compressions continued until medics arrived and took over care.

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000028

Exhibit 12
Page 9 of 12

LCSO Deputy Gent #346

On 3/27/20 at around 2300 hours, Deputy Gent learned that a "disorderly subject" was being brought into the jail by EPD officers on a warrant as well as resisting arrest that resulted in Payne being Tased. When the vehicle arrived, "Payne was contacted through the partition but did not answer any of the deputy's questions and was yelling incoherently. The rear door was opened and I unbuckled the seat belt on Payne. Payne was screaming and attempted to move away from me in the patrol car. I reached in and took control of his right arm. Payne was not complying and would not get out of the car. I was able to guide him closer to the door where I grabbed ahold of his pant leg in order to lift his feet out of the car. Once out of the car, I controlled Payne's left arm and attempted to guide him to the ground. Payne was resistive and tried to drop his weight by going to a seated position. Payne was controlled to the ground then rolled on to his stomach. Payne was tensing his entire body and yelling. He began to force his legs up into staff. I placed my knee over his calf in order to control his left leg while leg irons were being applied. Payne continued to resist and attempted to raise his legs with enough force that he was lifting my body. Payne stopped resisting and yelling and went limp. At this time staff checked for a pulse and could not feel one. Payne was rolled to his back. I could see what appeared to be urine on the ground. I could not see any rise or fall on his chest. After staff could not feel a pulse, I began chest compressions on Payne. I could see an unknown liquid coming from Payne's mouth. His lips and hands appeared blue in color. I continued chest compressions until becoming fatigued and was relieved by another deputy. Medical staff arrived with an Automated External Defibrillator (AED). I removed the AED from the cart and placed the pads on Payne's chest once his shirt was cut off. The AED advised no shock was needed. Staff continued chest compressions then AED reevaluated and again advised against a shock." When medics arrived, they took over all care for Landon.

LCSO Deputy Baeuerlen #338

On 3/28/20 [actually 3/27/20] at around 2310 hours, Deputy Baeuerlen "took lead on a combative subject brought in by EPD. I began asking Landon Payne (arrestee) some booking questions which he was not responding to. He continued to yell. I let me fellow deputies know I was not able to communicate with him so we could formulate a plan to get him out of the vehicle. When we took him out of the vehicle, he was actively resisting while he continued yelling. We laid him down on the ground and turned him on his stomach to place leg irons on him. I kept me hand on his arms to help control him. While placing leg irons on him, Payne released and stopped yelling. DS Fulton noticed Payne becoming non-responsive and turning 'blue.' We turned Payne over into his back. We check for a pulse and breathing, which we could not determine. Fulton began CPR and chest compression. I helped taking turns with compressions until EMS arrived."

LCSO Deputy Edwards #435/#58505

On 3/27/20 at around 2305 hours Deputy Edwards learned that Eugene Police officers were transporting "a combative" who "had been Tased and very uncooperative with the arresting officers. Eugene police arrived and stopped in front

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000029

Exhibit 12
Page 10 of 12

of our booking slider. I could hear Payne screaming hysterically from inside the patrol car. Payne was sweating profusely and his eyes were opened so wide. Due to current policy pertaining to the Covid-19 virus, medical staff is supposed to get a temperature on any incoming arrestees to make sure they do not have a fever. Deputies made contact with Payne at approximately 2310, who was continuing to scream. The door was opened and it took a few seconds to get Payne to get out of the car. Payne was standing was still very tense, screaming and trying to pull away from deputies. Payne began to drop his weight and deputies assisted him to the ground. Payne was on his stomach pushing back on deputies with extreme strength. Leg irons were placed on Payne and his shoes were removed. Payne was still screaming despite our best efforts to calm him. Payne began to get quiet but was still pushing back leading us to believe he was calming down. Deputy Fulton and I soon observed that Payne was not responding. Payne was not breathing and was rapidly turning blue. Payne was rolled on to his right side and I could not feel a pulse. A medical code was called requesting a crash cart and paramedics. Payne was rolled onto his back and we began chest compressions. I retrieved a pair of scissors and Payne's shirt was cut off so AED pads could be properly placed. After a few rounds of compressions, Payne showed signs the he was beginning to respond. That lasted about 15 seconds before I could no longer feel a pulse and Payne was blue again. Handcuffs and leg irons were removed. Compressions resumed. The AED determined that no shock was advised so we continued compressions. Deputies continued to perform lifesaving efforts for approximately 10-15 minutes until Paramedics arrived on scene."

LCSO Deputy Gawith
On 3/27/20 at around 2250 hours Deputy Gawith was notified that "there was a combative male ten minutes out" who was being brought in by Eugene Police officers. When the vehicle arrived, support deputies walked out to the secure parking. Gawith documented that "once I was in the secure parking, I could hear Payne screaming very loudly. One of the deputies got a briefing from the arresting officer and then started to ask Payne questions. From what I could hear, Payne did not answer any of the medical questions, yet only screamed at deputies. Deputies Santini and Baeuerlen briefed the rest of the deputies of Payne's behavior. Deputies opened the door and brought Payne out of the car and I closed the door. After the car door was closed, I went right to helping control Payne;s feet. Payne was screaming and flailing his entire body. I helped applying leg irons onto Payne's ankles, checking for fit and double locking them. Payne continued to fight against deputies while medical tried to get his temperature. Shortly after the leg irons were applied, Payne suddenly stopped moving and fighting against Deputies. Payne was rolled onto his back and at this time I could see he was blue in the face. Deputy Gent started CPR and Sergeant Jester called a medical code. Once the medical crash cart arrived, I saw Deputy Gent apply the AED. Deputies rotated giving chest compressions until EMT's arrived."

Examination:
Dr. Davis initially performed an external examination on Wednesday, April 1, 2020 at 9

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000030

Exhibit 12
Page 11 of 12



AM in the Sacred Heart Hospital morgue. After he viewed the residence body cam, cruiser back seat and jail scene videos, Dr. Davis performed a complete autopsy on Friday, April 3, 2020 at 10 AM.

