UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

ANZHELIKA PAYNE,                                    Case No. 6:22-cv-00471-MC

           Plaintiff,                          AMENDED OPINION AND
ORDER

       v.

CITY OF EUGENE, ET AL.

          Defendants.

_____

MCSHANE, Judge:

     Plaintiff Anzhelika ("Angie") Payne brings this civil rights and state tort action against the City of Eugene, Sergeant Griesel, and Officer Solorio ("City Defendants" or "the City") as well as Lane County, Deputy (Zachery) Fulton, Deputy Fifer, Deputy Santini, Deputy Baeuerlen, Deputy Wilson, Deputy Gent, and Deputy McClure ("County Defendants" or "the County").[1] The City and County Defendants move for summary judgment on Plaintiff's claims. City Def.'s Mot. Summ. J., ECF No. 45; Cnty. Def.'s Mot. Summ. J., ECF No. 57. Following summary judgment briefing, Plaintiff moved to amend her First Amended Complaint ("FAC"). Pl.'s Mot. Am., ECF No. 74.[2] Plaintiff's Motion is DENIED. City Defendants' Motion is GRANTED in part and DENIED in part. County Defendants' Motion is GRANTED in part and DENIED in part.

---

[1] Plaintiff voluntarily withdrew several claims and defendants in her Oppositions to Defendants' Motions for Summary Judgment. Pl.'s Resp. to Cnty. Def.'s Mot. Summ. J. 4, ECF No. 61; Pl.'s Resp. to City Def.'s Mot. Summ. J. 2, ECF No. 66. Seeing no objection, this Court proceeds accordingly.
[2] Plaintiff also moved for partial summary judgment as to Defendants' affirmative defenses. Pl.'s Mots. for Partial Summ. J., ECF No. 41, 43. The Court will address those defenses prior to trial, but not at this stage.

## BACKGROUND

This case arises out of the death of Mr. Landon Payne. On March 27, 2020, Eugene Police Department ("EPD") Officers responded to a 911 call by Angie Payne asking for assistance with her husband, Mr. Payne, who was experiencing a mental health crisis and believed to be under the influence of drugs, later determined to be methamphetamine. Mr. Payne was unarmed and was under the delusion that his family was trying to harm him. Thirty minutes after their arrival, EPD officers decided to arrest Mr. Payne on an unconfirmed warrant from Marion County for unpaid child support. Without warning, two officers approached Mr. Payne to apprehend him. Mr. Payne, perhaps not fully understanding what was happening, pulled his arms up and away. Within seconds, Mr. Payne was prone on the ground and tazed four to five times over the next two minutes. Mr. Payne told the officers he could not breathe, while officers told Mr. Payne not to resist. Following his arrest, Mr. Payne was moved to a police cruiser where his pale face, profuse sweat, and unintelligible groans were captured on video.

EPD Officers called EMTs to evaluate Mr. Payne. The EMTs were unable to obtain vitals to medically clear Mr. Payne. EPD Sergeant Griesel spoke with EMTs and decided that a medical evaluation could be conducted by County medical staff at the jail prior to booking. Sergeant Griesel testified that one of the medics told him it was "safe to transport [Mr. Payne] to the jail." Decl. of Andrea Coit ("Coit Decl."), Ex. 4, ECF No. 58-4. The EMT report, however, notes that "after conferring with EPD over inability to obtain vitals . . . EPD decided to transport to the jail[.]" *Id.* at Ex. 3, ECF No. 58-3.

Sergeant Griesel directed Officer Solorio to transport Mr. Payne to Lane County jail but did not inform him that EMTs did not medically clear Mr. Payne. Officer Solorio believed Mr. Payne had been medically cleared. Multiple people, including Mrs. Payne and CAHOOTS

workers, expressed concern for Mr. Payne's health and questioned whether officers were going to have Mr. Payne medically evaluated before taking him to jail.

Officer Solorio informed Lane County deputies that he was bringing in an uncooperative arrestee on an outstanding warrant from Marion county, as well as for resisting arrest. He informed the deputies that Mr. Payne had been tased. Officer Solorio did not inform deputies about Mr. Payne's mental health crisis, that his state had significantly changed since being tased, or that he had not received a medical evaluation since being tased.

At the jail, several deputies removed a handcuffed Mr. Payne from the EPD vehicle. A total of 12 Lane County officers and three EPD officers were nearby. Mr. Payne either fell or was placed face down on the ground, where seven to eight deputies applied varying degrees of pressure to his arms, legs, head, and back. The deputies intended to subdue Mr. Payne to take his temperature pursuant to the jail's new COVID-19 protocols and secure leg irons because Mr. Payne was kicking his feet. About 15 seconds after being placed on the ground under the officers' weight, Mr. Payne exasperated, "I cannot breathe." The officers maintained pressure on Mr. Payne's body. About 90 seconds after Mr. Payne was removed from the vehicle, one or more deputies noticed that Mr. Payne lost consciousness. Deputies Santini, Baeuerlen, Wilson, Gent, Fulton, and McClure, as well as two jail nurses, performed unsuccessful CPR on Mr. Payne, who remained handcuffed. During the resuscitation efforts, periods of time passed with no compression or ventilation.