Conclusion:
Dr. Davis reviewed the above investigation; viewed the residence body cam, cruiser back seat, and jail scene videos; correlated his autopsy findings; interpreted the toxicology results; and determined the cause and manner of death.

Cause of Death: Anoxic encephalopathy due to resuscitated cardiopulmonary arrest during restraint by law enforcement

Other Significant Conditions: Recent methamphetamine use; excited delirium; cardiomegaly; redundant mitral valve

Manner of Death: Undetermined

dwd    *Dan Davis MD*

Payne v. Solario et al, 6:22-cv-00471-MC
Lane County's Response to RFP 3
000031

Exhibit 12
Page 12 of 12

Justin Wilson

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal         )

representative to the estate  )

of LANDON PAYNE,                 )

         Plaintiff,              )

    v.                           ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                          )

         Defendants.            )


DEPOSITION OF JUSTIN WILSON

February 6, 2024

Tuesday

1:16 P.M.


        THE VIDEO-RECORDED DEPOSITION OF JUSTIN

WILSON was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon 97401, before Sara

Fahey Wilson, CSR/CCR, Certified Shorthand Reporter

in and for the State of Oregon and Washington.

Exhibit 13
Page 1 of 6

1    We would normally go from the front seat

2    and talk to the person through the partition of the

3    car if they were called in combative so we could

4    evaluate them.

5    I talked to the arresting officers.  Asked

6    them what the guy was being arrested for, how he was

7    doing, and what they had done with him.  Basically,

8    did they fight with him?  Did he resist?  What

9    interventions did they use.  That was pretty common

10   for me to do.

11   The decision was made to assist Mr. Payne

12   out of the vehicle.  I provided coverage on the

13   opposite side of the vehicle.  It was standard for

14   us that as a deterrent to not try and pull away or

15   try and exit the other side of the vehicle we would

16   open the door and stand on the other side of the

17   vehicle, a lot of times with our Taser at low ready.

18   So I did that when they opened the door

19   for Mr. Payne.  Other deputies assisted him out of

20   the vehicle and assisted him onto the ground into

21   the prone position.

22   This was also pretty standard for us where

23   we would conduct our preliminary pat search in this

24   position because it's much easier to control a

25   combative arrestee when they are on the ground.

Exhibit 13
Page 2 of 6

Dustin Wilson

1          Mr. Payne was manic, he was groaning, and

2    moaning, and yelling.  I could not make out any

3    clear words that he was saying.

4          I saw sort of a -- kind of a slobber

5    coming out of his mouth.  As he was talking he was

6    drooling.

7          I was -- once they got him out of the car,

8    I was kneeling down next to him talking to him

9    trying to get his attention saying, "Hey, Mr. Payne,

10   can you hear me?  Hey, it's okay.  Take deep

11   breaths.  It's going to be okay," trying to calm him

12   down.

13         As the time went on I noticed that he was

14   becoming less and less combative, and we were

15   getting our pat search on him, and I believe they

16   applied leg irons to him as well, which was standard

17   in this situation if someone was combative.

18         After a few seconds, maybe a minute or

19   two, I noticed that he was no longer doing anything,

20   he was just laying there, and so I looked at the

21   sergeant and I said -- I said, "Hey, is he okay?"

22         I looked at the medical staff.  I said,

23   "Hey, I don't think he's breathing."

24         We waited a few seconds to try and see

25   what medical staff wanted to do, and she, from what

Exhibit 13
Page 3 of 6

1    I remember, went over to Mr. Payne, we rolled him

2    onto his side, and I believe she checked for a pulse

3    on Mr. Payne.

4         She told us that she wasn't able to find a

5    pulse on him after checking several times, so I told

6    the deputies to roll Mr. Payne onto his back and

7    start chest compressions.

8         From what I remember, our central control

9    called a medical code three for assistance which got

10   our medical staff to respond with their crash cart,

11   as they called it.

12        While we were waiting for the medical cart

13   the other deputies were providing chest compressions

14   for Mr. Payne.

15        We were operating at the direction of our

16   medical staff.  She was telling us what to do.  I

17   took a position at the head of Mr. Payne and was

18   watching what everyone was doing.  Just because I

19   had been in these emergency medical situations

20   before, I was making sure that the other deputies

21   were swapping out between rotations of chest

22   compressions so that they could stay fresh and

23   provide effective chest compressions.  I was

24   basically just watching what was happening until the

25   medical cart showed up.

Exhibit 13
Page 4 of 6

1          Once the medical cart arrived, the

2   nurse -- one of the nurses obtained an oxygen bottle

3   and a -- what's called a bag valve mask, which is

4   standard in CPR for medical providers -- and I

5   assisted her with assembling the bag valve mask and

6   the oxygen bottle.

7          And I assisted her in applying what's

8   called a head tilt chin lift maneuver to Mr. Payne,

9   which is where you push the chin of the individual

10  up and push the forehead down which puts their head

11  in into an optimal position for administering the

12  breaths for -- via the bag valve mask.

13         From there, we -- the other deputies also

14  applied the AED.  They followed the instructions of

15  the AED, and we provided chest compressions and

16  lifesaving measures until the paramedics showed up.

17         Once the paramedics showed up we gave care

18  to them.  They were -- from what I recall, they were

19  able to find a heart rhythm on Mr. Payne via their

20  monitor that they applied to him.  They loaded him

21  up in the ambulance and took him to the hospital.

22              MR. LARWICK:  Can we take a quick

23  break?

24              MR. REED:  Sure.

25              THE VIDEOGRAPHER:  We'll go off the

Exhibit 13
Page 5 of 6

```
 1    State of Oregon    )
                         )        ss.
 2    County of Lane     )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 44 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 14th

18    day of February 2024, in the City of Eugene, County

19    of Lane, State of Oregon.

20

21

22

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

Zachery Fulton

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate   )

of LANDON PAYNE,                )

        Plaintiff,            )

  v.                            ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                        )

        Defendants.           )


DEPOSITION OF ZACHERY FULTON

February 19, 2024

Monday

1:04 P.M.


     THE VIDEO-RECORDED DEPOSITION OF ZACHERY

FULTON was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon 97401, before Sara

Fahey Wilson, CSR/CCR, Certified Shorthand Reporter

in and for the State of Oregon and Washington.

Exhibit 14
Page 1 of 3

Zachery Fulton

```
1        Q.    Okay.  Just making sure.