Mr. Payne was unconscious for over nine minutes before EMTs arrived. About an hour after Mr. Payne was taken from his home, Mrs. Payne received a phone call from Officer Solorio, who reported that Mr. Payne "collapsed" at the jail and was transported to the hospital. Mr. Payne died in the hospital on March 29, 2020. His death certificate lists the manner of death as

"undetermined" and the cause of death as "anoxic encephalopathy due to resuscitated cardiopulmonary arrest during restraint by law enforcement."[3]

## STANDARDS

### I.    Motion for Leave to Amend

District courts have significant discretion when considering leave to amend and should grant leave "when justice so requires." *DCD Progs., Ltd. v. Leighton*, 833 F.2d 183, 185–86 (9th Cir. 1987); Fed. R. Civ. P. 15. Leave to amend should be given absent a strong showing of prejudice, undue delay, bad faith, futility, or where a previous amendment failed to cure the deficiencies. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Undue prejudice to an opposing party is given the greatest weight, and its presence alone is sufficient to deny leave to amend. *Id.* Conversely, undue delay by itself is insufficient grounds for denial. *DCD Progs., Ltd.*, 833 F.2d at 186.

### II.    Summary Judgment

This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court reviews evidence and draws inferences in the light most favorable to the nonmoving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (citation omitted). When the moving party has met its burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted; emphasis in original). An issue is "genuine" if a reasonable jury could find in favor of the

---

[3] In emails between Medical Examiner Dr. Daniel Davis and Lane County District Attorney Erik Hasselman, Davis indicated his original intent to classify the manner of death as "homicide." Decl. of Derek Larwick ("Larwick Decl."), Ex. 13, ECF No. 62-13.

nonmoving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). A fact is "material" if it could affect the outcome of the case. *Id.*

## DISCUSSION

### I.  **Plaintiff's Motion for Leave to Amend**

Plaintiff moved to amend her complaint after the parties briefed summary judgment motions. Plaintiff's proposed amendments can be categorized four ways: (1) the withdrawal of several claims and individually named defendants; (2) a rearticulation of policies and customs in support of her *Monell* claim against the County; (3) a new negligence theory of liability for Defendant Solorio's failure to intervene at the Lane County jail; and (4) clarifications to her negligence claim against County Defendants for failure to perform proper resuscitation and CPR. Most of Plaintiff's proposed amendments do not create new claims and merely reflect Plaintiff's effort to clarify her theories of liability in light of misunderstandings shown in Defendants' summary judgment motions, discussed below. Plaintiff denies the existence of bad faith, undue delay, futility, and prejudice. Defendants oppose Plaintiff's Motion and argue the amendments are prejudicial, futile, and the result of undue delay. This Court agrees, and finds that the amendments are unduly delayed, prejudicial, and otherwise unnecessary to afford Plaintiff justice for her alleged harms. Plaintiff's Motion is DENIED.

Plaintiff's FAC, filed amidst discovery in January 2024, is the operative complaint. Discovery closed in May 2024 and the parties filed summary judgment motions in July 2024. Plaintiff's Motion for Leave was not filed until September 2024. Plaintiff states that she became aware of actionable claims in June 2021 but did not become aware of additional theories of liability until May 2023 after viewing video footage from the jail for the first time.

Moving for leave to amend after the close of discovery and during the pendency of four summary judgment motions reflects undue delay. *Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d 435, 443 (9th Cir. 1991). Proposed amendments should be filed in a reasonable time after a party knew or should have known the relevant facts and theories for an amendment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1388 (9th Cir. 1990) (eight-month delay is unreasonable). Plaintiff filed her FAC in January 2024—a clear opportunity to correct or add theories of liability—several months after viewing the video footage and conducting depositions, two-and-a-half years after first learning about the events at the jail, and almost four years after Mr. Payne's death.

Granting Plaintiff's Motion would unduly prejudice Defendants, particularly Defendant Solorio. The FAC contains no allegations that Defendant Solorio failed to intervene at the jail, leaving Defendants unable to address this claim in discovery or at summary judgment. During his deposition, Defendant Solorio was not asked a single question regarding his acts or omissions at the jail after Mr. Payne was removed from the EPD vehicle. *See* Larwick Decl., Ex. 25, ECF No. 62-25. The need to reopen discovery could delay a trial date and increase litigation costs. *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). Raising this new theory of liability at "the eleventh hour" is unduly prejudicial. *Roberts v. Ariz. Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981).