2              So now let's skip to 161, please.  I

3    wanted to see if you can find where you are on 161?

4        A.    Yes.

5        Q.    Are you able to tell?

6        A.    I am.

7        Q.    How would you describe your location?

8        A.    Where there's the group of deputies, there

9    is the shorter, bald deputy wearing the patrol vest.

10       Q.    Is that Fisher?

11       A.    That would be Deputy Fisher, yes.

12       Q.    Okay.

13       A.    And I'm just on the other side of him,

14   kind of 6:00 o'clock in the group.

15       Q.    Okay.

16             And so what do you think you're doing

17   right now in that scene?

18       A.    At that time it appears that we are

19   placing Payne on the ground.

20       Q.    So you're involved in sort of supporting

21   his weight while you lower him to the ground?

22       A.    Yes.

23                   (Deposition Exhibit 162

24                    marked for identification.)

25   BY MR. LARWICK:
```

Exhibit 14
Page 2 of 3

```
 1    State of Oregon    )
                         )        ss.
 2    County of Lane     )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 47 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 4th

18    day of March 2024, in the City of Eugene, County of

19    Lane, State of Oregon.

20

21

22

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate    )

of LANDON PAYNE,                )

          Plaintiff,           )

   v.                           ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                         )

          Defendants.         )


DEPOSITION OF EMMA GROTEFUND

October 11, 2023

Wednesday

12:00 P.M.


THE VIDEO-RECORDED DEPOSITION OF EMMA
GROTEFUND was taken at Hutchinson Cox, 940
Willamette Street, Suite 400, Eugene, Oregon, 97401,
before Eleanor G. Knapp, CSR-RPR, Certified
Shorthand Reporter in and for the State of Oregon.

Exhibit 15
Page 1 of 8

1    due to current policies, medical staff is supposed

2    to get a temperature is what you say.

3        A.    Uh-huh.

4        Q.    Does the "supposed to" in this sentence

5    mean that medical staff should have taken Landon

6    Payne's temperature but did not?

7        A.    I don't know if that's how I implied it at

8    the time.  I can tell you I write much more detailed

9    reports right now.  It might just be a general

10   statement, like:  This is the policy.  This is what

11   they were supposed to do.

12       Q.    Do you know when they took --

13       A.    I don't know.  I know they couldn't --

14   like, a lot of the custodies prior to Mr. Payne, if

15   they are being more physically cooperative, we can

16   just roll down the window and they just have one of

17   those little scanny thermometer things and they can

18   just touch to their forehead and get a reading

19   through the car.  I know that was not possible with

20   this scenario.

21       Q.    In your memo, you then describe how Landon

22   Payne was removed from the vehicle by deputies.

23   Where were you during this process?

24       A.    I was -- I wasn't the one getting him out

25   of the car.  I think I was, like, a person or two

Exhibit 15
Page 2 of 8

1  back.  Then once he was out, I was by his legs

2  initially.  Yeah.

3      Q.    Was there any discussion beforehand about

4  who will take what role in extracting --

5      A.    There generally is.  I didn't hear them,

6  what they were saying -- or not that I can recall at

7  least.

8          But generally, it's, like, "Hey, you and

9  me, let's make sure we can control his upper body so

10  he doesn't flail or fall," because a lot of times

11  they do drop their weight.  And with their hands

12  restrained that's -- obviously they can get hurt

13  that way, and we don't want that to happen.

14          And then it's something if we do need to

15  put them on the ground, then, okay, "And then you

16  can control the legs," if everything goes smooth, of

17  course.  Sometimes people spin around, and it

18  doesn't go as you think it's going to go.

19          And that's to prevent them from kicking or

20  slamming their knees or anything like that.

21      Q.    But on this occasion, you weren't directed

22  where to position yourself or where to be?

23      A.    I can't remember.

24      Q.    Do you know who made the decision to

25  remove Landon Payne from the vehicle?

Exhibit 15
Page 3 of 8

Emilia Groterund

1    of it?

2        A.    There's nothing physical until it needs to

3    be physical.  We'll describe what we need or what's

4    happening.  We don't just do things if there's

5    reasonable time to explain the situation.

6        Q.    I guess more so I'm talking in an effort

7    to calm him there was no physical action done to

8    assure him that, "Hey, we are trying to help you"?

9        A.    I don't think there was anything

10   physically that could be done.

11       Q.    What did you do personally to try to calm

12   him?

13       A.    I don't recall doing anything until I was

14   more towards his head, in which case I was talking

15   to him calmly, "Hey, like, come on," just human

16   conversation.

17       Q.    So at some point you and other deputies

18   get Landon Payne to the ground.  And he's placed

19   facedown on the concrete.  Is that correct?

20       A.    Yes.

21       Q.    From there where are you located when he

22   is placed on the concrete?

23       A.    Initially I think I'm down by his feet,

24   kind of like his knee area.

25       Q.    What was your role there?

Exhibit 15
Page 4 of 8

1      A.    That was to help control his legs from
2    kicking.

3      Q.    Did you remove his shoes?

4      A.    I can't remember if I personally removed
5    them.  I think I maybe did and helped pull his socks
6    off.

7      Q.    So is controlling and restraining someone
8    in that fashion something you had trained on before
9    March 27, 2020?

10     A.    Yes.

11     Q.    And so when Landon was -- Landon Payne was
12   placed facedown, his hands were still handcuffed
13   behind his back at the time?

14     A.    Yes.

15     Q.    So moving up to the next paragraph
16   there -- I think it is the last paragraph --
17   you write (as read):  Deputy Fulton and I
18      soon observed that Payne was not responding.