What Plaintiff calls a "good faith effort" to streamline and clarify her claims is mistimed, needless, prejudicial, and burdensome on the Court. Most of the changes are immaterial and, as discussed below, Plaintiff's remaining claims were properly alleged in her FAC such that justice does not require the Court to allow Plaintiff's amendments. Plaintiff's Motion is DENIED.

II.    **City Defendants' Motion for Summary Judgment**

Plaintiff voluntarily withdrew all claims against the City except a broadly pleaded negligence claim. The parties' briefs and representations at oral argument demonstrate a failure to confer to understand Plaintiff's legal theories. The City Defendants never sought clarification on Plaintiff's negligence theories by moving to dismiss for failing to state a clear claim. They did not move for a more definite statement or a bill of particulars. Instead, the City presumed Plaintiff's negligence claim as centered on the City's failure to transport Mr. Payne to the hospital. They now argue that Plaintiff is not permitted to raise new negligence theories at summary judgment.

At oral argument, Plaintiff's counsel confirmed that the negligence claim against the City is based on three theories: (1) failure to transport Mr. Payne to the hospital; (2) failure to inform the County of Mr. Payne's altered mental and physical state and lack of medical clearance post-tasing; and (3) Officer Solorio's failure to intervene at the jail. Because the Court denies Plaintiff's proposed amendments alleging Solorio's failure to intervene, the Court addresses only the first two theories. The first theory, for failure to transport Mr. Payne to the hospital, is time-barred by the OTCA, while the second theory survives summary judgment.

a.    **Failure to Transport to the Hospital**

Plaintiff's negligence claim against the City for failure to transport Mr. Payne to the hospital is time-barred by the OTCA. Under the OTCA, plaintiffs have one year after an alleged loss or injury to provide notice for a wrongful death claim. ORS § 30.275(2)(a)–(b). Plaintiff filed her initial complaint on March 27, 2022, two years after Mr. Payne's arrest and death. Plaintiff claims that she did not know or have reason to know that EPD officers acted in a way that was negligent and contributed to her husband's injury and death until June 2021. Decl. of Derek Larwick, Ex. 1, ECF No. 42-1.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff knew or should have known of this claim on or around March 27, 2020, making her March 27, 2022 complaint untimely. Plaintiff was present when the officers decided to take Mr. Payne to jail rather than the hospital; Plaintiff told a detective in April 2020 that she thought Mr. Payne was about to have a heart attack and that "more could have been done for [him] if he had been immediately transported to the hospital instead of the jail"; and Plaintiff knew Mr. Payne "collapsed" at the jail and subsequently died. Larwick Decl., Ex. 24, at 2, ECF No. 62-24. This negligence theory is time-barred as a result.

### b. **Failure to Inform the County**

At oral argument, Plaintiff's counsel clarified that Plaintiff's negligence claim against the City is also premised on the negligent transfer of custody and failure to inform the County of crucial information related to Mr. Payne's medical needs. After Mr. Payne was tased four to five times in a two-minute period, EPD summoned medics to evaluate him. The medics were unable to do so because Mr. Payne was uncooperative. There is a dispute as to whether medics told EPD it was safe to take Mr. Payne to jail, in large part because Sergeant Griesel muted his bodycam during his conversation with the medics, in violation of EPD policy. *Compare* Larwick Decl. Ex. 5, ECF No. 62-5 (EMT report noting that "after conferring with EPD over inability to obtain vitals . . . EPD decided to transport to the jail and have him evaluated on arrival"), *with* Decl. of Robert Griesel 2, ECF No. 46 ("The medics nonetheless informed us that Payne could safely be transported to jail."). Sergeant Griesel directed Officer Solorio to take Mr. Payne to jail without informing Solorio that medics did not assess Mr. Payne's vital signs. As a result, Officer Solorio believed that Mr. Payne had been medically cleared and did not provide much of the information

relevant to Mr. Payne's fragile health to the County deputies, who approached the situation only with the knowledge that they were dealing with an uncooperative detainee.

City Defendants have not addressed the merits of this claim. Plaintiff's FAC, though broadly pled, was sufficient to put the City on notice of this claim. *See* FAC ¶¶ 80–90, 96–97, 173–77 ("[Officer Solorio] did not inform [the jail] of Mr. Payne's mental health crisis past or present or, that he had not received a medical evaluation or clearance yet"; "Defendants' actions created an unreasonable and foreseeable risk of injury to Mr. Payne"). The parties' failure to confer on and brief this matter leaves the Court with insufficient arguments before it to grant judgment as a matter of law. Plaintiff's negligence claim against the City for its alleged failure to inform the County of Mr. Payne's medical needs remains viable when viewed in light of the facts most favorable to Plaintiff.