19          Where were you when you observed him not
20   responding?

21     A.    I think I was kind of in the same area,
22   maybe, like, slightly up towards his hip area.  But
23   I wasn't, like, at his face at that time.

24     Q.    What were you doing when you noticed?

25     A.    Just watching his face.

Exhibit 15
Page 5 of 8

Emma Groterund

75

1    It depends if they are in medical at the time or if

2    they have to get there, get the stuff, and then come

3    to you.  It depends where you are at in the jail.

4    Some places are much more accessible than others.

5         Q.   At some point -- you write that at some

6    point you retrieved some scissors to remove Landon

7    Payne's shirt for placements of AED nodes.  Is that

8    correct?

9         A.   Yes.

10        Q.   Were you the one that cut his shirt off of

11   him?

12        A.   I think I started cutting it, and then we

13   might have had to rip it or something like that.

14        Q.   You don't know -- did someone else finish

15   it or was it just a collective --

16        A.   I think it might have been a collective

17   thing.  I don't recall exactly.

18        Q.   Why did you have to go get scissors?  Were

19   there not scissors on the crash cart?

20        A.   I remember searching the crash cart for

21   them, but I can't remember if I was able to get them

22   from it or not.  I do remember going through the

23   drawers of it looking for them.

24        Q.   Do you agree that that's probably

25   something that should be included in the crash cart?

Exhibit 15
Page 6 of 8

Emma Groterud

80

1    Q.    Did you ever provide any compressions to

2  Landon Payne?

3    A.    No.  I think I was next up to, just

4  because you don't want people to get fatigued out.

5  You want quality compressions.  But I don't think I

6  ever did.

7    Q.    So I guess just as a guess, do you know

8  how long the stints people were doing on

9  compressions?

10    A.    It depended on the individual.  They were

11  all really good about knowing when they needed to

12  switch or even if they thought, like, "Hey, I'm

13  still good," someone else would be, like, "No, I'm

14  going to jump in."

15          We are going to give quality compressions.

16    Q.    So can you walk me through what you did

17  after getting the scissors?

18    A.    We got his shirt off, got the AED on,

19  followed its instructions.  Paramedics were, I

20  believe, on their way already.  We did compressions.

21  We watched his -- you know, watched his face,

22  watched his mouth, watched his color, continually

23  tried to assess him.  Like I said, I don't recall

24  checking his pulse any more after that.

25          The AED does that.  It monitors the pulse

Exhibit 15
Page 7 of 8

Emma Groterud

96

```
1    State of Oregon    )
                        )    ss.
2    County of Lane     )

3

4         I, Eleanor G. Knapp, CSR-RPR, a Certified

5    Shorthand Reporter for the State of Oregon, certify

6    that the witness was sworn and the transcript is a

7    true record of the testimony given by the witness;

8    that at said time and place I reported all testimony

9    and other oral proceedings had in the foregoing

10   matter; that the foregoing transcript consisting of

11   95 pages contains a full, true and correct

12   transcript of said proceedings reported by me to the

13   best of my ability on said date.

14        If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 26th

18   day of October 2023, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22   Eleanor G. Knapp, CSR-RPR

23   CSR No. 93-0262

24   Expires:  September 30, 2026

25
```

Exhibit 15
Page 8 of 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate  )

of LANDON PAYNE,               )

        Plaintiff,          )

   v.                       ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                        )

        Defendants.         )


DEPOSITION OF COLTER GAWITH

October 18, 2023

Wednesday

2:07 P.M.


THE VIDEO-RECORDED DEPOSITION OF COLTER
GAWITH was taken at Hutchinson Cox, 940 Willamette
Street, Suite 400, Eugene, Oregon, 97401, before
Sara Fahey Wilson, CSR/CCR, Certified Shorthand
Reporter in and for the State of Oregon and
Washington.

Exhibit 16
Page 1 of 5

Cureer Gawith

14

```
 1    prior to your deposition today?

 2         A.    Yes, it is.

 3         Q.    Okay.

 4               How many deputies were helping place the

 5    leg irons on?

 6         A.    I believe it was me and possibly two

 7    others.

 8         Q.    Okay.

 9               And how long did it take to get the leg

10    irons placed properly on Mr. Payne?

11         A.    I do not recall.

12         Q.    Okay.

13               Once the leg irons were on Mr. Payne, what

14    was the next thing that you did related to

15    Mr. Payne's incident there?

16         A.    I believe I checked them for fit and made

17    sure that they weren't too tight.  And from there, I

18    do not recall.

19         Q.    Okay.

20         A.    I don't believe I did much anything else

21    in regarding touching him.

22         Q.    Okay.

23               At some point was it determined that --

24    how did you learn that there was a medical problem

25    going on with Mr. Payne?
```

Exhibit 16
Page 2 of 5

Cutler Sawich

1        A.    I believe -- at some point I believe he

2    expelled his bowels, and then someone said, "He's

3    turning blue," is what I remember.

4        Q.    How did you know that he had -- did you

5    say expelled his bowels?

6        A.    Correct.

7        Q.    How did you know that?

8        A.    I believe I could smell it, and then his

9    pants were wet.

10       Q.    Were his pants wet on the front or the

11   back?

12       A.    I don't recall.  Kind of down the middle,

13   I think.

14       Q.    Okay.

15             So you could smell that he had urinated

16   himself and at -- and somebody told you he was

17   turning blue?

18       A.    I believe I remember hearing that.

19       Q.    Okay.

20             And did you participate at all in the

21   CPR --

22       A.    No, I did not.

23       Q.    -- of Mr. Payne?

24             What did you do while that was going?

25       A.    I believe I first removed the leg irons

Exhibit 16
Page 3 of 5

Cutler Sawtch

16

1    and then took a step back so that they were able to

2    help him.

3        Q.    At what point did you remove the leg

4    irons?  Had CPR already begun, or did remove them

5    immediately?