## III.   <u>County Defendants' Motion for Summary Judgment</u>

Plaintiff raises a genuine dispute of fact as to whether Deputies Fulton and Santini used excessive force in violation of Mr. Payne's clearly established constitutional rights. Plaintiff's excessive force claim survives summary judgment as to those Defendants. Plaintiff fails to prove that the County had a widespread policy or practice that was deliberately indifferent to Mr. Payne's constitutional rights, so her *Monell* claim fails as a matter of law.

### a.   <u>Excessive Force</u>

Plaintiff challenges the force used by Lane County deputies while restraining a handcuffed and prone Mr. Payne. In her Opposition, Plaintiff removes all individual defendants except Deputies Fifer, Fulton, and Santini. There is a genuine dispute of fact as to whether Deputies Fulton and Santini used an objectively reasonable amount of force on Mr. Payne, so summary judgment

as to these deputies is DENIED. Summary judgment on the excessive force claim against Deputy Fifer is GRANTED.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from excessive force; the analysis follows the Fourth Amendment's objective reasonableness standard. *Kingsley v. Hendrickson*, 576 U.S. 389, 397–99 (2015). This Court asks whether the force used by the County deputies was greater than what was "objectively reasonable" under the totality of the circumstances. *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). To do this, the Court balances the "nature and quality of the intrusion" on a person's liberty with the countervailing government interests. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). As here, when the subject of alleged excessive force has died, the Court carefully examines the evidence to determine if deputies' accounts of the events are "consistent with other known facts." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994). Excessive force cases often create questions of fact, so summary judgment "should be granted sparingly." *Santos*, 287 F.3d at 853.

As discussed below, the Sally Port and body cam footage, in combination with the deputies' testimony, raise genuine disputes of material fact regarding what happened as the deputies restrained Mr. Payne on the ground. Larwick Decl., Ex. 61, ECF No. 64-61 ("Sally Port"); Larwick Decl., Ex. 60, ECF No. 64-60 ("Baeuerlen BodyCam");[4] *see Spencer v. Pew*, 117 F.4th 1130, 1133 (9th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)) ("[T]o the extent that the uncontested video evidence from the officers' body cameras establishes the timing and occurrence of events, we 'view[ ] the facts in the light depicted by the videotape.'").

---

[4] The timestamp on the Baeuerlen BodyCam footage is roughly 58 minutes and 46 seconds behind the Sally Port video's time stamp.

### i.    The Amount of Force Used

To start, the Court looks to "the type and amount of force inflicted." *Drummond*, 343 F.3d at 1056. "[P]recedent establishes that the use of bodyweight compression on a prone individual can cause compression asphyxia." *Scott v. Smith*, 109 F.4th 1215, 1223 (9th Cir. 2024) (citing *Drummond*, 343 F.3d at 1056–57). "When the lungs are physically compressed and the person is prevented from breathing, the body becomes deprived of oxygen. The condition of depriving the body of oxygen is called asphyxia (or suffocation)." Larwick Decl., Ex. 1, at 3, ECF No. 62-1 ("Dr. Cronin Decl."). Ninth Circuit courts have repeatedly found that the use of body weight to restrain a handcuffed, prone, and agitated individual is severe, and may even be considered deadly force because of its substantial risk of death or serious bodily injury. *See, e.g.*, *Scott*, 109 F.4th at 1223; *Drummond*, 343 F.3d at 1056–67; *Garlick v. Cnty. of Kern*, 167 F.Supp.3d 1117, 1155 (E.D. Cal. 2016). These cases consider the pressure applied to a prone individual's back, which is particularly dangerous because it can compress the detainee's lungs and deprive them of oxygen. *See id.*

Plaintiff points to *Drummond*, where a mentally ill, compliant individual was handcuffed, prone, and repeatedly told two officers he could not breathe while they applied pressure to his neck and back for 20 minutes. 343 F.3d at 1054–55. The individual asphyxiated, sustained brain damage, and fell into a permanent vegetative state. *Id.* "[S]ome force was surely justified . . . so that [Drummond] could not injure either himself or the arresting officers. However, after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted." *Id.* at 1059.

Even more relevant is *Scott*, where two officers caused the death of an individual by restraining him on his stomach with his hands behinds his back. There, Scott was having a mental

health crisis and armed with a metal pipe and a knife, which he surrendered immediately. The officers decided to put Scott into a medical hold for his own safety and put him on his stomach with his arms restrained behind his back. One officer "put his weight on Scott's legs, restraining his lower body," and the other "put his bodyweight on Scott's back and neck for about one to two minutes." 109 F.4th at 1221. Evidence showed that Scott died from restraint asphyxia. The Ninth Circuit ruled that was "severe, deadly force" and excessive under the circumstances. *Id.* at 1223– 26. *Scott* demonstrates that it is not only the *duration* of the force, but also the *location*, that matters in restraint asphyxia cases, and that body weight pressure may be excessive even if it lasts one or two minutes.