6        A.    No.  Once I believe they said he was

7    turning blue and they were going to flip him over, I

8    removed the leg irons.

9        Q.    How did the leg irons work?  Are they like

10   handcuffs?  Do they lock like a handcuff?

11       A.    Correct.

12       Q.    Okay.

13             So you removed the leg irons.  And then

14   where did you go from there?

15       A.    I do not recall.

16       Q.    Okay.

17             Did you have any other hands-on contact

18   with Mr. Payne?

19       A.    Not to my recollection.

20       Q.    Okay.

21             Do you recall any statements that any of

22   the other deputies made during the medical incident

23   with Mr. Payne?

24       A.    Not directly.  Not that I could quote.

25       Q.    Okay.

Exhibit 16
Page 4 of 5

Colleen Gawlik

```
 1    State of Oregon     )
                          )       ss.
 2    County of Lane      )

 3

 4         I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 29 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14         If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17         IN WITNESS WHEREOF, I have set my hand this 31st

18    day of October 2023, in the City of Eugene, County

19    of Lane, State of Oregon.

20

21

22

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

Exhibit 16
Page 5 of 5

Stephen Foley

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate    )

of LANDON PAYNE,                )

          Plaintiff,            )

    v.                          ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual,   )

et al.,                         )

          Defendants.           )


DEPOSITION OF STEPHEN FOLEY

October 11, 2023

Wednesday

10:00 A.M.


THE VIDEO-RECORDED DEPOSITION OF STEPHEN

FOLEY was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon, 97401, before

Eleanor G. Knapp, CSR-RPR, Certified Shorthand

Reporter in and for the State of Oregon.

Exhibit 17
1 of 4

Stephen Foley

```
 1    our keys, our radio, our Taser if we have one.  And
 2    then --
 3        Q.    So in March of 2020 when you did a shift
 4    change, did, like, pretty much the whole staff
 5    change at the same time or was it a staggered
 6    schedule?
 7        A.    It would have been the whole staff.
 8        Q.    Is that still true now?
 9        A.    For the most part, yes, other than people
10    who are doing overtime.
11        Q.    So fair to say that this Landon Payne
12    incident occurred pretty close to the end of your
13    scheduled shift.
14        A.    Yes.
15        Q.    Is that correct?
16        A.    Yes.
17        Q.    Okay.  What's the first thing that you
18    remember about the Eugene police bringing Landon
19    Payne to the jail?
20        A.    I remember Sergeant Jester talking to the
21    AO.  I do not remember what was said.  I know it had
22    been talked about CLC-ing him or something along
23    that lines.  But it seemed like that was not an
24    option at the time.
25                And then after that I remember him coming
```

Exhibit 17
2 of 4

1    out of the car.  I grabbed his arm for half a

2    second, but other deputies were in a better

3    position.  I had stepped off.  And then I had no

4    physical contact with him through the rest of it.

5    So I was just observing through the rest of the

6    incident.

7        Q.    When you say AO, are you talking about

8    arresting officer?

9        A.    Arresting officer, yes.

10       Q.    Do you know who the arresting officer was?

11       A.    I do not.

12       Q.    And when you say CLC, do you mean citation

13   in lieu of confinement?

14       A.    Yeah.

15       Q.    Okay.  And what are the parameters for

16   that type of procedure?

17       A.    I am not -- I do not know.

18       Q.    Now, did you actually hear anything that

19   was said by the arresting officer?

20       A.    Not that I remember.

21       Q.    So everything that you described a moment

22   ago about your understanding of what the arresting

23   officer said, that was communicated to you through

24   Jester.  Is that correct?

25       A.    I believe so, yes.

Exhibit 17
3 of 4

Stephen Foley

69

```
 1   State of Oregon     )
                         )      ss.
 2   County of Lane      )

 3

 4        I, Eleanor G. Knapp, CSR-RPR, a Certified

 5   Shorthand Reporter for the State of Oregon, certify

 6   that the witness was sworn and the transcript is a

 7   true record of the testimony given by the witness;

 8   that at said time and place I reported all testimony

 9   and other oral proceedings had in the foregoing

10   matter; that the foregoing transcript consisting of

11   68 pages contains a full, true and correct

12   transcript of said proceedings reported by me to the

13   best of my ability on said date.

14        If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 25th

18   day of October 2023, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22   Eleanor G. Knapp, CSR-RPR

23   CSR No. 93-0262

24   Expires:  September 30, 2026

25
```

Exhibit 17
4 of 4

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate  )

of LANDON PAYNE,                )

        Plaintiff,          )

   v.                          ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual, )

et al.,                         )

        Defendants.         )


DEPOSITION OF JEREMY FIFER

October 19, 2023

Thursday

2:03 P.M.


       THE VIDEO-RECORDED DEPOSITION OF JEREMY

FIFER was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon, 97401, before

Sara Fahey Wilson, CSR/CCR, Certified Shorthand

Reporter in and for the State of Oregon and

Washington.

Exhibit 18
Page 1 of 9

1    exactly where I was standing.  It might have been

2    behind the patrol car.

3        Q.    But you weren't -- you weren't one of the

4    two deputies who originally reached in to remove him

5    from the vehicle, it sounds like?

6        A.    No.

7        Q.    Okay.

8              And so you said you saw there be some

9    struggling.  Did you see Mr. Payne kicking or

10   hitting at anyone?

11       A.    Not that I recall.

12       Q.    Okay.

13             Did you see him spit or head butt?

14   Anything like that?

15       A.    No.

16       Q.    Okay.

17             So he wasn't fighting.  Was Mr. Payne able

18   to walk?

19       A.    I don't know if he was or not.  From my

20   view, it looked like he was refusing to walk.

21       Q.    Okay.

22       A.    And that's why I -- that's why they laid

23   him down, was to get control of his legs.

24       Q.    Okay.

25             But he didn't appear to be actively

Exhibit 18
Page 2 of 9

Jeremy Fifer