Here, following his removal from the EPD vehicle, seven deputies placed Mr. Payne in a prone position, handcuffed and on his stomach. Five other officers stood by. Once on the ground, several deputies restrained Mr. Payne by holding down his legs, arms, and head. Deputies Fulton and Santini applied pressure to the upper right side of Mr. Payne's body while the jail nurse took his temperature, and continued restraint after the 11 seconds it took to do so. Four seconds after his temperature was taken and 15 seconds after being placed on the ground, Mr. Payne exasperated, "I cannot breathe." Baeuerlen BodyCam 22:11:45. Shortly after, Deputy Fifer positioned himself on Mr. Payne's right side. Deputy Fifer testified that he asked another deputy, determined to be Deputy Santini, to remove his knee "down off [Mr. Payne's] back." Larwick Decl., Ex. 66, at 35– 36, ECF No. 64-16 ("Fifer Dep."). The County concedes that Santini's knee applied pressure to Mr. Payne's "right arm" or "right flank" for as long as 18 seconds. Additionally, Deputy Fulton testified to placing his knee on Mr. Payne's right rhomboid (shoulder blade area) while using his hand to press Mr. Payne's head into the ground. Larwick Decl., Ex. 67, at 28–29, ECF No. 64-17 ("Fulton Dep."). Mr. Payne continued to grunt, shriek, and gasp for air for the next minute before

his body started twitching and he was rendered unconscious. Baeuerlen BodyCam 22:12:50; Sally Port 11:11:12.

Plaintiff alleges that Deputy Fifer kneeled on Mr. Payne's "left torso and arm." Deputy Fifer testified that he placed his knee *on the ground* in the crux between Mr. Payne's body and handcuffed arm. Fifer Dep. 34. The view of Deputy Fifer's knee placement is obscured throughout both videos, and the only other relevant testimony is Sergeant Jester's statement that he "couldn't see anybody that was putting pressure on [Mr. Payne's] back." Coit Decl., Ex. 6, at 14, ECF No. 58-6. Accordingly, the evidence establishes that Deputy Fifer's weight was not on Mr. Payne's back, so Plaintiff's claim against Deputy Fifer is dismissed.

On the other hand, the precise location, duration, and quantum of force used by Deputies Fulton and Santini is disputed, and the video footage, combined with deputy testimony, create a genuine issue of fact on this issue. *See* Fifer Dep. 35–36 (testifying that he asked another Deputy, later determined to be Santini, to remove his knee from Mr. Payne's back); Fulton Dep. 28–29 (testifying that he placed his knee on Mr. Payne's shoulder).

### ii. The Government's Interest

Turning to the governmental interest at stake, the County had a moderate interest in restraining, applying leg irons to, and taking the temperature of Mr. Payne to screen him for COVID-19. The Supreme Court provided a list of factors to consider when determining the government's interest, including the severity of the crime, whether the suspect was resisting arrest or attempting to escape, and most importantly, the threat posed by the detainee to officer or public safety. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "Other relevant factors include the availability of less intrusive alternatives to the force employed, . . . and whether it should have been apparent to officers that the person they

used force against was emotionally disturbed." *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

First, the severity of Mr. Payne's underlying crimes was minimal: both crimes, missing a child support hearing and resisting arrest, are misdemeanors in Oregon and unlikely to result in lengthy detention.

Second, there is a question of fact as to whether Mr. Payne was resisting. Plaintiff presents expert testimony, and the video seemingly corroborates, that Mr. Payne went unconscious after a period of agonal respirations and having stated, "I cannot breathe." Dr. Cronin Decl. 3. Several courts have cautioned against misinterpreting movement of limbs as active resistance when it may be more indicative of an individual's struggle to breathe. *See Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 467–68 (2021) (considering guidance "that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands"); *Garlick*, 167 F.Supp.3d at 1156–57 (finding a genuine issue of fact as to whether the detainee was passively resisting or actively resisting where plaintiff alleged that "Silva's movements trying to lift his chest and kicking his legs were not resistance but a sign of his struggle to breathe"); *see also Perkins v. Edgar*, 2022 WL 14476272, at *1 (9th Cir. Oct. 25, 2022) ("Perkins's body language and other facts surrounding the incident, taken in the light most favorable to the plaintiffs, including that Perkins was bleeding and handcuffed, had labored breathing, and had been mostly unresponsive to the Officers' questions, should have put the Officers on notice that he was having trouble breathing"). To this point, it was clear to at least Sergeant Jester that Mr. "Payne's breathing was labored." Coit Decl., Ex. 11, at 10, ECF 58-11. Determining whether Mr. Payne's conduct constitutes passive resistance, active resistance, or merely a struggle to breathe, is a question of fact. *See Bryan*, 630 F.3d at 830.