```
 1    fighting, just sort of not engaging in putting his
 2    weight on his legs at that point?
 3        A.    It appeared that he was pushing with his
 4    legs in the opposite direction the deputies were
 5    trying to take him.
 6        Q.    Okay.
 7              So ultimately he's proned out face down on
 8    the concrete.  Correct?
 9        A.    Yes.
10        Q.    And where do you move to become involved
11    in part of this process?
12        A.    I believe I was standing on Mr. Payne's
13    right side.
14        Q.    And our -- okay.
15              And so what was your participation from
16    that point forward in trying to get control of
17    Mr. Payne and the medical emergency?
18        A.    I could see the deputies were struggling
19    to get control of his legs, so then I kneeled down
20    on the top of his right arm and evaluated what the
21    other deputies were doing, basically.
22        Q.    And when you said you kneeled down on the
23    top of his right arm, his arms were still handcuffed
24    behind his back.  Correct?
25        A.    Correct.
```

Exhibit 18
Page 3 of 9

1    Q.    So were you kneeling on his arm which was

2    on his back?

3    A.    No.  It's the tactic I was explaining

4    earlier.  Basically, to control the body you control

5    the limbs, and when you do that -- you're basically

6    placing your knee on the ground between his arm and

7    his body, so there's really not much pressure on the

8    arm.

9    Q.    So your knee wasn't -- you're saying your

10   knee went in-between his body and his arm --

11   A.    Onto the ground.

12   Q.    -- onto the concrete?

13   A.    Yes.

14   Q.    Okay.

15         And were you closest to the EPD vehicle

16   side of Mr. Payne or were you closest to the

17   pre-book area side of Mr. Payne?

18   A.    The pre-book area.

19   Q.    Okay.

20         So you would have been on his left-hand

21   side?

22   A.    Oh, yeah.  I guess it would have been his

23   left-hand side.

24   Q.    Okay.

25         I just want to make sure I have the right

1    person in our pictures here.

2          And so in watching -- you watched the

3    sally port video --

4      A.    Yes.

5      Q.    -- prior to -- in watching the sally port

6    video, you sort of came in mid -- already people

7    having Mr. Payne proned out and restrained on the

8    ground.  Would you agree with that?

9      A.    I was there when they put him on the

10   ground.

11     Q.    But you came in a little -- sort of after

12   everyone else to restrain his left side?

13     A.    Yes.

14     Q.    Okay.

15          Outside -- or after you -- or as you came

16   down to restrain his left side, do you remember

17   hearing, or did you hear and do you know who said,

18   "Can you move your knee down off of his back?"

19     A.    I did.

20     Q.    You said that?

21     A.    Yes.

22     Q.    Who were you speaking to?

23     A.    I don't remember.

24     Q.    Okay.

25          And why did you say that?

Exhibit 18
Page 5 of 9

1      A.    I don't remember who it was.  I don't

2   remember if it was a knee or not.  But I was telling

3   somebody to move their limb onto his -- onto his

4   arm, basically.

5      Q.    So you came in to restrain his left side

6   and realized that there was some restraint going on

7   that probably was not the safest and you gave some

8   instruction to probably -- it was a younger deputy,

9   I would assume?

10      A.    I think so.

11      Q.    -- to remove their body weight from his

12   back onto his limbs?

13      A.    I didn't see the deputy putting much

14   weight on Mr. Payne, but I wanted to make sure that

15   there was nothing on his back.

16      Q.    Okay.

17            And so -- but you -- you're certain that

18   that was you that gave those instructions?

19      A.    Yes.

20      Q.    Okay.

21            Do you know which deputy you were speaking

22   to?

23      A.    No.

24      Q.    Okay.

25            Excuse me.

Exhibit 18
Page 6 of 9

1    Once you had taken over his left arm and

2  people had sort of moved their knees and things to

3  his limbs, how long after that was it until you

4  discovered that Mr. Payne was unconscious?

5            MS. DENLEY:  Object to the form.

6            You can still answer.

7    A.    I'm not sure.  It was fairly quick.  I

8  mean, it seemed -- seemed like less than a minute.

9  BY MS. HILLMAN:

10    Q.    And what did you -- what did you do at

11  that point?

12    A.    I don't remember.  I think I asked if he

13  was breathing.

14    Q.    So were you one of the -- his head was

15  sort of turned towards you on that side and you were

16  one of the only deputies on that side.  Correct?

17    A.    Uh-huh.

18    Q.    Were you one of the first ones, then, to

19  notice that there was something not right?

20    A.    I'm not sure if I was the first one or

21  not.

22    Q.    Okay.  Okay.  Okay.

23            Did you participate in rolling him onto

24  his side?

25    A.    I don't remember.  I don't think I did.  I

Exhibit 18
Page 7 of 9

1    think I just stood up.

2        Q.    Okay.

3              And then did you participate at all in the

4    CPR?

5        A.    No.

6        Q.    Okay.

7              Were you ever interviewed as part of a use

8    of force investigation regarding this incident?

9        A.    No.

10       Q.    Have you been asked any -- outside of

11   speaking with your lawyers, has anyone ever asked

12   you any questions about what happened that day until

13   today?

14       A.    No.  I don't think so.

15       Q.    Okay.

16             After the incident did you debrief with

17   Sergeant Jester?

18       A.    I don't think so.  I don't remember if I

19   did or not.  I don't know if there was a debrief.

20       Q.    Okay.

21             More recently than that we've heard some

22   testimony that there was a meeting at the Lane

23   County Jail that was led by Chief Deputy Wilkerson.

24   Did you participate in that meeting?

25       A.    Yes.

Exhibit 18
Page 8 of 9

```
 1    State of Oregon     )
                          )        ss.
 2    County of Lane      )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 60 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 3rd

18    day of November 2023, in the City of Eugene, County

19    of Lane, State of Oregon.