Third, and most importantly, the Court recognizes that Mr. Payne posed a minor threat to the deputies, as testimony and video evidence shows he was "thrashing around, his whole body was not in control," and he was kicking his legs, though not directly at any deputy. *See, e.g.*, Coit Decl., Ex. 6, at 10, ECF No. 58-6. The County followed its policy of placing combative inmates in leg cuffs before booking, as a security precaution for staff and other inmates. But Mr. Payne was already handcuffed and held in the backseat of the EPD vehicle when deputies chose to remove him. Once removed and placed on the ground, Mr. Payne posed only a minimal threat to the twelve nearby deputies. *See Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014) ("Green was also considerably outnumbered, which counts against a finding that she posed a threat to the multiple officers at the scene."); *Drummond*, 343 F.3d at 1057–58 (a jury can reasonably find that an individual on their stomach with arms cuffed behind their back poses "only a minimal threat to anyone's safety"). There is no evidence that any deputy feared for his or her safety.

Fourth, viewing the facts in the light most favorable to Plaintiff, and assuming that at least two deputies placed significant pressure on Mr. Payne's back, less intrusive alternatives were available—the most obvious being to not place any pressure on Mr. Payne's torso.

And fifth, it arguably should have been apparent to officers that Mr. Payne was emotionally disturbed. Mr. Payne's unintelligible grunts and screams could have indicated to a reasonable officer his fragile and agitated mental and physical state. *See Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001) ("[T]he governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual").

### iii.  The Reasonableness of Force Used

As the final step in the excessive force analysis, the Court balances the "nature and quality of the intrusion" on Mr. Payne's liberty with the County's interest. The Court is cognizant that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Viewing the facts in the light most favorable to Plaintiff, the County's moderate interest did not justify the severe force of pressure on Mr. Payne's back.

Here, EPD Officer Solorio informed the County deputies only that he was bringing in an uncooperative male who had been tased. Mr. Payne was handcuffed in the back of a police vehicle, unarmed, agitated, shrieking, and unintelligible. Seven county deputies then placed him in the prone position, where he was held down with severe force on his back, despite agonal respirations and exclaiming that he could not breathe. As in *Scott* and *Drummond*, a reasonable jury could find that the force used was unconstitutionally excessive when considering the moderate government interest and minimal threat posed by Mr. Payne. Factual disputes surrounding the duration, location, quantum of force, and what was known or should have been known by deputies during Mr. Payne's apprehension preclude judgment as a matter of law.

### b.  Qualified Immunity

The same questions of fact on excessive force create questions of fact on qualified immunity. Citing *Drummond*, Plaintiff frames Mr. Payne's violated right as one to be free from excessive force while handcuffed and prone.

Qualified immunity shields law enforcement from liability for constitutional violations unless "the unlawfulness of their conduct was 'clearly established at the time'" of the violation. *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (citations omitted). "For a constitutional

right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," but precedent must place the question "beyond debate." *Id.* at 741; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

As discussed above, a reasonable jury could find that Deputies Fulton and Santini's actions were objectively unreasonable and violated Mr. Payne's constitutional right.

This Court concludes that *Drummond* and its progeny through March 27, 2020, put Deputies Fulton and Santini on notice that their disputed actions—applying pressure to the back of a handcuffed, prone, agitated individual who was struggling to breathe—were unlawful. *See, e.g.*, *Drummond*, 343 F.3d at 1059 ("The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable"); *Wallisa v. City of Hesparia*, 369 F.Supp.3d 990, 1013 (C.D. Cal. 2019) ("It is also clearly established that pressing weight onto the back of a prone and helpless arrestee, particularly as he begs for air, constitutes excessive force."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("[I]t also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.").

Mr. Payne's case is distinguishable from *Drummond*, but the Court still believes that the deputies were on notice that applying pressure to the back of a prone, handcuffed individual who was struggling to breathe was constitutionally excessive. Like Drummond, Mr. Payne was unarmed, handcuffed, agitated, and on his stomach, with the weight of multiple officers applied to

his body. Like Drummond, Mr. Payne told the deputies "I cannot breathe." On the other hand, Mr. Payne was restrained for only 90 seconds before going unconscious, did not have weight applied directly to his neck, and debatably, did not demonstrate the same degree of compliance. The officers' actions in *Drummond* were certainly more egregious, but the circumstances here are similar enough that Deputies Fulton and Santini knew or should have known not to place pressure on Mr. Payne's back during those moments. Additionally, here, as in *Drummond*, the deputies were trained to know that placing pressure on a subject's back or neck may result in asphyxia, which further indicates that the deputies should have known that this conduct was unreasonable. *See Drummond*, 343 F.3d at 1062 (finding police training materials relevant to whether officers were on notice that the force used was objectively unreasonable).