20

21

22

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

William McClure

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ANZHELIA PAYNE, personal        )

representative to the estate    )

of LANDON PAYNE,                )

            Plaintiff,          )

    v.                          ) No. 6:22-CV00471-MC

JAIRO SOLORIO, an individual,   )

et al.,                         )

            Defendants.         )


            DEPOSITION OF WILLIAM MCCLURE

                October 16, 2023

                    Monday

                  10:53 A.M.


        THE VIDEO-RECORDED DEPOSITION OF WILLIAM

MCCLURE was taken at Hutchinson Cox, 940 Willamette

Street, Suite 400, Eugene, Oregon, 97401, before

Sara Fahey Wilson, CSR/CCR, Certified Shorthand

Reporter in and for the State of Oregon and

Washington.

Exhibit 19
Page 1 of 4

William McClure

1       A.    We only carry it when we're actually

2    outside the jail, so a few medical transports.

3       Q.    And I don't think I asked earlier.  Are

4    you still located within the jail?

5       A.    Yes.

6       Q.    You're not a patrol deputy?

7       A.    Yeah, I'm in the jail.

8       Q.    So we're going to go now to the incident

9    on March 27th.  Do you remember the incident that

10   Landon Payne was brought into the jail?

11      A.    Yep.

12      Q.    Can you describe what happened that day?

13      A.    From what I remember, it was scary COVID

14   time so we were all still trying to figure out what

15   the heck was going on with that.

16            And so we already knew who EPD was

17   bringing in before they came in -- you know,

18   obviously still out in the car, but we knew -- and I

19   forget where -- what warrant he was on, but it was

20   just an out-of-county warrant.  And the sergeants

21   and our records have already -- had already gotten

22   that cleared so we didn't need to lodge him.  I

23   remember them telling them that.

24            And EPD, for the most part, saying -- and

25   I don't know the officer's name, and I'm probably

Exhibit 19
Page 2 of 4

William McClure

1   not 100 percent quoting, but, Okay.  Well, if you're

2   going to release him on that, then I'll get him for

3   resisting, or whatever his charge was, and now you

4   have to take him.

5           And then I remember the sergeant kind of

6   going back-and-forth with the officer for a little

7   bit and then finally going, Okay.  Let's bring him

8   in.  And at that point -- I forget which deputy was

9   taking lead as far as that goes -- went and tried to

10  do our usual -- what we do with every book-in --

11  talking to them, Hey, how is it going?  Things like

12  that.  Are you having any issues?

13          Once that was done and it was decided to

14  take him out of the car, he was taken out of the

15  car.  I remember in the car he was thrashing about,

16  kicking, pretty unruly.  And so once we got him out,

17  he was doing the same thing, so he was lowered down

18  to the ground and everybody kind of positioned

19  themselves around him to be able to do what they

20  needed to do.  Kind of, everybody had a job.

21          So I was down on the feet, and I had leg

22  irons.  Because he was kicking everywhere, the goal

23  was to get leg irons on him so he wouldn't -- it

24  would be harder for him to kick, and if he started

25  to, we can kind of step on the chain and it limits

Exhibit 19
Page 3 of 4

William McClure

1    the amount his feet can move so nobody would get

2    hurt.

3            But it took quite a while.  There was a

4    person on each leg and he kept kicking, so it took

5    quite a while to actually get both leg irons on.  I

6    don't know time frame.  I just remember it was an

7    effort.

8            And then at that point we already knew we

9    were going to be taking him to our special housing

10    unit because he was being so combative.  And then

11    that's also where any medical -- major medical

12    issues would go, or things like that.  So while we

13    were there, I went ahead and -- you know, we were

14    going to need his clothes from him, so since we

15    weren't necessarily doing anything at the time, once

16    we were secured I went ahead and removed his shoes

17    and socks just to save that much more time once we

18    got him to the cell.

19            About that time is when -- because I'm

20    concentrating down here -- about that time is when

21    some people at the head were -- "Hey, something is

22    not quite right."

23            And then a code was called, which is us

24    trying to get medical help.  And then I know I kind

25    of -- once we knew -- once I knew I didn't need to,

Exhibit 19
Page 4 of 4

**EXHIBIT 20**

**(Thumb drive to be mailed)**



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DISTRICT

ANZHELIA PAYNE, personal
representative to the estate of
LANDON PAYNE,

        Plaintiff,

v.                       No. 6:22-CV-00471-MC

JAIRO SOLORIO, individual, ANDREW
ROBERTS, an individual, JACOB
THOMAS, an individual, ROBERT
GRIESEL, an individual, JUSTIN
WILSON, an individual, KIMBERLY
FULTON, an individual, EMMA
EDWARDS, an individual, COLTER
GAWITH, an individual, NATHAN GENT,
an individual, MICHAEL BAEUERLEN,
an individual, STEPHEN FOLEY, an
individual, JOSEPH FISHER, an
individual, JEREMY FIFER, an
individual, WILLIAM MCCLURE, an
individual, LANCE JESTER, an
individual, CLINT RILEY, an
individual, C. SANTINI, an
individual, LANE COUNTY, and CITY
OF EUGENE, a municipal corporation,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF

OFFICER JAIRO SOLORIO

TAKEN ON
MONDAY, SEPTEMBER 18, 2023
9:35 A.M.