Several unpublished Ninth Circuit decisions also find cases with slight factual variations from *Drummond* to fall within that case's orbit. *See, e.g., Perkins*, 2022 WL 14476272, at *1 (9th Cir. Oct. 25, 2022) (mem.) (denying qualified immunity under *Drummond* where officers "placed their body weight, including Officer Reynoso's right knee, onto Perkins's back and neck area while Perkins lay handcuffed on his stomach"); *Zelaya v. Las Vegas Metro. Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017) (mem.) (same, where three officers continued to pin plaintiff for 90 seconds after he was handcuffed and stopped resisting); *Abston v. City of Merced*, 506 F. App'x 650, 652 (9th Cir. 2013) (mem.) (same, where defendants used "body compression to restrain a prone and bound suspect" even when there was a dispute as to whether plaintiff meaningfully resisted); *Tucker v. Las Vegas Metro. Police Dep't*, 470 Fed. App'x 627, 629 (9th Cir. 2012) (mem.) (same, where two officers used "body pressure to restrain a delirious, prone, and handcuffed individual who pose[d] no serious safety threat"). Though not precedential, those cases guide this Court's holding.

If Deputies Fulton and Santini placed pressure on Mr. Payne's back beyond the minimal force warranted, as disputed testimony and video footage may show, that could evidence the violation of a clearly established right made clear in *Drummond* and elsewhere. Accordingly, those deputies are not entitled to qualified immunity at this stage.

### c. ***Monell* Claim**

Plaintiff withdrew all but one of her *Monell* theories, leaving one practice for consideration: "kneeling on restrained inmates/arrestees." Plaintiff presents a muddled articulation of a *Monell* claim, and confusingly aggregates theories of liability for the County's policy and its failure to train, both of which fail as a matter of law. Summary judgment on Plaintiff's *Monell* claim is GRANTED.

A municipality is liable for an injury caused by its employees only if execution of a policy or custom inflicts the injury. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiff must show that: (1) Mr. Payne was deprived of a constitutional right; (2) Lane County had a policy or custom; (3) the policy or custom amounts to deliberate indifference to Mr. Payne's constitutional rights; and (4) the policy or custom was the moving force behind the violation. *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citations omitted). To demonstrate deliberate indifference, Plaintiff must show that the County consciously disregarded the known or obvious consequence that a particular act or omission would cause its employees to violate individuals' constitutional rights. *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted).

### i. **Failure to Train**

To demonstrate deliberate indifference through a failure to train, it is "ordinarily necessary" to show a pattern of similar constitutional violations by untrained employees. *Connick v.*

19 – AMENDED OPINION AND ORDER

*Thompson*, 563 U.S. 51, 62 (2011). Alternatively, Plaintiff may show that the unconstitutional consequences of failing to train are patently obvious. *Id.* at 63.

Plaintiff fails to put forth any evidence that Lane County acted with deliberate indifference. To the contrary, the County's use of force policy reflects its awareness of restraint asphyxia and efforts to minimize its risks, providing that a "restrained person will be placed in a position that will minimize restraint asphyxia," and that the person's breathing will be monitored. Larwick Decl., Ex. 70, at 8, ECF No. 64-20 ("G.O. 1.12"). Almost every deputy deposed in this case testified to being trained on positional asphyxia prior to this incident. *See, e.g.*, Larwick Decl., Ex. 66, at 25, ECF No. 64-16 (Fifer testifying that deputies are trained not to put pressure on the neck or back because of "positional asphyxia"); *Id.* at Ex. 65, at 20, ECF No. 64-15 (Gawith testifying that the County provided training on positional asphyxia including "[t]hat individuals should only be placed in a prone position for a short period of time" and not to put pressure on their neck or back); *Id.* at Ex. 68, at 79, ECF No. 64-18 (Santini testifying that he understood at the time not to put excessive pressure on someone's upper body to avoid positional asphyxia); *Id.* at Ex. 69, at 29–30, ECF No. 64-19 (Grotefund testifying that positional asphyxia has "been discussed in multiple trainings"); *Id.* at Ex. 71, at 122, ECF No. 64-21 (Riley testifying that the County discusses positional asphyxia); *Id.* at Ex. 72, at 24, ECF No. 64-22 (McClure testifying that he had a class in positional asphyxia); *Id.* at Ex. 73, at 60–61, ECF No. 64-23 (Gent testifying that he had training in positional asphyxia); *Id.* at Ex. 74, at 29–30, ECF No. 64-24 (Wilson testifying that he had training on positional asphyxia); *Id.* at Ex. 76, at 69–74, ECF No. 64-26 (Jester testifying that County employees are trained not to put weight on someone's back to avoid positional aspyxhia); *but see id.* at Ex. 64, at 56, ECF No. 64-14 (Baeuerlen testifying that he did not believe he received any training on positional asphyxia); *Id.* at Ex. 67, at 30–31, ECF No. 64-17 (Fulton testifying that

"[a]t that time positional asphyxia wasn't really a conversation we were having" and that the County started discussing it "maybe a year or some time after this event"). Other testimony suggests that positional asphyxia was a regularly covered topic in annual classes required of every deputy in the jail. *Id.* at Ex. 66, at 41, ECF No. 64-16 (Fifer testifying that training on positional asphyxia is "recurring" and "covered once a year").