EUGENE POLICE DEPARTMENT
300 COUNTRY CLUB ROAD
EUGENE, OREGON  97401

Exhibit 21
Page 1 of 8

```
 1   correct?

 2        A.   Yes.

 3        Q.   And why didn't you transport him to the

 4   hospital?

 5        A.   Because medics arrived on scene after he

 6   had been tased and evaluated him, and they cleared

 7   him to go to the -- over hospital to the jail.

 8        Q.   Do you know which medic?

 9        A.   I don't.

10        Q.   Do you know the Springfield and Eugene

11   EMTs?

12        A.   Do I know them?

13        Q.   Yeah.  Do you know some of them?

14        A.   No.

15        Q.   You don't know any of them?

16        A.   No.

17        Q.   Do you remember which ambulance or engine

18   showed up?

19        A.   No.

20        Q.   What did the EMTs do to clear Landon

21   Payne, as you described it?

22        A.   I don't know.  I don't remember.

23        Q.   Did they check his vitals?

24        A.   I don't know.

25        Q.   Why were EMTs dispatched to clear Landon
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Exhibit 21
Page 2 of 8

Jairo Solorio Ofc    September 18, 2023    NDT Assgn # 68572

1    Payne before leaving the scene?

2        A.   To get medically evaluated before going to

3    the jail.

4        Q.   But why?

5        A.   Because he had been tased.

6        Q.   So who told you that Landon Payne was

7    clear?

8        A.   I don't remember.

9        Q.   Did Sergeant Griesel tell you that?

10       A.   I wouldn't be able to tell you.  I don't

11   remember who told me.

12       Q.   But as the transporting officer who -- you

13   know, as the -- as the officer who drove Landon

14   Payne from the scene to the jail, you would not have

15   left the scene with him unless he had been medically

16   cleared, correct?

17       A.   Yes, unless he was medically cleared by

18   the medics that were on scene.

19       Q.   Okay.  So what -- what's the procedure?

20   Is the medic supposed to tell you that he's been

21   cleared?

22       A.   Yeah.  Typically, once they do their job,

23   they let an officer know, and then that person gets

24   transported to the jail.

25       Q.   So in this case, were you the officer that

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 21
Page 3 of 8

1  they let know that Landon had been cleared?

2      A.   I don't remember if they told me.

3      Q.   I'm just trying to figure out where you

4  got this clearance information.  Was it directly

5  from the EMTs or was it from another officer on

6  scene?

7      A.   I don't remember who told me.  Yeah, I

8  can't remember who told me.

9      Q.   But you're sure that somebody told you?

10     A.   Yes.  Yes, that's my understanding that

11  somebody told me.

12     Q.   Did you have any expectation that staff at

13  the Lane County Jail were going to medically

14  evaluate or clear Landon Payne that night?

15     A.   Yes.

16     Q.   Why did you think that?  If he'd already

17  been cleared, why did you think that?

18     A.   Because that's what they do.  Those are

19  their procedures.

20     Q.   Were you relying on the jail to medically

21  evaluate Landon Payne in lieu of the EMT evaluation?

22          MS. MORROW:  Objection, misstates prior

23  testimony.  Go ahead.

24          THE DEPONENT:  No.

25          (WHEREUPON, Exhibit 142 was marked for

NAEGELI
DEPOSITION & Trial
(800)528-3335
NAEGELIUSA.COM

Exhibit 21
Page 4 of 8

```
 1       Q.   At some point.  Do you give them to the
 2  city?
 3       A.   No, not unless they ask for them.
 4       Q.   The city doesn't have a policy where they
 5  keep those?
 6       A.   They might.  I keep them, so I guess
 7  that's -- I work for the city.
 8            (WHEREUPON, Exhibit 144 was marked for
 9  identification.)
10  BY MR. LARWICK:
11       Q.   Let's take a look at Exhibit 144.  Do you
12  recognize Exhibit 144, what it depicts?
13       A.   Yes.
14       Q.   What is it?
15       A.   It's Landon sitting in the back of my
16  patrol car, and it appears to be me in the trunk of
17  the patrol car.
18       Q.   So that scene probably took place once you
19  arrived to the jail?
20       A.   Yes.
21       Q.   And that's called the sally port.  Do you
22  call it the "sally port," the jail?
23       A.   Yes, yes.
24       Q.   How would you describe Landon Payne's
25  behavior while you were driving him to the jail?
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 21
Page 5 of 8

1    A.    He had very erratic behavior, a lot of

2  screaming or yelling, like outbursts.

3    Q.    Anything else?

4    A.    I can't add anything else.

5    Q.    After he -- so after Landon Payne had been

6  tased and arrested, did you ever hear him say, like,

7  a complete sentence following that?

8    A.    I don't remember if he said -- or if I

9  heard him say anything like a complete sentence.

10  Yeah, I don't remember.

11    Q.    Did you have a conversation with him while

12  you were driving to the jail?

13    A.    I don't remember if I had a conversation

14  with him.

15    Q.    Did he say anything to you that was

16  intelligible during that drive to the jail?

17    A.    I don't remember.

18    Q.    While you -- while he was in your car and

19  you were driving him to the jail, did you think that

20  Landon Payne understood anything that you said to

21  him?

22    A.    I think he still understood anything that

23  I would say to him.

24    Q.    What makes you think that?

25    A.    Because other than him still showing the

1      Q.   When you say "him," who are you --

2      A.   Landon, sorry.

3      Q.   Do you -- you remember Landon saying

4  something about having difficulty breathing?

5      A.   I don't remember if it was difficulty

6  breathing.  I just remember before putting him in

7  the car -- maybe it was an officer, maybe it was

8  Landon -- but I remember someone saying something

9  about breathing.  Yeah.

10     Q.   Did that comment about the difficulty

11  breathing or something about breathing, did that

12  cause you to have any concerns about Landon Payne's

13  health?

14     A.   No.

15          (WHEREUPON, Exhibit 145 was marked for

16  identification.)

17  BY MR. LARWICK:

18     Q.   All right.  Let's turn to Exhibit 145.

19  Exhibit 145 shows the City of Eugene police vehicle

20  that you were driving that night, correct?

21     A.   It appears to be.

22     Q.   Is there a number on it?

23     A.   Yeah, I can't read it.  I think it's 140-

24  something, looks like it might be an eight.

25     Q.   So the person over in the far left of

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 21
Page 7 of 8

```
1                            CERTIFICATE

2

3          I, Ryan Batterson, do hereby certify that I

4     reported all proceedings adduced in the foregoing

5     matter and that the foregoing transcript pages

6     constitutes a full, true and accurate record of said

7     proceedings to the best of my ability.

8

9          I further certify that I am neither related

10    to counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    9th day of October, 2023.

15

16

17

18    _____

19                  Ryan Batterson

20

21

22

23

24

25
```

Exhibit 21
Page 8 of 8