The deputies' awareness of risks associated with how Mr. Payne was apprehended is apparent in the evidence. For example, Sergeant Jester positioned himself at Mr. Payne's head and watched for anyone putting pressure on Mr. Payne's back, and Deputy Fifer asked Deputy Santini to reposition his knee "off of [Mr. Payne's] back" when he noticed its location. *Id.* at Ex. 76, at 69, ECF No. 64-26 (Jester testifying that he "looked right down [Mr. Payne's] centerline as [Jester] was kneeling at his head" and "couldn't see anybody that was putting pressure on his back"); *id.* at Ex. 66, at 35–36, ECF No. 64-16 (Fifer testifying that he asked another deputy, "Can you move your knee down off of his back?" even though he "didn't see the deputy putting much weight on Mr. Payne," because he "wanted to make sure that there was nothing on his back").

With these facts before it, no reasonable jury could find that the County was deliberately indifferent to its detainees' constitutional rights because it failed to train its deputies. *See, e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989) ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."); *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (holding that practice must be "widespread" and proof of a single inadequately trained employee was insufficient); *Doughtery v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("Mere negligence in training or supervision, however, does not give rise to a *Monell* claim.").

### ii. **Policy, Practice, or Custom**

The Court understands Plaintiff's other argument to be that the County failed to implement procedural safeguards to prevent excessive force violations like the one allegedly endured by Mr. Payne. Plaintiff may recover from the County if it expressly adopted an official policy or had a widespread or longstanding practice or custom that is either unlawful in itself or directs employees to act unlawfully. *Endy v. Cnty. of L.A.*, 975 F.3d 757, 769 (9th Cir. 2020). To prove deliberate indifference in this context, Plaintiff must show that Lane County was on actual or constructive notice that its failure to implement adequate policies was substantially certain to result in its deputies' use of excessive force. *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016) (quoting *City of Canton*, 489 U.S. at 392).

Plaintiff makes no showing of even one other violation like Mr. Payne's committed by Lane County, nor does she establish that the County's policy directs employees to act unlawfully. As the County accurately states, "not all kneeling on detainees presents constitutional issues." The County's policy expects deputies "to utilize *the force reasonable*, given the information the deputy has at the time, to overcome resistance." G.O. 1.12, at 4 (emphasis added). As discussed above, the only unconstitutional conduct at issue is kneeling on Mr. Payne's back, and the County has policies and training in place to prevent such conduct. *See id.* at 8 (requiring that detainees be "placed in a position that will minimize restraint asphyxia," and providing for other safeguards such as monitored breathing). Accordingly, Plaintiff has not established that this policy caused the deputies to act in a way that violated Mr. Payne's constitutional rights.

### d. **Negligent Resuscitation and CPR Efforts**

Plaintiff's counsel clarified at oral argument that Plaintiff's negligence claim against the County is premised on the County deputies' allegedly negligent resuscitation efforts. Plaintiff's expert, Dr. Kimberly Cronin, testified that

> [Mr. Payne] was not resuscitated properly in a timely manner, and he experienced permanent brain damage that led to his death. The resuscitation efforts of deputies in the jail were inadequate as evidenced by lack of ventilation efforts for six minutes or more and periods of time without compressions. Those acts in particular are what caused [Mr. Payne's] anoxic encephalopathy (oxygen-deprived brain damage).

Dr. Cronin Decl. 3–4. County Defendants have not addressed the merits of this claim, and only argue that the claim is procedurally inadequate and prejudicial. This Court finds that Plaintiff's First Amended Complaint, though broadly pled, was sufficient to put County Defendants on notice of this claim. FAC ¶¶ 113, 173–77 (alleging that deputies gave Mr. Payne CPR and that Defendants' actions violated the standard of care). Once again, the parties' failure to confer leaves this Court with insufficient arguments before it to grant judgment as a matter of law. Plaintiff's negligence claim against the County and Deputies Santini, Baeuerlen, Wilson, Gent, Fulton, and McClure for their alleged failure to properly resuscitate Mr. Payne will go to the jury.

## <u>CONCLUSION</u>

For the reasons discussed above, Plaintiff's Motion for Leave to Amend (ECF No. 74) is DENIED, City Defendants' Motion (ECF No. 45) is GRANTED in part and DENIED in part, and County Defendants' Motion (ECF No. 57) is GRANTED in part and DENIED in part. The Court allows Plaintiff to voluntarily withdraw claims and dismiss parties as set forth in this Order.

IT IS SO ORDERED.

DATED this 30th day of January 2025.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge
